**THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

NEW JERSEY CARPENTERS VACATION
FUND and BOILERMAKER BLACKSMITH
NATIONAL PENSION TRUST, *on Behalf of
Themselves and All Others Similarly Situated,*

     Plaintiffs,

    *v.*

THE ROYAL BANK OF SCOTLAND GROUP,
PLC, GREENWICH CAPITAL HOLDINGS,
INC., GREENWICH CAPITAL ACCEPTANCE,
INC., GREENWICH CAPITAL FINANCIAL
PRODUCTS, INC., ROBERT J. MCGINNIS,
CAROL P. MATHIS, JOSEPH N. WALSH, III,
JOHN C. ANDERSON, JAMES M. ESPOSITO,
RBS SECURITIES, INC. f/k/a GREENWICH
CAPITAL MARKETS, INC., d/b/a RBS
GREENWICH CAPITAL, MOODY'S
INVESTORS SERVICE, INC. and THE
MCGRAW-HILL COMPANIES, INC.,

     Defendants.

---

Case No.: 08-CV-5093 (HB)

**CONSOLIDATED FIRST
AMENDED SECURITIES CLASS
ACTION COMPLAINT**

<u>**ECF CASE**</u>



# TABLE OF CONTENTS

I.  SUMMARY OF THE ACTION ............................................................................1

II.  JURISDICTION AND VENUE ........................................................................10

III.  PARTIES AND RELEVANT NON-PARTIES ...............................................10

IV.  BACKGROUND ..............................................................................................18

    A.  Greenwich Capital Emerges as a Major Issuer
        and Underwriter of Mortgage-Backed Securities ..................................18

    B.  Greenwich Capital's Securitization and Underwriting Operations ......20

        1.  Greenwich Capital's Bulk-Loan
            Purchases from Third-Party Originators.....................................21

        2.  S&P's and Moody's Roles in Greenwich
            Capital's Bid on Loans Purchased at Auction ...........................21

        3.  Greenwich Capital's Loan File "Due Diligence"
            Between Acceptance of Auction Bid and Settlement ..................24

    C.  Greenwich Capital's "Ratings Shopping" Practices ..............................25

V.  DEFENDANTS' OMISSIONS OF MATERIAL FACT FROM
   THE OFFERING DOCUMENTS UNDER THE SECURITIES ACT......................26

    A.  Exponential Increases in Borrower Delinquencies
        Shortly After Certificate Offerings Reflects
        Defective Loan Collateral and Faulty Origination..................................26

    B.  The Collapse of the Certificates' Ratings Shortly After Certificate
        Offerings Reflects Defective Loan Collateral and Faulty Origination ..................28

    C.  Investigations and Disclosures Subsequent to
        Offerings Evidence That the Originators Disregarded
        Stated Mortgage Loan Underwriting Guidelines...................................29

        1.  Countrywide Systematically Disregarded
            Stated Mortgage Loan Underwriting Guidelines ......................29

        2.  American Home Systematically Disregarded
            Stated Mortgage Loan Underwriting Guidelines.......................36

i

3.      IndyMac Systematically Disregarded
        Stated Mortgage Loan Underwriting Guidelines ........................................39

4.      BankUnited Systematically Disregarded
        Stated Mortgage Loan Underwriting Guidelines ........................................45

5.      Downey Systematically Disregarded
        Stated Mortgage Loan Underwriting Guidelines ........................................48

D.      GCM's Inadequate Due Diligence with Respect to Compliance
        with Stated Mortgage Loan Underwriting Guidelines ..............................55

E.      Governmental Agency Investigations and Subsequent
        Findings Related to the Residential Mortgage Industry .........................63

F.      The Offering Documents Failed to Disclose that
        GCM Relied on S&P and Moody's Outdated Models to
        Determine Levels of Credit Enhancement and Ratings ..........................65

G.      The Ratings Agencies Relaxed the Ratings Criteria Which
        Led to Artificially High Ratings Awarded to the Certificates ...............70

H.      The Prospectus Supplements Did Not
        Reflect the True Risk of the Certificates .................................................72

I.      The Offering Documents Failed to Disclose
        Greenwich Capital's Ratings Shopping Practices ...................................74

J.      The Offering Documents Failed to Disclose the True
        Roles of Ratings Agencies in Forming and Structuring
        the Certificates for Sale as Primarily AAA Securities ...........................75

K.      The Offering Documents Failed to Disclose Material Financial
        Conflicts of Interest between Greenwich Capital and the Ratings Agencies ........77

L.      Federal District Court Rules That Moody's Non-
        Independence in MBS and CDO Ratings Is a Material
        Misrepresentation in Moody's Securities Fraud Case ...........................79

**VI.    MATERIAL MISSTATEMENTS AND
        OMISSIONS IN THE OFFERING DOCUMENTS** ....................................................81

    A.    The Offering Documents Included Material Misstatements and Omitted
            Information Regarding Stated Mortgage Loan Underwriting Guidelines ............81

        1.    The Registration Statements ....................................................81

        2.    The Prospectus Supplements ....................................................84

            i.    Countrywide's Mortgage Loan Underwriting Guidelines ............84

            ii.    American Home's Mortgage Loan Underwriting Guidelines .......90

            iii.    IndyMac's Mortgage Loan Underwriting Guidelines...................93

            iv.    BankUnited's Mortgage Loan Underwriting Guidelines..............96

            v.    Downey's Mortgage Loan Underwriting Guidelines ..................98

    B.    The Offering Documents Included Material Misstatements and
            Omitted Information Regarding Delinquencies as of the Cut-Off Dates ............100

    C.    The Offering Documents Included Material Misstatements
            and Omitted Information Regarding Credit Support ...........................................102

    D.    The Prospectus Supplements Misstated the True Loan-to-
            Value Ratios Associated with the Underlying Mortgages...................................106

    E.    The Prospectus Supplements Misstated the
            Certificates' True Investment Rating.................................................................109

**VII.   CLASS ACTION ALLEGATIONS** ..........................................................................112

**VIII.  CAUSES OF ACTION** ..........................................................................................114

**IX.    PRAYER FOR RELIEF**..........................................................................................121

# I.

## SUMMARY OF THE ACTION

1.      This Amended Complaint (the "Complaint") is alleged upon personal knowledge with respect to Plaintiffs, and upon information and belief with respect to all other matters.  This action is brought pursuant to the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77a, *et seq*., by Court-Appointed Lead Plaintiffs New Jersey Carpenters Vacation Fund ("Carpenters Vacation Fund") and Boilermaker Blacksmith National Pension Trust ("Boilermaker Pension Trust") (collectively "Lead Plaintiffs" or "Plaintiffs") on their own behalf and as a class action on behalf of all persons and entities (the "Class") who purchased or otherwise acquired interests in the Harborview Mortgage Loan Trusts (the "Harborview Trusts" or "Issuing Trusts"), as set forth in ¶¶ 19-20, 34-35, *infra*, pursuant or traceable to two (2) Registration Statements and accompanying Prospectuses filed with the Securities and Exchange Commission (the "SEC") by Greenwich Capital Acceptance, Inc. ("GCA") on March 31, 2006 (No. 333-130961) (the "2006 Registration Statement") and on March 23, 2007 (No. 333-140279) ("the 2007 Registration Statement," with the 2006 Registration Statement, collectively referred to herein as the "Registration Statements").

2.      Pursuant to the Registration Statements and the Prospectus Supplements incorporated therein (collectively, the "Offering Documents"), RBS Securities, Inc, f/k/a Greenwich Capital Markets, Inc. d/b/a RBS Greenwich Capital ("GCM" or the "Underwriter") underwrote and sold to Plaintiffs and the Class $25.78 billion of Mortgage Loan Pass-Through Certificates (the "Certificates").  The Certificates were issued in fifteen (15) Offerings which took place between April 26, 2006 and October 1, 2007 (collectively, the "Harborview Offerings" or "Offerings").

3.      As set forth below, the Offering Documents contained material misstatements and omitted material information.  Defendants are strictly liable for these material misstatements and omissions under Sections 11, 12 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  The Complaint asserts no allegations or claims sounding in fraud.

4.      Plaintiffs seek redress against Defendant GCA, who prepared and filed the Registration Statements and was the Depositor of the underlying collateral into the Issuing Trusts; Defendants Robert J. McGinnis ("McGinnis"), Carol P. Mathis ("Mathis"), Joseph N. Walsh, III ("Walsh"), John C. Anderson ("Anderson") and James M. Esposito ("Esposito"), who were the individual signatories to the Registration Statements; Defendant Greenwich Capital Financial Products, Inc. ("GCFP"), the Sponsor and Seller for each of the Offerings; Defendant GCM, the underwriter of the Offerings; Defendant Greenwich Capital Holdings Inc. ("GCH"), the parent company of Defendants GCA, GCM and GCFP; and Defendant Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Ratings Services ("S&P"), a division of Defendant McGraw-Hill Companies, Inc. ("McGraw-Hill"), the Nationally Recognized Statistical Ratings Organizations (the "NRSROs"), who, along with GCM, determined the composition of the underlying mortgage pools and the Certificates' structure.  S&P, inclusive of Defendant McGraw-Hill, and Defendant Moody's are collectively referred to as the "Ratings Agencies," "Ratings Agency Defendants" or the "Ratings Agency Underwriters."  GCH, GCA, GCFP and GCM, together with their affiliates and subsidiaries, are collectively referred to as "Greenwich Capital" or the "Greenwich Capital Entities."

5.      This action arises from the role of Greenwich Capital, its affiliates and subsidiaries and the Ratings Agencies in acquiring and then converting 32,918 mainly sub-prime and Alt-A (*i.e.,* to borrowers with compromised credit) mortgage loans into $25.78 billion of

purportedly "investment grade" mortgage-backed securities ("RMBS" or "MBS"), which were then sold to Plaintiffs and the Class in the fifteen (15) Offerings made pursuant to the Offering Documents.  The value of the Certificates was directly tied to repayment of the underlying mortgage loans since the principal and interest payments due to investors were secured and derived from cash flows from those loans.[1]

6.     By the end of 2005, Greenwich Capital had become one of the largest MBS underwriters.  According to *Inside Mortgage Finance*, in 2005 alone, Greenwich Capital had underwritten $120.32 billion of MBS.  In connection with the Certificates, Greenwich Capital controlled every aspect of the securitization and underwriting process.  GCA acquired the underlying mortgage loans from third-party subprime loan originators, principally Countrywide Home Loans, Inc. ("Countrywide"), American Home Mortgage Corporation ("American Home"), IndyMac Bank, F.S.B. ("IndyMac"), Bank United, FSB ("BankUnited"), and Downey Savings & Loan Association ("Downey") (collectively referred to herein as the "Originators"). (¶ 25).  GCFP served as "Depositor" for the Offerings (¶ 23), acquiring the loans from GCA and "depositing" them to the Issuing Trusts where GCFP securitized the cash flows from the mortgage loans in the form of the Certificates.

7.     For Greenwich Capital, the Certificates could not be sold unless they were assigned, in substantial part, the highest investment grade rating by at least two NRSROs.  The reason was clear.  Without the award of high investment grade ratings, the Certificates could not be purchased by Greenwich Capital's principal clientele – institutional investors, namely pension

---

[1]     As the original borrowers on each of the underlying mortgage loans paid their mortgages, distributions were made to investors through the Issuing Trusts in accordance with the terms of the Offering Documents governing the issuance of the Certificates.  If borrowers failed to pay back their mortgages, defaulted, or were forced into foreclosure, the resulting losses flowed to the Certificate investors.  As set forth in the Prospectus Supplements, the Certificates were divided into a structure of classes, or "tranches," reflecting different priorities of seniority, payment, exposure to risk and default, and interest payments.

funds and insurance companies.  Greenwich Capital did not leave the assignment of these highest ratings to chance.  It ensured those ratings were assigned by engaging Moody's and S&P not merely to "rate" the Certificates at issuance, but more importantly, to directly participate in the formation and structuring of the Certificates prior to issuance. (¶¶ 50-61, 182-188).  Though undisclosed to Plaintiffs and the Class, well before the formation of the Certificates, the Ratings Agencies played a key role in determining which loans Greenwich Capital should purchase at auction and at what price they should be purchased. (¶¶ 37-38, 50-61).  Moreover, the Ratings Agencies assisted in determining which of the purchased loans were to be included in the mortgage pools underlying the Certificates and thereafter the structure of the Certificates themselves – *i.e.*, the amount of classes, or tranches, the Offering would include, and the amount and type of investment protection or "credit enhancement" which was going to be built into the Offering structure. (¶¶ 50-61).  Also undisclosed to investors was the fact that that Greenwich Capital engaged the Ratings Agencies by way of "ratings shopping," the practice of having the Ratings Agencies provide proposed ratings on the Certificates as part of their bid for the Certificate engagements.  (¶¶ 58-61).

8.      As a result, a substantial portion of the Certificates were assigned the highest investment ratings by the Ratings Agencies at the time of issuance.  (¶¶ 51-52, 67-68).  Moody's assigned its highest investment grade rating of "Aaa" to 92.7%, or $22.84 billion, of the Moody's-rated Certificates, and S&P assigned its highest investment grade rating of "AAA" ("AAA" and "Aaa" are collectively referred to herein as "AAA") to 92.2%, or $23.64 billion, of the S&P-rated Certificates. (*Id.*)  These ratings reflected the risk or probability of default by the borrower according to the Offering Documents.  (*Id.*)  None of the Certificates were initially

rated below "investment grade" ("Ba1" and below for Moody's and "BB+" and below for S&P). The Certificates were sold to Plaintiffs and the Class at approximately par, or 1.00 per unit.

9.      Soon after issuance, and as a result of massive increases in borrower delinquency, foreclosure, repossession and bankruptcy in the underlying Certificate collateral, the value of the Certificates collapsed.  Plaintiffs' holdings have lost a combined 68% of their initial value. (¶¶ 20-21).  Moreover, the likelihood of the value of the Certificates ever recovering is severely diminished by the fact that **_over 39%_** of the mortgage loans underlying the Certificates – the source of the financial return for Certificate investors – are delinquent, in default, in foreclosure or in bankruptcy. (¶¶ 49, 62-65, 70, 85, 93, 108, 121).  Further, the delinquency, foreclosure, repossession and bankruptcy rates for the Certificates' underlying collateral - arising from defective collateral and faulty origination practices - triggered unprecedented downgrades of the Certificates' credit ratings by the Ratings Agencies. (¶¶ 67-68).  Moody's and S&P have downgraded over 99% and 75%, respectively, of the aggregate value of the Certificates, citing "aggressive" loan underwriting practices.  To date, over 95% of the Certificates have been downgraded to speculative junk bond investments.  (*Id.*)

10.     Since the Certificate investors were dependent on the quality of the mortgage collateral for financial returns, the descriptions of the loan origination practices were highly material disclosures to them.  The Offering Documents purported to describe that the collateral was originated pursuant to guidelines which generally included an examination of borrower creditworthiness and appraisal of the underlying properties. (¶¶ 191-233).  These portions of the Offering Documents contained material misstatements and omissions since, as emerged only well after issuance of the Certificates, the principal Originators, *i.e.,* Countrywide, American Home, IndyMac, BankUnited and Downey, systematically disregarded the stated underwriting

guidelines set forth in the Offering Documents. (*Id.*)  These misstatements and omissions were reflected in the act that the Ratings Agencies themselves, in downgrading the Certificates from the highest investment grade to junk bond investments, specifically attributed the downgrades to "aggressive underwriting" in the origination of the loans (¶¶ 67-68); the utter collapse of the AAA ratings originally assigned the Certificates (¶¶ 67-68, 158-190); and the uniform pattern of exponential increases in delinquency, default and disclosure rates almost immediately after the Offerings (regardless of when the Offering occurred). (¶¶ 9, 49, 62-65, 70, 85, 93, 108, 121).

11.     While compliance with those loan underwriting guidelines was highly material to Certificate investors, who were dependent on the creditworthiness of the borrowers for interest and principal payments, Greenwich Capital and the Ratings Agencies had no such similar financial interest - since their compensation was earned when the Offerings were completed.  As a result, Greenwich Capital conducted inadequate due diligence with respect to whether the loans were originated in conformity with the underwriting guidelines stated in the Offering Documents.   Greenwich Capital's "due diligence" principally occurred, not during the underwriting phase of the securitized Offering by the Underwriter Defendant, but while Greenwich Capital was inspecting smaller bulk-loans for possible purchase from third-party loan originators after successfully bidding on the loans at auction.  (¶¶ 48-57, 138-152).  At that stage, there was a disincentive for Greenwich Capital to reject loans as non-compliant with stated guidelines since the Originator would be less likely to select Greenwich as the winning bidder in future actions.  Greenwich Capital generally used non-conforming loans as a means to negotiate a lower price for the loans instead of rejecting them.  Greenwich Capital's "due diligence" was limited, inadequate and defective.  (¶¶ 138-152).  Greenwich Capital was forced to review loans on an expedited basis and unable to commit to a full review of the loan pools.  Moreover,

Greenwich Capital did not have a mechanism in place to prevent previously "kicked-back" loans from being resubmitted as part of later pools by an originator.

12.     Greenwich Capital contracted out the inspection of loans for compliance with the Originator's underwriting guidelines to outside firms – Clayton Holdings, Inc. ("Clayton") and The Bohan Group ("Bohan") – and then conducted limited oversight of these subcontractors' activities.  As disclosed as part of an ongoing investigation of investment banking misconduct in underwriting MBS being conducted by the New York Attorney General (the "NYAG"), Clayton and Bohan routinely provided investment banks with detailed reports of loans non-compliant with underwriting guidelines, but the investment banks routinely overrode exclusion of those loans from purchase and securitization.  (¶¶ 138-152).  Further, the President of The Bohan Group stated, that by the time the Offerings of the Certificates took place, investment banks were requiring a review of only 5% to 7% of the entire loan pools.  (¶ 49, 57, 152, 193).[2]

13.     The Offering Documents failed to disclose that, given the systematic disregard for the underwriting guidelines by Greenwich Capital and the Originators, the amount of credit enhancement supporting the Certificates was insufficient to substantiate the assigned AAA and other investment grade ratings; and that the Ratings Agencies caused this understatement by failing to timely and adequately update the models employed to make those assessments.  As was only disclosed well after the issuance of the Certificates that S&P's models had not been materially updated since 1999, and Moody's models had not been materially updated since 2002. Since these models employed statistical assumptions based on the performance of mortgage loans issued in or before 2002, they failed to accurately reflect the performance of the Certificate

---

[2]     As former head of MBS at Moody's, Brian Clarkson stated in an October 17, 2008 article in the *Financial Times*, in structured finance, including mortgage backed securities "[y]ou start with a rating and build a deal around a rating."  (¶ 167).

collateral, which included substantial portions of the type of loans which only began to be originated en masse after 2002 – *i.e.,* sub-prime and Alt-A loans, non-traditional or hybrid adjustable rate mortgages, interest-only and negative amortization loans,[3] as well as loans issued with limited borrower documentation or employment verification.  (¶¶ 69-137, 158, 205-206, 238-239, 245).

14.     The Offering Documents also failed to disclose material financial conflicts of interest between the Ratings Agencies and Greenwich Capital, including Greenwich Capital's engagement of the Ratings Agencies through "ratings shopping."  (¶¶ 58-61, 178-181).  These conflicts of interest were detailed in a report released by the SEC in July 2008 (the "SEC Report"), after a year-long investigation into the Ratings Agencies' activities relating to the issuance of RMBS in the period spanning 2005 through 2007.  The SEC Report disclosed that the Ratings Agencies were typically engaged by way of "ratings shopping" whereby the Ratings Agency that was ultimately engaged was the one which provided the most profitable rating to the investment bank in "bidding" for the engagement.  The SEC Report also explained that the Ratings Agencies were incentivized, due to the highly profitable nature of these MBS engagements and the concentration of business in the hands of a relatively small group of investment banks, to not update their models lest they become unable to provide to the investment bank the most profitable credit enhancement and rating structure for the mortgage backed securities transaction.  (¶¶ 158-174, 183-188).

---

[3]     As discussed below, originations of non-traditional adjustable mortgages, interest only and negative amortization ("Neg Am") loans increased dramatically between 2004 and 2006.  (¶ 52).  These types of loans presented the greatest potential for **"payment shock"** to the borrower since they both provide small initial fixed rates for a limited period of time which then reset thereafter to much higher monthly payment amounts. Specifically, Neg Am loans are defined as mortgage loans which may have a low introductory interest rate, and thereafter have a mortgage interest rate which adjusts periodically based on the related index; however, the borrower is only required to make a minimum monthly payment which may not be sufficient to pay the month

15.     As set forth herein, the Offering Documents contained material misstatements and omissions of material facts in violation of Section 11 and 12 of the Securities Act, including the failure to disclose that: (i) the Certificate mortgage loan collateral was not originated in accordance with the loan underwriting guidelines stated in either the Registration Statements or the Prospectus Supplements, with the Originators having failed to conduct both a meaningful assessment of the borrowers' creditworthiness or effective appraisal of the mortgaged properties (¶¶ 191-240); (ii) Greenwich Capital failed to conduct adequate due diligence with respect to the Originators' compliance with the loan underwriting guidelines stated in the Offering Documents (¶¶ 138-152); (iii) the stated credit enhancement did not support the investment grade ratings assigned to the Certificates in light of the true undisclosed and impaired quality of the mortgage collateral (¶¶ 158-177, 237-240); (iv) there were material undisclosed conflicts of interest between Greenwich Capital and the Ratings Agencies, including those reflected in the undisclosed "ratings shopping practices," which incentivized the Ratings Agencies to understate what would have been the minimum required credit enhancement for the Certificates and inflate the Certificate ratings to maintain its relationship with the issuer banks (¶¶ 158-190); and (v) the amount of credit enhancement provided to the Certificates was inadequate to support the AAA and investment grade ratings because those amounts were determined primarily by Ratings Agencies' models which had not been updated in a timely manner.  (¶¶ 158-174).

16.     As a result of these material misstatements and omissions of material fact, Plaintiffs and the Class have suffered damages for which Defendants are liable pursuant to Sections 11, 12 and 15 of the Securities Act.

## II.

## JURISDICTION AND VENUE

17.     The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Jurisdiction is conferred by Section 22 of the Securities Act, and venue is proper pursuant to Section 22 of the Securities Act.

18.     The violations of law complained of herein, including the dissemination of materially false and misleading statements in connection, occurred in this County.  The Greenwich Capital Entities, Moody's and S&P, as well as their affiliates and subsidiaries, conduct or conducted business in this County.

## III.

## PARTIES AND RELEVANT NON-PARTIES

19.     Court-Appointed Lead Plaintiff Carpenters Vacation Fund is a Taft-Hartley Pension Fund.  As reflected in the certification filed herein, the Carpenters Vacation Fund purchased the following Certificates pursuant and traceable to the Registration Statements and Prospectus Supplements and has been damaged thereby.

| Certificates Purchased | Amount of Units Purchased | Price Paid (Per Unit) | Value as of the Date of Filing of Complaint (Per Unit) |
|---|---|---|---|
| Harborview Mortgage Loan Trust, Mortgage Pass-Through Certificates Series 2006-4, Class B1 | 100,000 | $ 1.0000 | $ 0.0509 |

20.     Court appointed Lead Plaintiff Boilermaker Pension Trust is a Taft-Hartley Pension Fund.  As reflected in the certification filed herein, the Boilermaker Pension Trust purchased the following Certificates pursuant and traceable to the Registration Statements and Prospectus Supplements and has been damaged thereby.

| Certificates Purchased | Amount of Units Purchased | Price Paid (Per Unit) | Value as of the Date of Filing of Complaint (Per Unit) |
|---|---|---|---|
| Harborview Mortgage Loan Trust, Mortgage Pass-Through Certificates Series 2007-7, Class 2A1A | 3,557,554.98 | $ 0.9977 | $ 0.3344 |

21.     Defendant, The Royal Bank of Scotland Group, PLC ("RBSG") is principally located at 600 Steamboat Road, Greenwich, Connecticut 06830.  RBSG is a multi-national corporation that delivers banking and financial services throughout the world.  RBSG is the parent and sole owner of Greenwich Capital Holdings, Inc.  RBSG maintains an office in New York County located at 101 Park Avenue, New York, New York 10178.

22.     Defendant Greenwich Capital Holdings, Inc. ("GCH") is a wholly owned subsidiary of the RBSG and is located at 600 Steamboat Road, Greenwich, Connecticut 06830.  Defendant GCH is the parent and sole owner of GCA, GCFP and GCM.

23.     Defendant GCFP, a Delaware Corporation incorporated in 1990, is a wholly-owned subsidiary of GCH and is principally located at 600 Steamboat Road, Greenwich, Connecticut 06830.  GCFP acted as the Sponsor for the Certificates issued pursuant to the Registration Statements.  Greenwich Capital originated or acquired all underlying mortgage collateral for the various Offerings from the Sponsor, GCFP.  GCFP made certain representations and warranties in connection with the loan pools collateralizing the Certificates. (¶¶ 191-252).  As set forth in the Registration Statements, GCFP then conveyed the mortgages to

a Special Purpose Entity ("SPE"), namely the Depositor, Defendant GCA, which had been created for the sole purpose of forming, collecting, and thereafter depositing the collateral into, the Issuing Trusts.  The Issuing Trusts then issued the Certificates supported by the cash flows from the assets and were secured by those assets.  (¶¶ 48-61).

24.     Defendant GCFP filed the following Registration Statements and accompanying Prospectus with the SEC on Form S-3, as subsequently amended on Form S-3/A as follows:

### The 2006 Registration Statement (Registration No. 333-130961):

| Date Filed | Form Type | Amount Registered |
|---|---|---|
| January 11, 2006 | S-3 | $ 1,000,000 |
| February 23, 2006 | S-3/A | $ 1,000,000 |
| March 16, 2006 | S-3/A | $ 1,000,000 |
| March 31, 2006 | S-3/A | $ 1,000,000[4] |

### The 2007 Registration Statement (Registration No. 333-140279):

| Date Filed | Form Type | Amount Registered |
|---|---|---|
| January 29, 2007 | S-3 | $ 1,000,000 |
| March 16, 2007 | S-3/A | $ 1,000,000 |
| March 23, 2007 | S-3/A | $ 35,000,000,000[5] |

25.     Defendant GCA is a wholly owned subsidiary of GCH and is located at 600 Steamboat Road, Greenwich, Connecticut 06830.  Defendant GCA filed Registration Statement and Prospectuses with the SEC in connection with the Offerings.  Defendant GCA served as the Depositor in connection with each of the Offerings.  The role of the Depositor was to purchase the mortgage loans from the seller and then assign the mortgage loans and all of its rights and interest under the mortgage loan purchase agreement to the trustee for the benefit of the

---

[4]     The amount registered under the 2006 Registration Statement also includes $85,432,340,861.00 of securities previously registered under Registration No. 333-127352 on September 1, 2005 and which remained unissued as of March 31, 2006.  Accordingly, the aggregate registered under the 2006 Registration Statement as of the filing date is $85,433,340,861.00.

[5]     The amount registered under the 2007 Registration Statement also includes $31,490,852,079.00 of securities previously registered under Registration No. 333-130961 (the 2006 Registration Statement) on March 31, 2006 and which remained unissued as of March 23, 2007.  Accordingly, the aggregate registered under the 2006 Registration Statement as of the filing date is $66,491,852,079.00.

Bondholders.   GCA, as Depositor, was also responsible for preparing and filing any reports required under the Securities Exchange Act of 1934.

26.    Defendant Robert J. McGinnis ("McGinnis") was, at all relevant times, GCA's President and Director.  In addition, at all relevant times, McGinnis was also GCM's Managing Director, Head of Securitized Products.  Defendant McGinnis signed the Registration Statements for the Offerings.

27.    Defendant Carol P. Mathis ("Mathis") was, at all relevant times, GCA's Chief Financial Officer and Managing Director.  In addition, at all relevant times, Mathis also was the Managing Director, Chief Financial Officer at GCM.  Defendant Mathis signed the Registration Statements for the Offerings.

28.    Defendant Joseph N. Walsh, III ("Walsh") was, at all relevant times, GCA's Managing Director and Director.  In addition, at all relevant times, Walsh was also the Managing Director, Head of Mortgage Trading, Originations and Finance at GCM.  Defendant Walsh signed the Registration Statements for the Offerings.

29.    Defendant John C. Anderson ("Anderson") was, at all relevant times, GCA's Managing Director and Director.  In addition, at all relevant times, Anderson also was the Managing Director, Head of Asset-Backed Principal Finance at GCM.  Defendant Anderson signed the Registration Statements for the Offerings.

30.    Defendant James C. Esposito ("Esposito") was, at all relevant times, GCA's Managing Director, Director, General Counsel and Secretary.  Defendant Esposito signed the Registration Statements for the Offerings.

31.    The Defendants identified in ¶¶ 26-30 are referred to herein as the "Individual Defendants."  The Individual Defendants functioned as directors to the Issuing Trusts as they

were officers and/or directors of GCA and signed the Registration Statements for the registration of the securities subsequently issued by the Issuing Trusts.

32.     The Individual Defendants participated with and/or conspired with the remaining Defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

33.     Defendant GCM is an SEC-registered broker-dealer.  GCM is principally located at 600 Steamboat Road, Greenwich, Connecticut 06830 and is a wholly-owned subsidiary of GCH.  Defendant GCM served as the underwriter for all of the Certificate Offerings.  GCM was intimately involved in the Harborview Offerings.  GCM failed to perform the requisite level of due diligence not merely once, but on all times in connection with all of the Harborview Offerings complained of herein.  The Prospectuses disseminated in connection with each of the Offerings contained the same material misstatements and omissions of material fact relating to the "underwriting standards" employed in originating the underlying mortgage loans.  GCM is one of the leading underwriters in mortgage-backed securities in the United States.  Since 1987, GCM has helped mortgage lenders issue more than $400 billion in asset-backed securities.  GCM, as an essential part of its investment banking business, has substantial contacts within this County and regularly and continually transacts business in New York – specifically New York County (*i.e*., Wall Street and the financial markets) including through the Offerings.

34.    GCM served as the sole underwriter in the sale of the Certificates and assisted in drafting and disseminating the Offering Document for the following Offerings issued pursuant to the 2006 Registration Statement:

| Trust | Approximate Principal Amount | Approx. Offering Date | Underwriter(s) | Depositor/Issuer | Sponsor |
|---|---|---|---|---|---|
| Harborview Mortgage Loan Trust Series 2006-4 | $ 1,848,773,350 | April 26, 2006 | Greenwich Capital Markets, Inc. | Greenwich Capital Acceptance, Inc. | Greenwich Capital Financial Products, Inc. |
| Harborview Mortgage Loan Trust Series 2006-5 | $ 1,621,394,200 | June 27, 2006 | Greenwich Capital Markets, Inc. | Greenwich Capital Acceptance, Inc. | Greenwich Capital Financial Products, Inc. |
| Harborview Mortgage Loan Trust Series 2006-6 | $ 624,991,100 | June 27, 2006 | Greenwich Capital Markets, Inc. | Greenwich Capital Acceptance, Inc. | Greenwich Capital Financial Products, Inc. |
| Harborview Mortgage Loan Trust Series 2006-7 | $ 1,996,709,000 | August 10, 2006 | Greenwich Capital Markets, Inc. | Greenwich Capital Acceptance, Inc. | Greenwich Capital Financial Products, Inc. |
| Harborview Mortgage Loan Trust Series 2006-8 | $ 1,173,704,000 | August 28, 2006 | Greenwich Capital Markets, Inc. | Greenwich Capital Acceptance, Inc. | Greenwich Capital Financial Products, Inc. |
| Harborview Mortgage Loan Trust Series 2006-9 | $ 2,867,084,000 | October 3, 2006 | Greenwich Capital Markets, Inc. | Greenwich Capital Acceptance, Inc. | Greenwich Capital Financial Products, Inc. |
| Harborview Mortgage Loan Trust Series 2006-10 | $ 1,697,279,000 | November 10, 2006 | Greenwich Capital Markets, Inc. | Greenwich Capital Acceptance, Inc. | Greenwich Capital Financial Products, Inc. |
| Harborview Mortgage Loan Trust Series 2006-11 | $ 414,094,000 | November 10, 2006 | Greenwich Capital Markets, Inc. | Greenwich Capital Acceptance, Inc. | Greenwich Capital Financial Products, Inc. |
| Harborview Mortgage Loan Trust Series 2006-12 | $ 4,915,300,000 | December 11, 2006 | Greenwich Capital Markets, Inc. | Greenwich Capital Acceptance, Inc. | Greenwich Capital Financial Products, Inc. |

| Harborview Mortgage Loan Trust Series 2006-13 | $ 397,112,100 | December 11, 2006 | Greenwich Capital Markets, Inc. | Greenwich Capital Acceptance, Inc. | Greenwich Capital Financial Products, Inc. |
| Harborview Mortgage Loan Trust Series 2006-14 | $ 2,401,466,000 | December 20, 2006 | Greenwich Capital Markets, Inc. | Greenwich Capital Acceptance, Inc. | Greenwich Capital Financial Products, Inc. |
| Harborview Mortgage Loan Trust Series 2007-1 | $ 1,791,072,000 | March 7, 2007 | Greenwich Capital Markets, Inc. | Greenwich Capital Acceptance, Inc. | Greenwich Capital Financial Products, Inc. |

35.     Furthermore, GCM served as sole underwriter for the following Offerings issued pursuant to the 2007 Registration Statement:

| Trust | Approximate Principal Amount | Approx. Offering Date | Underwriter(s) | Depositor/Issuer | Sponsor |
| --- | --- | --- | --- | --- | --- |
| Harborview Mortgage Loan Trust Series 2007-2 | $ 1,328,283,000 | March 29, 2007 | Greenwich Capital Markets, Inc. | Greenwich Capital Acceptance, Inc. | Greenwich Capital Financial Products, Inc. |
| Harborview Mortgage Loan Trust Series 2007-5 | $ 1,106,572,000 | July 11, 2007 | Greenwich Capital Markets, Inc. | Greenwich Capital Acceptance, Inc. | Greenwich Capital Financial Products, Inc. |
| Harborview Mortgage Loan Trust Series 2007-7 | $ 1,598,999,000 | October 1, 2007 | Greenwich Capital Markets, Inc. | Greenwich Capital Acceptance, Inc. | Greenwich Capital Financial Products, Inc. |

36.     Each of the Issuer Trusts for the various Offerings was a common law trust formed for the sole purpose of holding and issuing the Certificates.  Each of the Issuing Trusts issued hundreds of millions of dollars worth of Certificates pursuant to a Prospectus Supplement, incorporated by reference into its corresponding Registration Statement, which each listed numerous classes of offered Certificates.

37.     Defendant McGraw-Hill is a New York corporation with its principal place of business located at 1221 Avenue of the Americas, New York, New York 10020.  Standard & Poor's Ratings Service is a division of Defendant McGraw-Hill which provides credit ratings,

risk evaluation, investment research and data to investors.  S&P participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiffs and other Class members.  In addition, S&P worked with the Greenwich Capital Entities, loan sellers and servicers in forming and structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

38.     Defendant Moody's is a subsidiary of Moody's Corporation and is principally located at 250 Greenwich Street, New York, New York 10007.  Moody's provides credit ratings, risk evaluation, investment research and data to investors.  Defendant Moody's participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiffs and other Class members.  In addition, Moody's worked with the Greenwich Capital Entities, loan sellers and loan servicers in forming and structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

39.     Defendants McGraw-Hill, inclusive of S&P, and Moody's are collectively referred to herein as the "Ratings Agencies," the "Ratings Agency Defendants" or the "Ratings Agency Underwriters."  The Ratings Agencies are not being sued herein pursuant to Section 11(a)(4) as persons who prepared or certified the ratings portion of the Registration Statements because, in accordance with Securities Act Rule 436(g), the ratings assigned to a class of debt securities shall not be considered part of the Registration Statement "prepared or certified by a person within the meaning of Section 11 of the Securities Act."  Instead, they are being sued on the basis of their roles, as alleged in detail, *infra*, as underwriters and control persons within the meaning of Sections 11 and 15 of the Securities Act, including their activities both before and

17

after their engagement to "rate" the Certificates in determining which mortgage loans were to be included and excluded from the underlying collateral and composition of the Certificate credit enhancement needed in order to sell the Certificates with AAA ratings.

## IV.

## BACKGROUND

**A.    Greenwich Capital Emerges as a Major Issuer
and Underwriter of Mortgage-Backed Securities**

40.    As illustrated below, a mortgage securitization is where mortgage loans are acquired, pooled together, and then sold to investors, who acquire rights in the income flowing from the mortgage pools.



**Follow the Mortgage** What happens to your mortgage after you sign on the dotted line

Source: WSJ Reporting

41.    When mortgage borrowers make interest and principal payments as required by the underlying mortgages, the cash flow is distributed to the holders of the MBS certificates in order of priority based on the specific tranche held by the MBS investors.  The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage-borrowers become delinquent or default on their mortgages.  Of course, because the investment quality and risk of the higher tranches is

affected by the cushion afforded by the lower tranches, diminished cash flow to the lower tranches results in impaired value of the higher tranches.

42.     The securitization of loans fundamentally shifts the risk of loss from the mortgage loan originator to the investor who purchased an interest in the securitized pool of loans.  When the originator holds the mortgage through the term of the loan, it profits from the borrower's payment of interest and repayment of principal, but it also bears the risk of loss should the borrower default on repayment of the loan or the property value is not sufficient to repay the loan.  Traditionally, the originator was economically vested in establishing the creditworthiness of the borrower and the true value of the underlying property through appraisal before issuing the mortgage loans.  As a result, in securitizations where the originator immediately sells the loan to an investment bank, it does not have the same economic interest in establishing borrower creditworthiness or a fair appraisal value of the property in the loan origination process.

43.     In the 1980s and 1990s, securitizations were generally within the domain of Government Sponsored Enterprises ("GSE"), *i.e.,* the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which would purchase loans from originators.  Investors in these early GSE securitizations were provided protections since the underlying loans were originated pursuant to strict underwriting guidelines.

44.     Between 2001 and 2006, however, there was dramatic growth in non-GSE loan originations and securitizations, for which there were no such underwriting limitations.  That growth resulted in a commensurate increase in subprime securitizations.  According to *Inside Mortgage Finance* (2007), in 2001, agency originations were $1.433 trillion and securitizations were $1.087 trillion – far outpacing non-agency originations of $680 billion and securitizations

of $240 billion.  In 2006, agency originations grew to $1.040 trillion while securitizations declined to $904 million.  However, in that same period, non-agency originations had grown by 100% to $1.480 trillion, and non-agency securitizations had grown by 330% to $1.033 trillion in 2006.  Further, non-agency origination of subprime loans grew by 315% – from $190 billion in 2001 to $600 billion in 2006; and non-agency Alt-A origination grew by 566% – from $60 billion in 2001 to $400 billion in 2006.  Non-agency securitizations of subprime loans had also grown exponentially by 415% – from $87.1 billion in 2001 to $448 billion in 2006.  Greenwich Capital became a significant underwriter in the MBS securitizations market.  According to *Inside Mortgage Finance*, Greenwich Capital issued $10.747 billion and $36.548 billion of non-agency MBS in 2004 and 2005.  Greenwich Capital underwrote $92.69 billion and $120.312 billion of non-agency MBS in 2004 and 2005. (Moody's, *Bloomberg Asset Securitization*, January 2008).

**B.**     **Greenwich Capital's Securitization and Underwriting Operations**

45.     In 2005 and 2006, Greenwich Capital's RMBS operations were run primarily out of its offices at 600 Steamboat Road, Greenwich, Connecticut 06830.

46.     Greenwich Capital derived its profit from the sale of the Certificates for a price in excess of the amount paid for the underlying mortgage loans.  The goal for Greenwich Capital was to sell the Certificates for a price above par or $1.00 per unit. As noted, for securitized Certificates to be marketable to begin with, approximately 80% of the securitization had to have the highest rating by the rating agencies.  With that condition met, subprime securitizations and home equity securitizations posed the greater profit potential for Greenwich Capital.

47.     Before securitization could begin, Greenwich Capital had to acquire the underlying mortgage loans.  Generally, this was accomplished by substantial bulk-loan purchases from third-party originators through originator-initiated auction sales.  This was the primary

method by which Greenwich Capital obtained the mortgage collateral used in securitizing and structuring the Harborview Mortgage Loan Trust ("HVMLT") securitizations.

### 1.    Greenwich Capital's Bulk-Loan Purchases from Third-Party Originators

48.    Greenwich Capital had a specific sales team assigned to bulk-loan purchases from third-party originators. Originators set a date and time for bids to be submitted by competing investment banks to purchase a block of mortgage loans.  In advance of the auction, the Originator would send to each bidding investment bank a "Loan Level File" in the form of a spreadsheet, which contained numerous fields of non-borrower sensitive information regarding the loans to be auctioned.  The spreadsheet would include information such as borrower FICO scores, LTV, property location and the level of documentation supporting the loan, and many other loan characteristics.  Greenwich Capital would scrub the loan data for errors and then analyze the underlying loan characteristics.

49.    At the same time, the originator would provide Greenwich Capital with a Bid Stipulation Sheet (the "Bid Sheet").  The Bid Sheet would describe the general characteristics of the loan pool being auctioned, the variance rate of the pool and most importantly the *maximum* size of the pool sample which the investments banks were permitted to conduct due diligence on (*i.e.,* 5-7%) and the number of loans which the banks could "kick-back" to the originator due to borrower deficiencies, payment delinquencies or first/early payment defaults on the loan.

### 2.    S&P's and Moody's Roles in Greenwich Capital's Bid on Loans Purchased at Auction

50.    Greenwich Capital traders had, on their desktop computers, S&P's LEVELS Model and Moody's M-3 Model, which they used to determine the amount of credit enhancement needed for certain Certificates, based upon a specific pool of loans, to be rated AAA.  Nevertheless, Greenwich Capital would also send the "Loan Level File" to the Ratings

Agencies in advance of the auction in order for them to participate and advise on Greenwich Capital's determination of the appropriate price to pay for the loans at auction.  S&P would run the loan tape through both its "LEVELS" and "SPIRE" Models.  Moody's would run the loan tape through its M-3 Model. The LEVELS and M-3 Models analyzed and indicated if there were loans that failed to have necessary information or support so that they should be excluded from Greenwich Capital's purchase.  Further, these Models analyzed 50-80 loan characteristics (*e.g.,* borrower FICO score, LTV, property location, etc.), in order to estimate the number of loans that were likely to default and the corresponding dollar amount of the loss which would result from such default.  The estimates were based on the performance of undisclosed data based on loans tested under undisclosed economic stresses.  By determining these two factors, the LEVELS Model calculated the amount of "credit enhancement" required to offer a specific pool of loans with ratings of "AAA."  The LEVELS Model might show a certain pool of loans required 20% credit enhancement in order for 80% of the loan pool to be rated AAA.  Credit enhancement was a highly material issue for investors.  It represented the amount of "cushion" or protection the Certificate structure provided to the senior classes of the Certificates.  There were multiple forms of credit enhancement, including subordination, overcollateralization and excess spread. (¶¶ 51, 60, 237-248).

51.    Greenwich Capital attempted to obtain as many classes of AAA rated Certificates as possible since they were more easily sold and significantly more profitable to Greenwich Capital than lower-rated Certificates.  At the same time, Greenwich Capital also attempted to limit the number of subordinate classes because they were more difficult to sell and more costly to Greenwich Capital in general.  This was a constant point of negotiation, with Greenwich Capital pressing the Ratings Agencies for more AAA rated classes and less credit enhancement.

It was the level of credit enhancement described in the Offering Documents which provided the justification to investors of an award of an AAA rating to mortgage loans comprised in part of subprime and Alt-A borrowers.  The Offering Documents described the credit enhancement in the form of subordination or overcollateralization, or even limited bond insurance, which appeared to justify the ratings.

52.     The materially omitted fact that was not disclosed until well after the Certificates were issued was that the Ratings Agencies' models fundamentally rested on the performance of a specific data set of loans, and as the market for MBS evolved, those models were never materially expanded or adjusted to test the new economic stresses.  The S&P model was not updated since 1999, and Moody's was not updated since 2002.  (¶¶ 158-177).  However, it was after these dates that there had been a substantial expansion in subprime, Alt-A (limited and no documentation), non-traditional adjustable rate mortgages or Option-ARMs, as well as interest-only and negative amortization loans.

53.     S&P also would run the loan data through its "SPIRE" Model, which would apply timing assumptions to the specific loan pool.  The SPIRE Model considered default curves, prepayment and interest rate stresses which occur over time.  The end result of the SPIRE Model would be an assessment of specific subordination structure for the MBS deal, specifically the excess spread and over-collateralization required.

54.     The information derived from the LEVELS Model was then provided to GCM, and was a critical factor in determining the price Greenwich Capital would bid for the loans at auction.

55.     All of this work by S&P and Moody's, referred to by S&P as "bid package" work, was performed without any compensation from Greenwich Capital in an effort to engender

goodwill so that Greenwich Capital would ultimately engage either Ratings Agency to rate the loans at the underwriting stage.

56.     If Greenwich Capital's bid was accepted by the Originator, Greenwich Capital would have a short period before the Originator was paid in cash for Greenwich Capital to examine the loans more closely.

### 3.     Greenwich Capital's Loan File "Due Diligence" Between Acceptance of Auction Bid and Settlement

57.     Between the date of the auction where Greenwich Capital's bid was accepted and the settlement date when Greenwich Capital paid the Originator in cash for the loans purchased, a limited review was conducted.  The ostensible purpose of this review was to determine principally whether the loans contained the requisite legal documentation as reflected in the loan tape provided before the auction and whether the loans were originated in accordance with the Originator's loan underwriting guidelines.  Greenwich Capital contracted this "due diligence" work to outside firms, principally Bohan and Clayton, who, in turn, hired outside contractors to review the loan files of 5-7% of the total amount of loans included in the pool.  GCM's Due Diligence Team (defined herein as the "DDT"), which was made up of approximately 2-3 individuals (for all of the numerous ongoing Offerings), was responsible for overseeing the work performed by Clayton and Bohan.  These workers were supposed to be looking to see if the loans conformed to the Originators' underwriting guidelines and if the loan files contained the requisite legal documentation.  Each loan reviewed would be rated either category "1," "2" or "3".   The loans rated category "3" loans were found to be defective or fraudulent and recommended by the reviewer to be excluded while those rated category "2" were deemed to be questionable.  The rating of the audit loans was provided to Greenwich Capital's DDT on a Microsoft Excel spreadsheet, and they determined whether the loans should be "kicked" out of

the loan pool or rejected.  Greenwich Capital's DDT exercised its discretion to rarely exclude either category "2" or "3" rated loans.  Greenwich Capital was incentivized not to "kick-out" loans even if they were designated category "3," since if Greenwich Capital rejected any significant portion of the loans, the originator from which those loans were purchased would likely not sell Greenwich Capital loans at auction in the future, for fear of too many "kicked-out" loans.  In addition, Greenwich Capital knew it was able to securitize even loans designated category "3" and so at most, Greenwich Capital would generally use the evidence of non-conforming loans to negotiate a cheaper price.

C.      **Greenwich Capital's "Ratings Shopping" Practices**

        58.     Greenwich Capital derived its profit from the sale of the Certificates for a price in excess of the amount paid for the underlying mortgage loans. For the Certificates to sell profitably, approximately 80% of the securitization had to be assigned the highest AAA rating by the rating agencies.

        59.     Greenwich Capital ultimately engaged the Ratings Agency Defendants through a "ratings shopping" process.   Initially, the Collateral Analyst would send the preliminarily structured deal to the Ratings Agencies for feedback.   Greenwich Capital's in-house ratings agency personnel would oversee the communications with the Ratings Agencies.   At which point S&P, for example, would run the loan tape through both its LEVELS and SPIRE Models again and provide Greenwich Capital with the results in an effort to obtain the ratings engagement. Through the LEVELS Model, S&P would advise Greenwich Capital, for example, that 94.25% of the Certificates would be rated AAA as long as 5.75% of the total collateral balance supporting those Certificates were subordinate.   This 5.75% was the amount of loss coverage required.   Greenwich Capital would then again "negotiate" with the Ratings Agencies before

they were hired, in order to get them to agree to the least amount of loss coverage and credit enhancement, and the highest percentage of AAA designated Certificates.

60.     S&P would also again run the Deal File through its SPIRE Model in order to provide a deal structure that was within its acceptable levels of subordination or overcollateralization in order to obtain class sizes with the appropriate ratings.

61.     Greenwich Capital relied on this "ratings shopping" process to obtain the most profitable structure on the Offerings.  As set forth below, ratings shopping was disclosed in detail in the SEC Report released in July 2008 (¶¶ 183-188) and in testimony by former Moody's and S&P managers in October 2008 (¶¶ 163-181).  The practice was effectively ended by way of an agreement entered into between the Ratings Agencies and New York Attorney General in 2008. (¶¶ 179, 187-188).

**V.**

**DEFENDANTS' OMISSIONS OF MATERIAL FACT FROM
THE OFFERING DOCUMENTS UNDER THE SECURITIES ACT**

**A.     Exponential Increases in Borrower Delinquencies Shortly After Certificate
Offerings Reflects Defective Loan Collateral and Faulty Origination**

62.     The defective nature of the Certificate collateral was reflected in the recurring pattern in the fifteen (15) Offerings of exponential increases in borrower delinquencies in the months after issuance.

63.     Four months after each of the Offerings were consummated, borrower delinquency and default rates on the underlying mortgage collateral increased by a staggering 652% – from an average of 0.38% to over 2.5% of the mortgage loan balance.  Furthermore, within six months of issue that average increased to over 3.2%.  This spike in borrower default

and delinquency rates has continued to worsen.  To date, 39% of mortgage collateral is either delinquent or in default, foreclosure or repossession.

64.     These early payment defaults and delinquency rates are reflective of a disregard for underwriting guidelines.  (¶¶ 65, 70, 85, 93, 108, 121, 198-233).  As reported by the Federal Bureau of Investigation ("FBI") in its 2006 and 2007 Mortgage Fraud Reports, a study of three million residential mortgage loans found that between 30% and 70% of early payment defaults were linked to significant misrepresentations in the original loan applications.  The study cited by the FBI and conducted by Base Point Analytics, found that loans that contained egregious misrepresentations were five times more likely to default in the first six months than loans that did not.  The misrepresentations included income inflated by as much as 500%, appraisals that overvalued the property by 50% or more, fictitious employers and falsified tax returns.  The 2006 FBI report also cited studies by a leading provider of mortgage insurance, Radian Guaranty Inc., concluding that the same top states for mortgage fraud – including the states where the MBS collateral was principally originated – were also the same top states with the highest percentage of early payment defaults.

65.     This pattern of borrower default shortly after the completion of the Offerings evidences substantial early payment default and borrower misrepresentations.  The origination of such fundamentally impaired loan collateral could only have occurred as a result of systematic failures to abide by the underwriting guidelines in the Offering documents and as a result of inadequate due diligence by Greenwich Capital in monitoring compliance with those guidelines.

**B.    The Collapse of the Certificates' Ratings Shortly after Certificate
Offerings Reflects Defective Loan Collateral and Faulty Origination**

66.    The Ratings Agencies rated the Certificates pursuant to the following twenty-three (23) level rating system:

| Color code | Number | Definition | Moodys | S & P | Fitch |
|---|---|---|---|---|---|
| | | **Investment Grade** | | | |
| | 10.0 | US Treasuries | *** | *** | *** |
| | 9.5 | Prime, maximum safety | Aaa | AAA | AAA |
| | 9.0 | Very high grade/quality | Aa1 | AA+ | AA+ |
| | 8.5 | " | Aa2 | AA | AA |
| | 8.0 | " | Aa3 | AA- | AA- |
| | 7.5 | Upper medium quality | A1 | A+ | A+ |
| | 7.0 | " | A2 | A | A |
| | 6.5 | " | A3 | A- | A- |
| | 6.0 | Lower medium grade | Baa1 | BBB+ | BBB+ |
| | 5.5 | " | Baa2 | BBB | BBB |
| | 5.0 | " | Baa3 | BBB- | BBB- |
| Color code | Number | Definition | Moodys | S & P | Fitch |
| | | **Speculative grade** | | | |
| | 4.5 | Speculative | Ba1 | BB+ | BB+ |
| | 4.0 | " | Ba2 | BB | BB |
| | 3.5 | " | Ba3 | BB- | BB- |
| | 3.0 | Highly speculative | B1 | B+ | B+ |
| | 2.5 | " | B2 | B | B |
| | 2.0 | " | B3 | B- | B- |
| | 1.5 | Substantial risk | Caa1 | CCC+ | CCC+ |
| | 1.0 | In poor standing | Caa2 | CCC | CCC |
| | 0.5 | " | Caa3 | CCC- | CCC- |
| | 0.0 | Extremely speculative | Ca | CC | CC |
| | 0.0 | Maybe in or extremely close to default | C | C+,C,C- | C+,C,C- |
| | 0.0 | Default | | D | D |

67.    As noted above, Moody's rated $24.63 billion and S&P rated $25.63 billion of the total $25.78 billion of Certificates issued pursuant to the Harborview Offerings complained of herein.  (¶¶ 34-35).  Moreover, Moody's assigned its highest investment grade rating to 92.70%, or $22.84 billion, of the Moody's-rated Certificates, and S&P assigned its highest investment

grade rating to 92.2%, or $23.64 billion, of the S&P-rated Certificates.  As a general matter, a rating downgrade of even one level – *e.g.*, from AAA to AA or from Aaa to Aa – is considered material to the financial condition of the rated entity or security.  Here, the magnitude of the Certificate downgrades is unprecedented, and currently over $23.3 billion, or 95%, of the Moody's rated Certificates have been downgraded to speculative junk bond investments.

68.     In fact, the Harborview Certificates have now been downgraded by as many as the maximum 23 levels (*i.e.,* from initially Aaa to "D") – with, for example, $21.35 billion of the total $22.84 billion in Certificates initially rated Aaa, having now been downgraded to "Ba1" ("speculative") or below.  Moreover, of that $21.35 billion, $14.61 billion, or 68.50%, of initially Aaa rated Certificates have been downgraded and are currently rated "Caa1" ("substantial risk of default") and below.  The remaining Certificate tranches have fared no better.  Of the $1.79 billion of Moody's-rated Certificates that were not awarded initial ratings of Aaa - but, however, were nevertheless awarded investment grade ratings, 100% have now been downgraded to "C" ("in or extremely close to default") and below.  This historic and dramatic reversal in the financial assessment of the Certificates by the Ratings Agencies underscores that these securities were impaired from the outset.

**C.     Investigations and Disclosures Subsequent to
          Offerings Evidence That the Originators Disregarded
          Stated Mortgage Loan Underwriting Guidelines**

**1.     Countrywide Systematically Disregarded
          Stated Mortgage Loan Underwriting Guidelines**

69.     Countrywide was a principal originator for the HVMLT Series 2006-4, the HVMLT Series 2006-5, the HVMLT Series 2006-6, the HVMLT Series 2006-9, the HVMLT Series 2006-11, the HVMLT Series 2006-12 and the HVMLT Series 2007-1 Certificate Offerings.  The total value of these seven (7) Offerings for which Countrywide was a principal

originator was $14.08 billion, of which 92%, or $12.35 billion, was awarded initial ratings of AAA.

70.     Following issuance of the Certificates, information indicating that Countrywide systematically disregarded the underwriting guidelines set forth in the Offering Documents began to emerge.  As a result, 94.13%, or $11.62 billion, of the initially rated AAA Certificates have been downgraded to speculative "junk" status and below.  Moreover, current delinquency and default rates on the Countrywide-originated collateral has risen exponentially since the Certificates were issued – from 0.25% as of the cut-off dates to 42.35% as of May 1, 2009.

71.     Countrywide is currently under investigation by a panel of the United States Senate for predatory lending – a practice whereby a lender deceptively convinces a borrower to agree to unfair and abusive loan terms, including interest and fees that are unreasonably high.  Countrywide's increased risk of not being able to collect on these predatory mortgage loans puts the Certificates' underlying mortgage collateral at risk, thereby further increasing the risk to Plaintiffs and the Class.

72.     During an August 29, 2007 press conference reported in *The Wall Street Journal*, Senator Charles Schumer, chairman of the Senate panel investigating Countrywide's predatory lending practices, stated:

> Countrywide's most lucrative brokers are those that make bad loans that are largely designed to fail the borrower ….  [Countrywide's] brokers can earn an extra 1 percent of the loan value in commission by adding a three-year prepayment penalty to loans.

73.     On or about March 10, 2008, the FBI disclosed that it had initiated a probe into the fraudulent mortgage practices engaged in by Countrywide, including manipulation of the subprime and non-traditional loan markets, knowledge of and disregard for underwriting inaccuracies and misrepresentations, and specific instructions to underwriters by Countrywide

not to scrutinize certain types of loans it issued.  Subsequently, on April 2, 2008, a Federal Bankruptcy Judge overseeing the proceedings of more than 300 Countrywide-related bankruptcies ordered a further inquiry into the misconduct and, specifically, the illegal inflation of fees throughout the loan process that had been occurring at Countrywide.

74.    On April 11, 2008, a detailed amended securities class action complaint for violations of the federal securities laws was filed in federal court in the Central District of California against Countrywide (the "Countrywide Complaint").  In a decision dated December 1, 2008 (the "Countrywide Decision" or "Countrywide Dec."), Judge Mariana Pfaelzer of the U.S. District Court of the Central District of California upheld the bulk of the 416-page Countrywide Complaint, which detailed a massive fraud involving Countrywide.  Highlights of the Countrywide Decision include the following:

> "From mid-2003 onward, Countrywide continually loosened its underwriting guidelines to the point of nearly abandoning them by 2006."  Countrywide Dec., at 7.

> In December 2007, Countrywide revealed that 89% ($64 bn.) of it's 2006 pay-option ARMs would not have been approved under its original underwriting guidelines, nor would 83% ($74 bn.) of its 2005 pay-option ARMs.  Countrywide Dec., at 8.

> During the Class Period,[6] Countrywide "employed an internal, misleading definition of 'subprime,'" using a FICO score of 620 to delineate between prime and sub-prime instead of an industry-wide standard of 660.  Countrywide Dec., at 10.

> "Countrywide often waived its weakened standards, routinely approving loans that fell well outside its guidelines … It's goal was to [a]pprove virtually every borrower and loan profile…"  Countrywide Dec., at 11.

> Throughout the Class Period, appraisals were inflated (Countrywide Dec., at 13-14), salaries for no-doc loan applications were inflated (Countrywide Dec., at 14-15), and loan-to-value ratios were understated. Countrywide Dec., at 16.

> Citing a "Price Any Loan system" of underwriting and "Countrywide's internal

---

[6]    The Class Period in the Countrywide action is March 12, 2004 through March 7, 2008.

documents that systematically encouraged approving virtually any loan with additional 'add-on' fees," the court rejected motions to dismiss the fraud claims against senior Countrywide officers.  Countrywide Dec., at 89.

"Plaintiffs describe a unified course of abandoning sound [loan] underwriting practices."  Countrywide Dec., at 38.

Plaintiffs persuasively alleged a pattern of "systematically lowering, avoiding and undermining guidelines while approving low-quality mortgages as 'prime.'" Countrywide Dec., at 85.

75.     Summarizing the Countrywide Complaint's allegations regarding Countrywide's core mortgage-related operations, the court observed:

> Plaintiffs have created a cogent and compelling inference of a company obsessed with loan production and market share with little regard for the attendant risks, despite the company's ***repeated assurances to the market***.  With respect to loan origination practices, they raise strong inferences that (1) borrower requirements were progressively loosened over the Class Period; (2) in many instances, the actual loan quality was lower than the borrower's FICO score and LTV ratio suggested because Countrywide misrepresented how lax its verification practices became; and (3) Countrywide management routinely circumvented the normal underwriting process by approving highly risky loans for sale into the secondary market.

Countrywide Dec., at 78 (emphasis added).

76.     The Countrywide securities fraud complaint identified specific deviations from Countrywide's stated underwriting guidelines.  For example, in connection with the "No Income/No Asset Documentation Program," Countrywide represented that "[t]his program is limited to borrowers with excellent credit histories."  However, Countrywide routinely extended these loans to borrowers with weak credit, and knew that such "low doc" or "no doc" loans, particularly when coupled with nontraditional products like ARMs, were highly likely to contain misinformation from the borrower, such as overstated incomes, that might result in increased defaults.  Because borrowers were advised that their representations on loan applications would not be verified, Countrywide employees referred to these products as "liar loans."

77.     On April 30, 2008, *The Wall Street Journal* reported on a federal probe of Countrywide that uncovered evidence that executives deliberately overlooked inflated income figures for many borrowers.  Indeed, Countrywide's "Fast and Easy" mortgage program, in which borrowers were asked to provide little or no documentation of their finances, was particularly prone to abuse by loan officers and outside mortgage brokers.

78.     On May 7, 2008, *The New York Times* published a tongue-in-cheek article entitled "A Little Pity, Please, for Lenders," that shifted the onus for the current residential mortgage crisis to borrowers.  In particular, the article noted that low documentation and stated documentation loans – *e.g*., Countrywide's No Income/No Assets Program and Stated Income/Stated Assets Program – have "become known within the mortgage industry as 'liar loans' because many of the borrowers falsified their income."  However, these relaxed loan programs were created and promoted by aggressive lenders looking to amass volume loans for securitizations.

79.     In addition to ongoing SEC, FBI and FTC investigations, the Attorneys General of California, Florida and Illinois all launched investigations of Countrywide for deceptive business practices relating to its mortgage lending.  More recently, both California and Illinois have commenced lawsuits against Countrywide.

80.     *The New York Times* reported that the Illinois Attorney General initiated a lawsuit against Countrywide and Angelo Mozilo, Countrywide's Chairman of the Board and Chief Executive Officer through July 1, 2008, contending that the company and its executives defrauded borrowers in the state by selling them costly and defective loans that quickly went into foreclosure.  The lawsuit accuses Countrywide and Mozilo of relaxing underwriting standards, structuring loans with risky features, misleading consumers with hidden fees and marketing

claims, and creating incentives for its employees and brokers to sell questionable loans.  As the Illinois Attorney General explained, "[t]his mounting disaster has had an impact on individual homeowners statewide and is having an impact on the global economy.  It is all from the greed of people like Mozilo."

81.     *The New York Times* reported that the complaint, derived from 111,000 pages of Countrywide documents and interviews with former employees, "paints a picture of a lending machine that was more concerned with volume of loans than quality."  *See* Gretchen Morgenson, "Illinois to Sue Countrywide," *The New York Times,* June 25, 2008.

82.     As reported in the June 26, 2008 edition of *The New York Times*, California filed a similar lawsuit against Countrywide and Mozilo, accusing defendants of engaging in unfair trade practices that encouraged homeowners to take out risky loans, regardless of whether they could repay them.  Jerry Brown, California's Attorney General, stated: "Countrywide exploited the American dream of homeownership and then sold its mortgages for huge profits on the secondary market."

83.     On July 24, 2008, *The Los Angeles Times* reported that "three big Southland lenders [are] under federal investigation; Sources say IndyMac, Countrywide and New Century [have been] subpoenaed."  *The Los Angeles Times* further reported that officials have begun to investigate whether investors were defrauded by the value of mortgage-backed securities:

> A federal grand jury in Los Angeles has begun probing three of the nation's largest subprime mortgage lenders in the clearest sign yet that prosecutors are investigating whether fraud and other crimes contributed to the mortgage debacle.
>
> **Grand jury subpoenas have been issued in recent weeks and months to Countrywide Financial Corp., New Century Financial Corp. and IndyMac Federal Bank** seeking a wide range of information, according to sources with direct knowledge of the subpoenas.

People familiar with the situation told The Times that the subpoenas seek e-mails, phone bills and bank records and follow interviews that federal investigators have conducted with employees and others knowledgeable about the lending operations of the three Southern California institutions, which all collapsed under the weight of bad loans.

***In the case of Countrywide, the sources said, investigators have also begun looking into news reports that the firm and its former chairman, Angelo Mozilo, gave mortgage breaks to members of Congress and other influential "friends of Angelo," including Richard Aldrich, an associate justice of the California Court of Appeal.***

The investigations are part of a coordinated Justice Department effort that until now has focused primarily on smaller operators suspected of defrauding homeowners and mortgage lenders.

The subpoenas, while indicating that the effort is still at an early stage, show that the government is starting to take aim at the largest lenders and their executives to determine whether they were complicit in the multibillion-dollar mortgage crisis. The sources familiar with the subpoenas spoke on condition of anonymity because they were not allowed to discuss them publicly.

The mortgage losses have regulators and law enforcement personnel gearing up for what experts say could prove to be the biggest financial fraud case since the savings and loan crisis of the 1980s.

***Officials have said they are beginning to investigate whether securities investors were defrauded about the value of subprime mortgages they purchased, as well as other possible crimes such as insider trading by corporate officials who sold stock knowing their holdings were about to deflate in value.***

(Emphasis added).

84.     As reported in the October 6, 2008 edition of *The New York Times*, Countrywide agreed to commit $8.4 billion in loan aid as part of a settlement with the Attorneys General of eleven states, including Illinois and California, which brought suit against Countrywide alleging that the bank engaged in predatory lending practices.  The settlement provides a program by which existing loans would be modified:

[B]orrowers were placed in the riskiest loans, including adjustable-rate mortgages whose interest rates reset significantly several years after the loans were made. Pay-option mortgages, under which a borrower must pay only a small fraction of

the interest and principal, thereby allowing the loan balance to increase, also are included in the modification.

### 2. American Home Systematically Disregarded Stated Mortgage Loan Underwriting Guidelines

85.     American Home was a principal originator for the HVMLT Series 2006-6, the HVMLT Series 2006-7, the HVMLT Series 2006-14, the HVMLT Series 2007-2, the HVMLT Series 2007-5 and the HVMLT Series 2007-7 Certificate Offerings.  The total value of the six (6) Offerings for which American Home was a principal originator was $9.06 billion, of which 94.8%, or $7.88 billion, was awarded initial ratings of AAA.  Following issuance of the Certificates, information indicating that American Home systematically disregarded the underwriting guidelines set forth in the Offering Documents began to emerge.  As a result, 93.2%, or $7.34 billion, of the initially rated AAA Certificates have been downgraded to speculative "junk" status and below.  Moreover, current delinquency and default rates on the American Home-originated collateral has risen exponentially since the Certificates were issued – from 0.67% as of the cut-off dates to over 34% as of May 1, 2009.

86.     By mid-2007, American Home's dubious underwriting practices caught up with American Home.  On August 2, 2007, the New Jersey Department of Banking and Insurance ordered American Home to stop doing business in the state and started the paperwork to revoke American Home's mortgage lender license.  In the course of one week, American Home went from being one of the ten largest mortgage lenders in the country, servicing about $50 billion in loans, to insolvency because of cash shortages and demands for more collateral from its lenders.  As a result, American Home was forced to file for bankruptcy protection on August 6, 2007.

87.     In fact, American Home had been originating fraudulent and defective loans as early as 2006.  Specifically, in 2006, American Home instituted several lawsuits to compel

smaller lenders to repurchase bad loans that had all suffered early payment defaults.   The purchase contract defined "early-payment default" as "any mortgage loan in which one or more 30-day delinquency occurred in the three months following the purchase of the loan."   See *American Home Mortgage Corp. v. Federal Guaranty Mortgage Corp.,* 06-CV-05465 (E.D.N.Y. Oct. 2006); *see also, American Home Mortgage Corp. v. Solutions Funding, Inc.,* 2:06-cv-05506 (E.D.N.Y. Oct. 2006); *American Home Mortgage Corp. v. USA Funding Corp.,* 2:06-cv-05956 (E.D.N.Y. Nov. 2006); *American Home Mortgage Corp. v. Home Loan Mortgage Corporation*, 2:06-cv-05993 (E.D.N.Y Nov. 2006).

88.   On September 12, 2007, *Newsday* reported that Fitch downgraded $16.2 million of American Home's loans to "scratch and dent" bonds.   Unlike other mortgage-related securities, which enjoy an assumption of industry-standard performance, "scratch and dent" bonds are scrutinized for actual performance from the day they are bundled and sold as securities.

89.   American Home's egregious conduct was further revealed on February 11, 2008, when the *Wall Street Journal* reported that American Home had 490,000 home loan files in storage with no idea who owned the loans.   This evidenced that American Home was signing off on loans without any attention to the contents of the documents.   Moreover, rather than taking responsibility, American Home's solution was to destroy all the loans because it cost $45,000 a month to warehouse.   Only after facing fierce opposition did American Home finally offer to hand over the loans to investors who say they can prove that they are the rightful owners of the loans.

90.   In addition to its civil woes, American Home is involved in several criminal probes and investigations.   According to a May 5, 2008 article in *The Globe and News,*

prosecutors from the Eastern District of New York were investigating American Home for criminal activity including reporting misrepresentations in securities filings about the company's financial position and quality of its mortgage loans, failing to disclose a rising number of loan defaults and engaging in questionable accounting to hide losses.

91.     As early as March 2008, federal prosecutors already had convicted one American Home sales executive, Kourash Partow, of mortgage fraud.  According to a March 11, 2008 *Wall Street Journal* article, after conviction, Partow, who worked for Countrywide before joining American Home, sought a lighter sentence on the grounds that his former employers, Countrywide and American Home, not only had knowledge of the loan document inaccuracies but in fact encouraged manipulation by intentionally misrepresenting the performance of loans and the adequacy of how the loans were underwritten.  Partow's attorney argued that Countrywide and American Home had competitive cultures that encouraged a blind eye mentality.  In fact, American Home immediately hired Partow and appointed him as branch manager and loan officer even though he had been fired from Countrywide in June 2006 after FBI scrutiny of his loans provoked an internal audit.  Partow admitted that that he would falsify accurate information given by clients by inflating income or assets in order to get loans approved.  Most of the loans did not require documentary verification of such figures.

92.     Presently all that remains of American Home is the servicing unit which was purchased by Wilbur Ross of WL Ross & Co. on October 5, 2007 for $500 million.  In March 2008, the *Globe and Mail* reported that Ross, who has a reputation for buying distressed companies at rock-bottom prices, bought Option One, H&R Block's mortgage servicing division, to merge with American Home.  Together, the two units comprise the second largest servicing business for subprime loans in the country.

**3.      IndyMac Systematically Disregarded
Stated Mortgage Loan Underwriting Guidelines**

93.      IndyMac was a principal originator for the HVMLT Series 2006-14 Certificate Offering.  The total value of the Offering for which IndyMac was a principal originator was $2.4 billion, of which 94.3%, or $2.27 billion, was awarded initial ratings of AAA.   Following issuance of the Certificates, information indicating that IndyMac systematically disregarded the underwriting guidelines set forth in the Offering Documents began to emerge.  As a result, 100%, or $2.27 billion, of the initially-rated AAA Certificates have been downgraded to speculative "junk" status and below.  Moreover, delinquency and default rates on IndyMac-originated collateral have risen exponentially since the Certificates were issued – from 0.13% as of the cut-off dates to over 41.42% as of May 1, 2009.

94.      IndyMac's growth was propelled by its utilization of Alt-A, stated-income high CLTV/piggyback and negative/interest-only amortizing loans.  Alt-A loans are those loans offered to applicants who lack proof of income from traditional employment, such as investors or self-employed borrowers.

95.      By the third quarter of 2006, IndyMac was the top Alt-A lender nationwide and had earned the nickname "the kingpin of Alt-A loans."  IndyMac had originated more than $49 billion in Alt-A production, representing 77.5% of IndyMac's total origination volume.  *See* Zelman Credit Suisse Analyst Report, "Mortgage Liquidity du Jour: Underestimated No More," March 12, 2007.

96.      In response to media sources' characterization of IndyMac as a subprime lender, IndyMac issued a press release on March 15, 2007 claiming it had been inappropriately categorized.  IndyMac stated that it is primarily a prime/Alt-A mortgage lender with minimal exposure to the subprime market.  Further, IndyMac maintained that subprime mortgages

generally include loans where the borrower's FICO score is 620 or below and that their customer's average score was 701 in 2006.

97.     Soon after IndyMac's press release, *CNNMoney.com* published the article "'Liar's Loans': Mortgage Woes Beyond Subprime," which disclosed that there was a growing indication that Alt-A mortgages issued by lenders, such as IndyMac, "could be the next threat to the troubled real estate market – and the economy."

> Subprime mortgages have been generating a lot of attention, and worry, among investors, economists and regulators, but those loans may be only part of the threat posed to the housing market by risky lending.
>
> Some experts in the field are now concerned about the so-called Alt.-A mortgage loan market, which has grown even faster than the market for subprime mortgage loans to borrowers with less than top credit.
>
> Alt-A refers to people with better credit scores (A-rated) who borrow with little or no verification of income, or so-called alternative documentation.
>
> But some people in the industry call them "stated income" loans, or worse, "liar loans."  And they were an important part of the record real estate boom of 2004 and 2005 that has recently shown signs of turning into a bust.
>
> *            *            *
>
> ***Inside Mortgage Finance's Cecala said he believes underwriting of the loans had grown too loose by the end of last year, and that even some subprime borrowers were getting so-called low-doc or no-doc loans.  He believes as much as a quarter of Alt.-A loans were going to subprime borrowers.  "In some ways it's the worst possible combination," he said.***
>
> Now with the market correcting, even some borrowers with good credit are having Alt. A loan applications rejected, Ohlbaum said.  That will cut off another source of financing for the battered real estate market.
>
> The biggest Alt-A lender is Pasadena, Calif-based IndyMac Bancorp.  Trade publication Inside Mortgage Finance estimates it did $70.2 billion of the loans in 2006, up 48 percent from a year earlier.  As the sector grew, its shares shot up nearly 50 percent in a year and hit a record high in April 2006. But with rising concern about the mortgage sector, its shares have plunged 36 percent since the start of 2007.

98.    On March 21, 2007, *Housing Market* published an article entitled "US Housing Market – IndyMac – We are Not a Subprime Lender!" which criticized the differentiation between subprime and Alt-A provided by IndyMac.  IndyMac's key differentiating factor – the borrower's FICO score – "is hardly the root cause of the escalating subprime defaults," but rather "[t]he problem lies in the type of loans that have been originated."   The article described IndyMac's Alt-A loans as "Liar Loans" since income is taken as fact:

> No further documentation is required.  As long as the automated property appraisal software is functioning, approval is only a few keystrokes away.  ***These loans are tremendously profitable, since the underwriting costs are much lower and the rates are higher than a standard 30 year fixed mortgage.***

(Emphasis added.)

99.    IndyMac's use of piggyback loans, as part of its Alt-A loan production, was equally as risky.  It was only after the Offerings that IndyMac first separated out its loan production to include a delineation of piggyback loans, which showed that a significant portion of IndyMac's loan production was risky 80/20 piggyback mortgage loans.

100.    In response to IndyMac's risky loan preferences, Moody's announced that it would begin modeling Alt-A loans as subprime loans absent strong compensating factors.  The Ratings Agency had found that "[a]ctual performance of weaker Alt-A loans has in many cases been comparable to stronger subprime performance, signaling that underwriting standards were likely closer to subprime guidelines."   "Moody's Says Some 'Alt-A' Mortgages Are Like Subprime," *Bloomberg News*, July 31, 2007.

101.    On August 20, 2007, an article in *Business Week* entitled, "Did Big Lenders Cross the Line? Law Suits Assert Some Firms Doctored Loan Documents," provided glaring examples of IndyMac's loose underwriting and aggressive mortgage lending practices.  The article discussed the disturbing story of Elouise Manuel, where an IndyMac underwriter directed that

certain income documentation in her stated-income loan application be blacked-out in order for the loan to be approved.  The conditional approval letter from IndyMac even informed the loan applicant that to be approved it needed "[Social Security] benefits letters for the last two years with income blacked out."  Ultimately, Ms. Manuel was unable to pay the loan, and subsequently lost her home.

102.    These types of stated-income loans were the easiest to manipulate, and the easiest for IndyMac to follow through on due diligence had it so desired.  IndyMac could have insisted on double-checking a client's stated income by utilizing IRS Form 4506.  When asked by analysts during the November 2, 2006 Conference Call, as to what percentage of IndyMac's Alt-A customers provided IndyMac with IRS Form 4506, Michael W. Perry ("Perry"), Chairman of IndyMac Bancorp, Inc.'s Board of Directors and Chief Executive Officer, was evasive and non-responsive.  Indeed, studies have confirmed that upwards of 90% of stated-income loan borrowers exaggerated their stated income by over 50%.  "Eighth Periodic Mortgage Fraud Case Report to Mortgage Bankers' Association," produced by Mortgage Asset Research Institute, Inc., April 2006.

103.    IndyMac Bancorp's 2007 Annual Report contained Shareholders, dated February 12, 2007, in which the Company's Chairman and CEO "[took] full responsibility for the mistakes [IndyMac] made," indicating that IndyMac's "innovative home lending went too far" and resulted in a "'systemic' underestimation of credit risk."  Perry also confirmed that once "we began to realize [the systemic underestimation of credit risk], we tightened our [underwriting] guidelines throughout the last year…."

Dear shareholders,

2007 was a terrible year for our industry, for IndyMac and for you, our owners. …

*      *      *

Who is to blame for the mortgage industry's financial losses and also the record number of Americans losing their homes?

*All home lenders, including Indymac, were a part of the problem, and, as Indymac's CEO, I take full responsibility for the mistakes that we made… Most of us believed that innovative home lending served a legitimate economic and social purpose, allowing many U.S. consumers to be able to achieve the American dream of homeownership … and we still do.* Homeownership is the main way we Americans accumulate wealth, and, in fact, a recent Federal Reserve Bank study shows that homeowners on average have 46 times the personal wealth of renters.

*As innovative home lending and loan products became more widespread, the result was more people succeeding (in homeownership) and more people failing (losing their home) than ever before. …*

*However, in retrospect, like many innovations (e.g., the Internet, railroads, etc.), innovative home lending went too far…*

*      *      *

*… Automated risk-based models, on which the entire market relied, replaced portions of traditional underwriting and credit evaluation, and only in retrospect is it now clear that these models did not perform as predicted during a period of severe economic stress. As events unfolded, this proved to be particularly the case with respect to programs such as piggyback loans and high LTV cash-out refinance transactions, including home equity and second mortgages.*

*The bottom line of the housing crisis for Indymac and its leadership team. As I said earlier, I take full responsibility for the errors we made at Indymac…*

IndyMac 2007 Annual Report, Letter to Shareholders, at 1-9 (emphasis added).

104.    On June 6, 2008, a detailed amended complaint was filed in federal court in the Central District of California against IndyMac and Perry, for violations of the federal securities laws.  As alleged, IndyMac issued numerous materially false and misleading statements regarding the company's strong internal controls and underwriting practices.  In reality, however, IndyMac's internal controls were grossly deficient.  According to the IndyMac complaint,

IndyMac's management, including Perry, exploited internal control weaknesses or overrode controls to drive loan originations and sales growth.

105.    For example, a former IndyMac vice-president stated that Perry sought to make his short term goals for the company "at all costs."  To this end, Perry put immense pressure on subordinates to "push loans through," even if it meant consistently making "exceptions" to the company's guidelines and policies.

106.    According to confidential witnesses, the following practices, which were contrary to stated IndyMac guidelines, were employed to close loans: (a) intentionally manipulating software used to compute loan eligibility; (b) violating stated rate lock protocols and controls; and (c) disregarding underwriting guidelines generally, with a focus on growing loans without the required documentation.  On January 13, 2009, the Honorable George H. Wu, United States District Judge for the Central District of California, indicated that the federal securities law violations against IndyMac's CEO Perry will move forward.

107.    As reported by *CNNMoney.com* on July 11, 2008, the Federal Deposit Insurance Corporation (the "FDIC") shut down IndyMac Bancorp and operations were taken over by federal regulators.  At the center of IndyMac's demise was its focus on Alt-A loans that it had long argued were of minimal risk.  In that same article, *CNNMoney.com* discussed how IndyMac had gotten to this point:

> ***IndyMac specialized in loans it had long argued were of minimal risk: low documentation loans to residential mortgage borrowers.***
>
> On Tuesday, IndyMac - which had 33 branches - announced that it was firing 53% of its workforce and exiting its retail and wholesale lending units.  Last year, the lender was ranked 11th in residential mortgage origination, according to trade publication *Inside Mortgage Finance*.

*       *       *

IndyMac lost $184.2 million in the first quarter and announced on Monday that it was expecting a wider loss for the second quarter. *It lost $614 million last year stemming from its focus on the Alt-A mortgage sector, where it originates loans to borrowers who fall between prime (or conforming) and sub-prime on the credit spectrum.* The lender's chief executive, Michael Perry, had long argued that it was being unfairly punished given its relatively paltry exposure to sub-prime mortgages.

Rising Alt-A and sub-prime mortgage delinquencies likely were enough indication for investors that the housing crisis had moved beyond the weakest borrowers. Even worse, with the securitization markets in collapse, IndyMac had no way to get new loans off its books. *As it turned out, IndyMac was a leader in loans requiring little income and asset documentation, a category that has had disastrous levels of delinquencies at other troubled lenders*. What loans the bank had made recently were to borrowers with well-documented assets and income, but those are sharply less profitable with respect to fees and interest income.

(Emphasis added).

### 4. BankUnited Systematically Disregarded Stated Mortgage Loan Underwriting Guidelines

108.    BankUnited was a principal originator for the HVMLT Series 2006-8, the HVMLT Series 2006-10 and the HVMLT Series 2006-14 Certificate Offerings. The total value of the three (3) Offerings for which BankUnited was a principal originator was $5.27 billion, of which 92.5%, or $4.88 billion, was awarded initial ratings of AAA. Following issuance of the Certificates, information indicating that BankUnited systematically disregarded the underwriting guidelines set forth in the Offering Documents began to emerge. As a result, 95.3%, or $4.65 billion, of the initially rated AAA Certificates have been downgraded to speculative "junk" status and below. Moreover, current delinquency and default rates on the BankUnited originated collateral has risen exponentially since the Certificates were issued – from 0.04% as of the cut-off dates to over 40% as of May 1, 2009.

109.    BankUnited, based in Coral Gables, Florida was organized in 1993 and grew to be the largest banking institution headquartered in Florida. According to *Reuters*, BankUnited

began as an originator of both fixed and adjustable rate, first-lien mortgages.  But as the potential for greater loan volume and higher origination fees grew, so did the allure of Neg Am or Option-ARM loans.

110.    On August 9, 2006, BankUnited reported $12.2 billion in assets and record quarterly net income, up 45% from the prior year. This was followed two months later, on October 24, 2006, when BankUnited reported a record fiscal year net income of $83.9 million, and double-digit increases in income, margin, deposits and loan production.  According to BankUnited's Annual Report, this record increase included a 32% increase in option ARM residential loans over the fourth quarter of the previous year.

111.    As reported in a January 2007 *Miami Herald* article, however, BankUnited's record profit came at the expense of its underwriting guidelines.

> BankUnited posted record profit while simultaneously disregarding an increase in troubled loans.  Mr. Ortiz brushed off the losses, stating he was "dumbfounded" by "the keen interest in [BankUnited's] nonperforming assets," and attributed the delinquencies to a rise in insurance bills.

112.    As the market turned in late 2006, BankUnited's troubles continued to grow.  As reported in BankUnited's 10-Q in December 2006, 69.3% of the bank's loans were option-ARMs, and an additional 17.7% were non-option ARMS, leaving a mere 13% in traditional, fixed-rate loans.  This overexposure led BankUnited to issue a press release in mid-2007, stating that $6.5 billion of their $7.6 billion option ARM portfolio was negatively amortizing.

113.    At the end of 2007, BankUnited's non-performing assets (including past due and delinquent loans, as well as properties foreclosed upon) had increased nine-fold.  $6.7 billion of mortgages held by BankUnited were negatively amortizing, putting 55% of the bank's loan book at risk.  Although BankUnited still refused to label these loans as subprime, it originated 82% of

these loans through its limited or no documentation programs.  Only 18% of BankUnited's portfolio had been originated pursuant to its full documentation guidelines.

114.   In January 2008, BankUnited, expressing disappointment and citing the "extraordinary" deterioration of the mortgage and housing markets, reported a loss of $25.5 million.

115.   In July 2008, *CNBC* placed BankUnited on "the danger list" of banks on the verge of failure.

116.   On September 5, 2008, the Office of Thrift Supervision (the "OTS") issued a Cease and Desist Order to BankUnited.  The Cease and Desist Order required the bank, among other things, to "reduce the portfolio of negative option ARM loans" and to raise $400 million in capital to cover the expected losses from these toxic loans.  At the same time, the OTS downgraded BankUnited to "adequately capitalized" from the highest rating of "well capitalized."

117.   Many of the disclosures regarding BankUnited's problems and poor underwriting practices were supported in a detailed complaint for violations of the federal securities laws filed against BankUnited on September 16, 2008 in the United States District Court for the Southern District of Florida.  *See Waterford Township General Employees Retirement System v. BankUnited Financial Corporation, et al.,* No. 08-CV-22572 (S.D. Fla., Sept. 17, 2008) (the "BankUnited Complaint" or the "BankUnited Compl.")

118.   The BankUnited Complaint alleged that the bank and its top executives had employed, poor underwriting standards in their loan origination process, and had failed to disclose the extent to which these standards were relaxed or disregarded in the underwriting process.  Further, the BankUnited Complaint alleged that the bank had failed to disclose the true

nature of the losses that were certain to occur once interest rates had reset on the billions of dollars of Neg Am loans that BankUnited had originated.

119.    As alleged in the Complaint, BankUnited engaged in "sketchy" underwriting whereby appraisal values were inflated.  This allowed borrowers to obtain mortgages they could not otherwise afford.

120.    On April 19, 2009, *The New York Times* reported that the OTS had issued a "prompt corrective action directive" requiring BankUnited to find a buyer who would raise its depleted capital to acceptable levels or risk a government takeover.

### 5.    Downey Systematically Disregarded Stated Mortgage Loan Underwriting Guidelines

121.    Downey was a principal originator for the HVMLT Series 2006-13 and the HVMLT Series 2007-7 Certificate Offerings.  The total value of the two (2) Offerings for which Downey was a principal originator was $1.99 billion, of which 96.9%, or $1.43 billion, was awarded initial ratings of AAA.  Following issuance of the Certificates, information indicating that Downey systematically disregarded the underwriting guidelines set forth in the Offering Documents began to emerge.  As a result, 63%, or $891 million, of the initially-rated AAA Certificates have been downgraded to speculative "junk" status and below.  Moreover, current delinquency and default rates on the Downey-originated collateral has risen exponentially since the Certificates were issued – from 1.44% to over 33% as of May 1, 2009.

122.    From 2001 through their eventual seizure and forced sale by the FDIC in November 2008, Downey concentrated its origination practices on Option ARM or Neg Am loans.  Downey began as a mortgage lender specializing in loans to applicants with stellar credit, but Option-ARM and Neg-Am loans constituted 73% of Downey's single-family lending portfolio by 2003, and 91%, or $13.4 billion, by 2005.  According to *HousingWire.com*, Downey

reported quarterly earnings of $32.7 million from its Option-ARM loan programs in July 2007. However, by July 2008, Downey was reporting quarterly losses of more than $218 million as a result of the increasing numbers of bad loans on its books.

123.     According to Downey's 2007 Annual Report, 82% of the loans in Downey's portfolio were underwritten using Downey's stated income program, and another 7% were underwritten using its stated income and stated asset documentation.  Thus, 89% of Downey's 2007 loan portfolio had been originated without any verification of borrower capacity.

124.     On July 11, 2008, *The Los Angeles Times* reported that Downey had informed its wholesale lending clients that it was dropping "its infamous option arm loan program, presumably before it dropped them."

> Downey has been big on the option arm for years, but it's clearly not working well for them anymore, as 14.33 percent of their assets are now considered non-performing, up from just 1.30 percent a year earlier.

125.     On September 5, 2008, the OTS issued a Cease and Desist Order requiring Downey to "cease and desist from any unsafe and unsound practices regarding lending."  In addition, the Order found that Downey's "asset quality, earnings, liquidity planning, management and projected capital levels" were "not satisfactory and require[d] strengthening." As part of the Order, Downey was required to create a plan to reduce its Option ARM and stated income programs.

> Within forty-five (45) days, the Board shall review, approve and submit for OTS review and non-objection a written comprehensive long-term Business Plan covering at least a three-year period (Business Plan) beginning with the fourth quarter of 2008 (4Q 2008).  ***The Business Plan shall, at a minimum, contain specific Board strategies for a reduction in concentration of Payment Option Adjustable Rate Mortgage and Stated Income loans.***  The Business Plan shall specify the manner and method for reducing the Association's level of Payment Option Adjustable Rate Mortgage and Stated Income loans, including the establishment of a timetable and target reduction amounts.

49

OTS Order, at 8 (emphasis added).

126.    On October 16, 2008, *Bloomberg.com* reported that Downey had shut its wholesale mortgage lending department and associated loan processing centers and had "scaled-back" its retail lending operations.

127.    On November 10, 2008, in its quarterly report, Downey stated in its quarter that it would be unable to satisfy minimum capital ratios required by the OTS Order and that there is substantial doubt that Downey will be able to continue as a going concern.

128.    On November 21, 2008, the *OC Register*, a California-based publication, reported that the FDIC had seized all of Downey's assets and property because it had not been able to raise the capital requirements necessary to remain viable. The following day, *Bloomberg.com* reported that the FDIC had transferred control of Downey's operation to U.S. Bancorp.  The transfer of control was predicated on U.S. Bancorp's agreement to absorb the first $1.6 billion due to Downey's exposure, with the remainder being shared between the FDIC and U.S. Bancorp.

129.    Downey's improper lending practices were detailed in a complaint alleging violations of the federal securities laws filed against Downey and its parent company, Downey Financial Corp., on May 16, 2008 in the United States District Court for the Central District of California.  *See In re Downey Securities Litigation,* Civ. No. 09-03261-JFW (RZx) (the "Downey Complaint" or the "Downey Compl.").  The Downey Complaint alleged that Downey ignored its own stated underwriting guidelines, engaged in predatory lending practices and concealed losses by manipulating its capital requirements all arising from its Option-ARM loan programs.

130.    According to the Downey Complaint, because of the Neg Am loan's ability to reset up to six times in a six-to twelve-month period, a former Downey senior underwriter recalled that employees in his/her office called Option ARMs their own form of "liar's loans." Now, instead of the name applying to the applicant's ability to lie on a stated income loan application, the lender was able to lie about the true interest rate and monthly payments on the loan.   Moreover, these Neg Am loans were offered to borrowers through Downey's stated income program.

131.    According to a broker who worked at the bank, Downey did not do any reasonableness tests on stated incomes.  Downey Compl., at ¶ 60.  Had such tests been done, "Downey would have learned that the borrowers did not have the income to qualify."  (*Id.*) Servicing logs and servicing histories in Downey's customers' files made clear that Downey was aware that applicants did not have, and never had, the income to qualify for these loans.  (*Id.*)

132.    According to a former Downey account executive who worked for Downey from 2005 to 2007, *"**Downey's underwriting guidelines were very vague which mortgage brokers and account executives took advantage of to get loans passed through**."*  Downey Compl., at ¶ 61 (emphasis added.)

133.    A senior underwriter in Downey's Scottsdale, Arizona Operations Center from 2004 until 2007 further supported this view: "borrowers with low credit scores and very little proof of income were approved for Option ARM loans that they clearly would not be able to afford once they adjusted."  Downey Compl., at ¶ 62.

134.    As alleged in the Complaint, Downey not only concentrated on pushing these Option ARMs through the underwriting process, but also trapped borrowers in these loans by imposing drastic prepayment penalties on the loans, in some cases six months' worth of interest

on the loan." Downey Compl., at ¶ 8.  Thus, when monthly payments skyrocketed, the borrower would be forced to either pay the higher monthly payment or refinance and pay a prepayment penalty and refinancing fees for escaping the loan.  *Id*.  As a mortgage broker whose company brokered loans with Downey between 2004 and 2006 stated, "Downey did not disclose to potential borrowers the risks involved with the Option ARM product."  *Id.*, at ¶ 55.  7Mel Foster, a Downey account executive with 14 years of experience stated that the responsibility of an account executive was to just "bring in loans."  *Id*., at ¶ 56, n.7.

135.    The Downey Complaint also provided that, employees such as account executives and branch employees were given incentives to push Neg-Am loans on customers.  Downey Compl., at ¶ 11.  Downey's internal guidelines required that these loans be pushed through even when there was little ability of the borrower to repay.  One former Downey wholesale operations manager recalled being "berated by Downey's director of lending for objecting to a loan application which claimed a McDonald's employee made $8,500 per month because guidelines for stated income loans called for the loans to be processed."  Downey Compl., at ¶ 12.  Where Downey underwriters denied applicants, it was customary for Downey superiors to grant exceptions and fund the loan anyway.  Downey Compl., at ¶ 15.  Although Downey used an automated system to underwrite most of its loans, "any senior underwriter could override the system for any loan." Downey Compl., at ¶ 63.

136.    As one wholesale operations manager, named as a confidential witness in the Downey Complaint, recounted, when he/she refused a loan because it was obvious that the income was overstated:

> The account executives would go over his/her head to get exceptions.  Generally … he/she would get a call from [Downey's Senior Vice President and Director of Lending, Denise] Moeller of the corporate office telling him/her that they were good loans and instructing him/her to manually override the automated system.

> When [he/she] argued the facts with Moeller, Moeller would tell him/her to follow the guidelines for Stated Income Loans and put the loan through.  [He/She] recalls butting heads with Moeller often because he/she did not believe in the bad loans but was told that it did not matter.

Downey Compl., ¶ 66.

137.   As restated in the Downey Complaint, Downey was the subject of several predatory lending lawsuits based on its Option ARM/Neg Am loans.

> Harry Donald Fisher filed suit on April 8, 2008 in Sonoma County Superior Court.  Mr. Fisher was approved for a Downey Option ARM on or about March 2005.  Mr. Fisher was 71 years of age at the time, retired and unemployed.  His sole source of monthly income was his retirement benefits and Social Security payments, totaling $2,379.94 a month.  Mr. Fisher has a high school education and a history of medical problems.  Mr. Fisher was offered a 1% mortgage on his home on the promise that his monthly payments would be reduced dramatically and he could receive several thousand dollars of equity out of his house for his personal use.  Mr. Fisher maintains that his income on his loan application was fraudulently increased to reflect $8,000 a month qualifying him for the loan.  The broker received $21,009.68 from Downey that consisted of a $7,999.68 origination fee, $495 processing fee, $35 credit report fee and $12,480 rebate.

> Oman Nwansi filed suit on August 30, 2006 in the Northern District of California.  On or about July 25, 2005, Mr. Nwansi, who represents at the time he was legally blind, was given a loan in the amount of $337,500 by Downey which set forth his monthly payments as $869.4 and called for a prepayment penalty of $9,051.53.  The broker was given a rebate of $10,125 or 3% for the loan by Downey.  In October 2005, Mr. Nwansi refinanced with Downey this time in the amount of $360,000 with monthly payments set at $1,242.44, indicating that the amount may change.  Mr. Nwansi has asserted that he did not want to refinance, he wanted a second line of credit.  The broker was given a rebate of $11,700 or 3.250% for the loan by Downey.  Mr. Nwansi paid the $9,051.53 penalty for prepayment on his July 2005 Downey loan and $6,892.65 in settlement charges for his October 2005 Downey loan.  Downey did not contact Mr. Nwansi as to why he would seek to refinance his loan eight weeks after the original loan, despite Downey's right to contact the borrower under its Wholesale Agreement with the broker.  Mr. Nwansi was subjected to what is known as "loan flipping," described as the predatory lending practice of: "inducing a borrower to repeatedly refinance a loan in order to charge high points and fees each time the loan is refinanced."  The OTS ultimately required Downey to have sufficient internal controls to ensure compliance with applicable laws to avoid such practices.

> Reverend Will Hardeman filed suit on January 24, 2007 in Alameda County Superior Court.  Mr. Hardeman, is a 96-year-old widowed man with vision and

hearing difficulties, and suffers from a mild form of dementia.  Mr. Hardeman owned his home for 34 years.  He had a fixed income of $1,300 per month supplemented by periodic negligible donations he received serving as a pastor. Mr. Hardeman refinanced a subprime mortgage on his home in early 2006 with World Savings and Loan which raised his monthly payment to $1,400 on an adjustable rate mortgage.  On or about April 21, 2006, Mr. Hardeman received a loan application from Downey in the amount of $322,006.50 with an adjustable rate at 7.472% with monthly payments of $1,005.39 (increasing to $2,380.40 in the year 2009).  The loan origination fee to be paid to the broker was 2%.  Less than a week later, another set of loan documents was prepared which set forth a loan in the amount of $340,509.10 with an adjustable rate of 8.674% with a monthly payment of $2,350 for five years increasing to $2,802.58 and gave the broker a 5% origination fee.  The second loan application indicated Mr. Hardeman's monthly income as $5,382.  Three months later Downey was notified of problems with the loan and responded indicating that Mr. Hardeman was required to pay the higher monthly payment.  On September 22, 2006, Downey began foreclosure proceedings.

Lewis Gary Morris filed suit on April 19, 2007 in Northern District of California. Mr. Morris is in his mid-60s and is diagnosed with schizophrenia.  Mr. Morris entered into a loan with Downey on or about April 2006 with a variable interest rate of 7.586% which would adjust 30 days after the loan's inception and a prepayment penalty equal to six months of advance interest.  The application stated that Mr. Morris made $100,000 annually or $9,200 a month when he actually made less than $20,000 annually with an income of only $1,350 a month.

Gerald Porter filed suit on August 28, 2007 in San Diego County Superior Court. Mr. Porter was in his mid-70s with diminished cognitive ability and owned a home in Escondido, California.  In applying for a loan with Downey, Mr. Porter was asked to provide proof of his retirement check from the State of California Teacher's Retirement System in the amount of $3,157.41, mortgage statement, insurance and tax information, bank statement and driver's license with social security card.   Despite Mr. Porter's contention that he signed no loan documentation, on or about May 19, 2007, he received a "Payoff' notice from his prior lender and notice that his loan had been refinanced with Downey.  Mr. Porter then requested a copy of the loan documents from Downey, which reflected forged signatures.  The loan documentation incorrectly stated that he received $1,800 in Social security/Disability Income.   The documents had approved a Neg Am loan with a 7.21% (almost 2% higher than his existing loan) with total finance charges of $382,744.15, doubling his finance charges from his original loan and a three-year prepayment penalty.  Further, the broker was paid a $7,605 yield spread premium by Downey.

Celedonio and Edith Rabe (the "Rabes") filed suit on June 12, 2007 in the Southern District of California.  The Rabes are 70-plus-year old, financially unsophisticated seniors who lived in their home in San Diego, California since

1978. In spring 2005, the Rabes responded to a flyer advertising reverse mortgages, but instead received a mortgage from Downey. The Rabes had an income of approximately $1,900-$2,100 per month. Their existing loan had a 6.5% fixed interest rate and payments of $1,200 per month with a prepayment penalty. The income application submitted by the Rabes' broker falsely stated that they had a Social Security income of $7,048 per month. The loan left the Rabes paying $15,300 in fees on a $370,000 loan which also contained a prepayment penalty, and by the end of 2006, the principal balance was $390,549.44 with an 8.2075% interest rate and a 3.45% margin with the interest only payment on the loan being $2,671.20.

(*Id.*)

### D. GCM's Inadequate Due Diligence with Respect to Compliance with Stated Mortgage Loan Underwriting Guidelines

138. The Registration Statement provided that the loan underwriting guidelines used to originate the loan collateral was specifically set forth in each of the Prospectus Supplements. (¶¶ 191-199, 203, 205, 210, 213, 217, 220, 230). The Prospectus Supplements provided that the collateral underlying the Certificates was originated pursuant to stated underwriting guidelines of the principal loan Originators set forth therein. (*Id.*)

139. GCM played a prominent role in the rise and fall of the U.S. subprime mortgage market. Since 1987, GCM has helped mortgage lenders issue more than $400 billion in asset-backed securities. As an underwriter on transactions involving more than $183 billion of securities issued in 2004, GCM ranked as the industry's No. 1 underwriter of sub-prime mortgages and the top asset-backed sales organization. In 2005, GCM ranked No. 2 in the top ten subprime MBS underwriters. In both 2004 and 2005, GCM ranked No. 3 in the top ten non-agency MBS underwriters. As the sole Underwriter of the Certificate Offerings, GCM conducted inadequate due diligence with respect to whether the various Originators complied with the loan underwriting guidelines described in the Prospectus Supplements.

140.   In June 2007, the NYAG launched an investigation into whether underwriters of mortgage-backed bonds turned a blind eye to the possibility that many of the securities' underlying home loans were facing default.  In a December 6, 2007 article published in *The New York Times*, it was reported that:

> Andrew Cuomo, the New York attorney-general, has subpoenaed RBS and about 15 of Wall Street's biggest sub-prime mortgage bond underwriters, such as Bear Stearns and Merrill Lynch, requesting information that will help to determine how much due diligence was conducted on the home loan-backed securities that they issued.
> RBS is the seventh-biggest underwriter of US mortgage bonds this year, managing issues worth $52 billion, (£25.6 billion), giving it a 5.8 per cent share of the market, according to Thomson Financial.
>
> Mr. Cuomo is also examining the relationship between mortgage lenders, third party-due diligence firms, the credit rating agencies and the underwriting banks to see if they colluded to ignore risks.
>
> Wall Street firms made hefty fees from buying high-risk sub-prime mortgages and packaging them into bonds backed by the home loans' interest payments. Investors, including Wall Street giants such as Citigroup, as well as hedge funds and pension funds, have collectively lost more than $50 billion this year on sub-prime-backed bonds after a surge in defaults on high-risk home loans forced down their valuations.
>
> Many of Wall Street's underwriters relied heavily on third-party vendors to examine the home loans that were used to back the mortgage bonds.  This helped them to determine how reliable an income stream the underlying mortgages would produce and, in turn, how likely it was that the bonds' interest payments would be met.
>
> Since bond underwriters have an obligation to make sure that the statements made in the securities' offering documents are accurate, Mr. Cuomo is investigating how much, if any, due diligence they conducted themselves.  He is also seeking to determine whether they should have done more.

141.   On February 8, 2008, a *Stamford Tribune* article entitled "RBS Arm Involved in SEC Inquiry" reported that Royal Bank of Scotland had confirmed that its GCM unit was part of an SEC probe into the collapse of the subprime market and had been ordered to turn over

financial documents to the SEC regarding, *inter alia*, originations of mortgages, accounting, due diligence, sales and insider trading:

> **The Royal Bank of Scotland has confirmed its Greenwich Capital unit is part of a Securities Exchange Commission probe into the collapse of the subprime mortgage market.**
>
> The SEC has opened about three dozen inquiries, including those that involve major investment banks, according to recent published reports.
>
> **Greenwich Capital … was asked by the SEC to hand over some of its financial documents,** but RBS officials would not comment on the probe beyond that.
>
> *      *      *
>
> The SEC opened its investigation in June, launching a dozen investigations into collateralized debt obligations linked to the plummeting value of subprime mortgages.
>
> **The SEC is said to be looking at originations of mortgages, accounting, due diligence, sales of securities and insider trading.**
>
> Recent published reports cite sources claiming the SEC investigation now is moving at a more vigorous pace.

(Emphasis added.)

142.    Further, in connection with the SEC probe into the collapse of the subprime market, on March 8, 2008, Royal Bank of Scotland confirmed that its GCM unit had been ordered to turn over financial documents to the SEC regarding originations of mortgages, accounting, due diligence, sales and insider trading.  According to a May 11, 2008 article in the English newspaper, *The Sunday Times*:

> Details of the investigation are buried in the prospectus for the bank's imminent £12 billion rights issue, which will be put to a vote at a shareholder meeting this week.
>
> The probe is in addition to an earlier inquiry by the New York State attorney-general – relating to the bank's Greenwich Capital subsidiary – which came to light earlier this year.
>
> The documents reveal that RBS subsidiaries have received requests for

information from "various US governmental agencies and self-regulatory organisations" in relation to the sub-prime mortgage crisis.

The documents add: "In particular, during March 2008 RBS was advised by the SEC that it had commenced a nonpublic, formal investigation relating to RBS's US sub-prime securities exposure and US residential mortgage exposures.  RBS and its subsidiaries are cooperating with these various requests for information and investigations."

143.    In a January 12, 2008 article titled "Inquiry Focuses on Withholding of Data on Loans," *The New York Times* reported:

An investigation into the mortgage crisis by New York State prosecutors is now focusing on whether Wall Street banks withheld crucial information about the risks posed by investments linked to subprime loans.

Reports commissioned by the banks raised red flags about high-risk loans known as exceptions, which failed to meet even the lax credit standards of subprime mortgage companies and the Wall Street firms.  But the banks did not disclose the details of these reports to credit-rating agencies or investors.

The inquiry, which was opened last summer by New York's attorney general, Andrew M. Cuomo, centers on how the banks bundled billions of dollars of exception loans and other subprime debt into complex mortgage investments, according to people with knowledge of the matter.  Charges could be filed in coming weeks.

*                *                *

The inquiries highlight Wall Street's leading role in igniting the mortgage boom that has imploded with a burst of defaults and foreclosures.  The crisis is sending shock waves through the financial world, and several big banks are expected to disclose additional losses on mortgage-related investments when they report earnings next week.

As plunging home prices prompt talk of a recession, state prosecutors have zeroed in on the way investment banks handled exception loans.  In recent years, lenders, with Wall Street's blessing, routinely waived their own credit guidelines, and the exceptions often became the rule.

It is unclear how much of the $1 trillion subprime mortgage market is composed of exception loans.  Some industry officials say such loans made up a quarter to a half of the portfolios they saw.  In some cases, the loans accounted for as much as 80 percent.  While exception loans are more likely to default than ordinary subprime loans, it is difficult to know how many of these loans have soured

because banks disclose little information about them, officials say.

Wall Street banks bought many of the exception loans from subprime lenders, mixed them with other mortgages and pooled the resulting debt into securities for sale to investors around the world.

*      *      *

Mr. Cuomo, who declined to comment through a spokesman, subpoenaed several Wall Street banks last summer, including Lehman Brothers and Deutsche Bank, which are big underwriters of mortgage securities; the three major credit-rating companies: Moody's Investors Service, Standard & Poor's and Fitch Ratings; and a number of mortgage consultants, known as due diligence firms, which vetted the loans, among them Clayton Holdings in Connecticut and the Bohan Group, based in San Francisco.  Mr. Blumenthal said his office issued up to 30 subpoenas in its investigation, which began in late August.

*      *      *

To vet mortgages, Wall Street underwriters hired outside due diligence firms to scrutinize loan documents for exceptions, errors and violations of lending laws. But Jay H. Meadows, the chief executive of Rapid Reporting, a firm based in Fort Worth that verifies borrowers' incomes for mortgage companies, said lenders and investment banks routinely ignored concerns raised by these consultants,

"Common sense was sacrificed on the altar of materialism," Mr. Meadows said, "We stopped checking."

144.    On November 28, 2008, Royal Bank of Scotland announced that the government would take majority control of the bank, buying a 57.9% stake in the Company in exchange for £20 billion pounds.  In a February 27, 2009 article in *MarketWatch*, it was reported that Royal Bank of Scotland was receiving another £19.5 billion ($28 billion) in new capital from the U.K. Treasury in an agreement struck this week that gives the struggling bank the option to raise another £6 billion ($8.7 billion) from the government if needed.

145.    On March 23, 2009, in a *Telegraph* article titled, "RBS Traders Hid Toxic Debt," it was uncovered that although the Chief Executive of Royal Bank of Scotland, Sir Fred Goodwin, had repeatedly stated that Royal Bank of Scotland "don't do sub-prime," in fact,

59

traders at Royal Bank of Scotland's U.S. subsidiaries were buying up billions of dollars of subprime assets:

> Sir Fred did not tell the RBS board about the multi-million pound decision to start buying sub-prime mortgages from other banks.
>
> RBS began buying up about £34 billion of sub-prime assets as US banks were offloading the mortgages.  RBS was unable to sell the assets on as planned leading to the taxpayer bail-out.
>
> The system of annual cash bonuses encouraged bankers to buy up the assets with insufficient regard to the risks involved.
>
> The Daily Telegraph has established that Sir Fred told the RBS directors' board in 2006 that the bank would not be moving into sub-prime mortgage lending.
>
> *     *     *
>
> On April 13, 2007, New Century Financial, one of America's largest sub-prime lenders which was facing bankruptcy disclosed in a Delaware court that it had agree to sell 2,000 existing subprime mortgages to RBS Greenwich Capital Financial Products.
>
> It is claimed that it was not until the summer of 2007 … that Sir Fred told the board that RBS had, in fact, built up a substantial subprime exposure.
>
> Its investment banking division had some £20 billion of sub-prime assets. Citizens Bank [RBS's other US banking subsidiary] had about £14 billion worth of sub-prime exposure.
>
> By the end of 2007, RBS was beginning to announce losses – or write-downs – on the value of sub-prime assets that had secretly been amassed.  The majority of the bank is now owned by the Government.

146.    On January 29, 2009, ten lawsuits were filed against the Greenwich Capital Entities, including GCM, alleging violations of the federal securities laws. These lawsuits were consolidated in the United States District Court for the Southern District of New York. *Zemprelli v. The Royal Bank of Scotland Group PLC, et al*, No. 09-CV-0300.[7]  The actions all

---

[7]    The consolidated cases are *Harold H. Powell Trust U/A Dated December 21, 1988 v. Royal Bank of Scotland Group plc,* No. 09-CV-0617-DAB; *Gordon v. The Royal Bank of Scotland Group, plc,* No. 09-CV-704-DAB; *Levy v. The Royal Bank of Scotland Group plc,* No. 09-CV-856-DAB; *Wacksman v. The Royal Bank of*

allege that the Royal Bank of Scotland entities concealed the true nature of their exposure to the U.S. subprime market until August 8, 2008 when the company announced its first-ever loss after being forced to take £5.9 billion in write-downs.

147.    As alleged herein, GCM failed to conduct proper due diligence and perform necessary oversight functions in the underwriting, securitization and preparation of the Offering Documents for the HVMLT Offerings complained of herein.

148.    Specifically, GCM did little to no due diligence on the mortgage loan collateral underlying the Certificates, but rather it contracted out the work to outside third-party due diligence firms to review whether the loans included in pools complied with the loan originators' represented standards.  Greenwich Capital was a noted client of Bohan and Clayton.

149.    In June 2007, the NYAG subpoenaed documents from Bohan and Clayton related to their due diligence efforts on behalf of the investment banks, such as GCM, that underwrote MBS.  The NYAG, along with Massachusetts, Connecticut and the SEC (all of which also subpoenaed documents) are investigating whether investment banks held back information related to the sale of MBS to investors that they should have provided in the disclosure documents.

150.    On January 27, 2008, Clayton revealed that it had entered into an agreement with the NYAG for immunity from civil and criminal prosecution in the State of New York in exchange for agreeing to provide additional documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients.  On the same day, both *The New York Times* (Anderson, J. and Bajaj, V., "Reviewer of Subprime Loans Agrees to Aid

---

*Scotland Group plc*, No. 09-CV-857-DAB;  *Kosseff v. Royal Bank of Scotland Group plc*, No. 09-cv-00890-DAB; *Brown v. The Royal Bank of Scotland Group plc*, No. 09-CV-01096-DAB; *Fitter v. The Royal Bank of Scotland Group PLC*, No. 09-CV-01650-DAB; *Raynor v. The Royal Bank of Scotland Group plc*, No. 09-CV-01854-DAB; *Lindsay v. The Royal Bank of Scotland Group plc*, No. 09-CV-02325-DAB.

Inquiry of Banks," Jan. 27, 2008), and the *Wall Street Journal* ran articles describing the nature of the NYAG's investigation and Clayton's testimony.  The *Wall Street Journal* reported that the NYAG's investigation is focused on "the broad language written in prospectuses about the risky nature of these securities changed little in recent years, even as due diligence reports noted that the number of exception loans backing the securities was rising."  According to *The New York Times* article, Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

151.    A March 23, 2008 *Los Angeles Times* article reported that Clayton and Bohan employees "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated or documents that looked fake – but the problems were glossed over, ignored or stricken from reports" as follows:

> The reviewers' role was just one of several safeguards – including home appraisals, lending standards and ratings on mortgage-backed bonds – that were built into the country's mortgage-financing system.
>
> But in the chain of brokers, lenders and investment banks that transformed mortgages into securities sold worldwide, no one seemed to care about loans that looked bad from the start.  Yet profit abounded until defaults spawned hundreds of billions of dollars in losses on mortgage-backed securities.
>
> "The investors were paying us big money to filter this business," said loan checker Cesar Valenz.  "It's like with water.  If you don't filter it, it's dangerous.  And it didn't get filtered."
>
> As foreclosures mount and home prices skid, the loan-review function, known as "due diligence," is gaining attention.
>
> The FBI is conducting more than a dozen investigations into whether companies along the financing chain concealed problems with mortgages.  And a presidential working group has blamed the subprime debacle in part on a lack of due diligence by investment banks, rating outfits and mortgage-bond buyers.

*The Los Angeles Times*, "Subprime Watchdogs Ignored," March 23, 2008.

152.    Moreover, while underwriters would have sought to have Clayton review 25% to 40% of loans in a pool that was going to be securitized earlier in the decade, by 2006 the typical percentage of loans reviewed for due diligence purposes was just 5-7%.  Bohan's President, Mark Bohan, stated that "[b]y contrast [to investment banks in RMBS deals], buyers who kept the mortgages as an investment instead of packaging them into securities would have 50% to 100% of the loans examined."

**E.    Governmental Agency Investigations and Subsequent
       Findings Related to the Residential Mortgage Industry**

153.    In August 2007, following reports of defaults in mortgage loans underlying various MBS, downgrades of such MBS and potential downgrades of additional MBS in the future, and the resulting illiquidity in the credit markets, the President of the United States commissioned the Secretary of the Treasury, the SEC and the Commodities Futures Trading Commission (the "CFTC") (hereinafter referred to as the "President's Working Group") to investigate the causes of the market turmoil.  After a seven-month investigation, the President's Working Group issued its report on March 13, 2008.  The President's Working Group found:

- A significant erosion of market discipline by those involved in the securitization process, including ***originators, underwriters, credit rating agencies, and global investors,*** related in part to failures to provide or obtain adequate risk disclosures;

- The turmoil in financial markets clearly was triggered by a ***dramatic weakening of underwriting standards for U.S. subprime mortgages***…

(Emphasis added).

154.    Further, as noted, relatively soon after issuance, the delinquency and foreclosure rates of the Certificate collateral began to increase.  (¶¶ 9, 49, 62-65, 70, 85, 93, 108, 121).  This

performance was an indication to S&P of pervasive underwriting failures in the origination of the collateral which ultimately led to widespread and deep downgrades of most of the Certificate classes.  On or about July 10, 2007, S&P publicly announced it was revising the methodologies used to rate numerous RMBS Certificates because the performance of the underlying collateral "called into question" the accuracy of the loan data.  This announcement triggered several governmental investigations which only began reporting their findings in 2008.  (¶¶ 153-158, 163-168, 179, 183-188, 190).

155.   S&P announced that it was revising its methodology assumption to require increased "credit protection" for rated transactions.  S&P reiterated that it would also seek in the future to review and minimize the incidence of potential underwriting abuse given "the level of loosened underwriting at the time of loan origination, misrepresentation and speculative borrower behavior reported for the 2006 ratings."

156.   One day later, on July 11, 2007, Moody's announced it also was revising its methodology used to rate the Certificates and anticipated Certificate downgrades in the future.  Moody's did in fact significantly downgrade most of the Certificate classes, noting aggressive underwriting used in the origination of the collateral.

157.   Further, as set forth more fully below, disclosures emerged well after the issuance of the Certificates with respect to each of the Originators which further evidenced that they had engaged in loan underwriting practices which were wholly inconsistent with the guidelines set forth in the Registration Statement and Prospectus Supplements.  (¶¶ 191-233).

**F.     The Offering Documents Failed to Disclose that
         GCM Relied on S&P and Moody's Outdated Models to
         Determine Levels of Credit Enhancement and Ratings**

158.    The Prospectus Supplements describe the varying forms of credit enhancement, including by way of subordination and over-collateralization.  The Supplements contain material misstatements and omissions of fact, including the failure to disclose that the amounts and forms of credit enhancement were understated and insufficient because they were largely determined by Ratings Agencies' models that had not been materially updated since 1999 (for S&P) and 2002 (for Moody's).   As a result, these outdated models were based primarily on the performance of fixed interest loans and not subprime, Alt-A, no or limited documentation loans – which were the kinds of loans substantially included in the Certificate collateralizations.   The models failed both to provide sufficient, appropriate credit enhancement and to disclose the deficiencies in the manner in which credit enhancement was determined.

159.    The Ratings Agencies' determinations of the amount and kind of credit enhancement to be included in the Certificates were faulty.  These same faulty determinations were then used by the same firms to assign inflated and faulty AAA ratings to a substantial portion of the total Certificate value of the Offerings (92.21% by S&P and 92.73% by Moody's). These ratings were unjustifiably high because they were determined pursuant to the same models used to determine credit enhancement – models that had not adequately been updated at the time the Certificates were issued.

160.    The truth about the Ratings Agencies' undisclosed use of outdated models in rating RMBS deals only began to emerge in 2008.  The inadequacy of the models used to rate (and determine the amount of credit enhancement needed to support the rating) was discussed in the April 2008 issue of *Mortgage Banking* which explained that the Ratings Agencies' models

used statistical assumptions that were too heavily based on the performance of 30-year fixed

mortgages – which were not the kinds of mortgages that had been securitized in the prior four

years:

> S & P's Coughlin admits that "assumptions that went into decision-making [on credit ratings] were informed by what had happened in the past," and yet in this instance "previous loss data proved to be much less of a guide to future performance."
>
> But why?  Drexel University's Mason believes it's because the CRAs relied on statistical models that were misleading, at best.  "I think their [credit-rating] methodologies were demonstrably insufficient," he says.
>
> "Unlike the traditional rating processes for single-named issuers, which rely on empirical analysis at their core, structured-finance rating analysis is essentially driven by statistical models," write Mason and Rosner in their paper.  And the data that the rating agencies used when evaluating mortgage-backed securities-- including those backed by subprime mortgages--were heavily biased by over-reliance on traditional 30-year fixed prime mortgage loans.  But it turns out that a subprime loan, as Mason explains during an interview, is a very different animal.
>
> "This is not your historical mortgage loan," he says.  "This is more like a credit-card loan."  Mason cites the increased popularity during the mortgage boom of so-called option ARMs, which are home loans that give the borrower a variety of monthly payment options and have variable cash-flow characteristics that are more like credit cards.

161.    In an article appearing in *The New York Times* on April 8, 2008, entitled "Triple

A Failure," *The New York Times* took note of Moody's April 2007 disclosure that it was

"revising" its model which had not been revised since 2002:

> In April 2007, Moody's announced it was revising the model it used to evaluate subprime mortgages.  It noted that the model "was first introduced in 2002.  Since then, the mortgage market has evolved considerably."  This was a rather stunning admission; its model had been based on a world that no longer existed.

162.    The article explained that when Moody's had analyzed subprime delinquency data

in 2007 it had found trends that its 2002 model never accounted for:

> Poring over the data, Moody's discovered that the size of people's first mortgages was no longer a good predictor of whether they would default; rather, it was the

size of their first and second loans – that is, their total debt – combined.  This was rather intuitive; Moody's simply hadn't reckoned on it.  Similarly, credit scores, long a mainstay of its analyses, had not proved to be a "strong predictor" of defaults this time.  Translation: even people with good credit scores were defaulting.  Amy Tobey, leader of the team that monitored XYZ, told me, "it seems there was a shift in mentality; people are treating homes as investment assets."  Indeed.  And homeowners without equity were making what economists call a rational choice; they were abandoning properties rather than make payments on them.  Homeowners' equity had never been as high as believed because appraisals had been inflated.

163.    On October 22, 2008, the House Oversight Committee heard testimony from Frank Raiter (the "Raiter Testimony"), the former Managing Director and head of RMBS at S&P from March 1995 through April 2005.  Raiter testified that the ratings on S&P deals turn in part on the credit rating of the individual mortgages.  It was from this credit analysis that S&P determined *(1) the expected default probability* of a loan and *(2) the loss that would occur in the event of a default* which, in turn, was used to establish the amount of AAA bonds that could be issued against the pool and amount of equity or "credit enhancement" needed to protect the AAA bonds from experiencing losses:

> A mortgages backed security consists of a pool of individual mortgage loans. Depending on the type of mortgage product (i.e., prime-jumbo, subprime, Alt-A or HEL) underlying a given security, the pool could consist of 1,000 to 25,000 loans.  The ratings process consists of two distinct operations – the credit analysis of individual mortgages and a review of the documents governing the servicing of loans and the payments to investors in the securities.
>
> *The credit analysis is focused on determining the expected default probabilities on each loan and the loss that would occur in the event of a default.*  These, in turn, establish the expected loss for the entire pool and determine the amount of AAA bonds that can be issued against the pool.  It is analogous to your equity position in your home and the underlying mortgage.
>
> The loss estimate determines the equity needed to support the bond – it is intended to protect the AAA bonds from experiencing any losses, much the same as the homeowners' equity stake in a house protects the lender from loss in the mortgage loan.

Raiter Testimony, at 3 (emphasis added).

164.     Raiter testified that in 1995, S&P developed a sophisticated model to estimate the default and loss of individual loans and pools – a model based on approximately 500,000 loans with performance data going back five or more years.  This "LEVELS" Model was updated in early 1999 based on a database of 900,000 loans.  Raiter testified further that ***"it was critical to maintain the best models as they were the linchpins of the rating process."***  Raiter Testimony, at 4 (emphasis added).  After the housing boom took off in 2001, S&P developed a far better model in 2001, with updated data in 2003 and 2004, based on approximately 9.5 million loans ***"covering the full spectrum of new mortgage products, particularly in AAA and fixed/floating payment type categories."***  (*Id*.) (Emphasis added.)

165.     Nevertheless, S&P failed to implement this updated model, which, in Raiter's view, would have forewarned on the loan-losses from the new loan products, in particular:

> [T]he analysts at S&P had developed better methods for determining default which did capture some of the variations among products that were to become evident at the advent of the crisis.  It is my opinion that had these models been implemented we would have had an earlier warning about the performance of many of the new products that subsequently lead to such substantial losses.  That, in turn, should have caused the loss estimates mentioned above to increase and could have thus caused some of these products to be withdrawn from the market as they would have been too expensive to put into bonds.

Raiter Testimony, at 4.

166.     As Raiter explained, the unfortunate consequences of continuing to use outdated versions of the rating model included "the failure to capture changes in performance of the new non-prime products" and "the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market."  Raiter Testimony, at 5.  S&P's current President, Deven Sharma, agreed, noting in his October 22, 2008 testimony before the House Oversight Committee, "[i]t is by now clear that a number of the assumptions we used in preparing our

ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work … [E]vents have demonstrated that the historical data we used and the assumptions we made significantly underestimated the severity of what has actually occurred." (*Id.*)

167.    Executives at Moody's also acknowledged a lack of investment in Moody's ratings models and the failure of Moody's ratings models to capture the decrease in lending standards.  In a confidential presentation to Moody's Board of Directors from October 2007, released by the House Oversight Committee on October 22, 2008 during the Committee's "Hearing on the Credit Agencies and the Financial Crisis" (the "House Oversight Committee Hearing"),[8] Raymond McDaniel, the current Chairman and CEO of Moody's, noted that underfunding can put ratings accuracy at risk and acknowledged that "Moody's Mortgage Model (M3) needs investment."  McDaniel also acknowledged that Moody's models did not sufficiently capture the changed mortgage landscape.  (*Id.*)  Brian Clarkson – Moody's former President and Chief Operating Officer – also recognized  during a Moody's Town Hall on September 10, 2007, the transcript of which was released during the House Oversight Committee Hearing on October 22, 2008, Moody's failure to incorporate decreased lending standards into their ratings, stating: "We should have done a better job monitoring that [decrease in underwriting standards]."

168.    Not only were Moody's and S&P's models based on outmoded data but they were often constructed by people who were not familiar with the housing markets in the areas that they were rating.  And, in some instances, real estate investments were graded by analysts who never actually reviewed the investment and who merely relied upon ratings assigned by a competitor ratings agency.

---

[8]    All exhibits released by the House Oversight Committee from the Committee's "Hearing on Credit Agencies and the Financial Crisis" can be found on the Committee's website at www.oversight.house.gov.

**G.      The Ratings Agencies Relaxed the Ratings Criteria Which
         Led to Artificially High Ratings Awarded to the Certificates**

169.    Moody's and S&P repeatedly eased their ratings standards in order to capture more market share of the ratings business.  In a September 25, 2008 article published by *Bloomberg*, titled "Race to Bottom at Moody's, S&P Secured Sub-prime's Boom, Bust," a former S&P Managing Director – Richard Gugliada – explained the easing of standards as a "'*market-share war where criteria were relaxed*'" and admitted, "'***I knew it was wrong at the time … [i]t was either that or skip the business***.  That wasn't my mandate.  My mandate was to find a way.  Find the way.'" (*Id.*) (Emphasis added). According to Gugliada, when the subject of tightening S&P's ratings criteria came up, the co-director of CDO ratings, David Tesher, said: "Don't kill the golden goose."  (*Id.*)

170.    The loosening of ratings standards is exemplified by the following "instant message" conversation between Rahul Shah ("Shah") and Shannon Mooney ("Mooney"), two S&P analysts, from April 5, 2007, that described S&P's rating of an investment similar to the Trusts and that was submitted during the House Oversight Committee Hearing:

> **Shah:** btw – that deal is ridiculous
>
> **Mooney:** i know right ... model def does not capture half of the rish [sic]
>
> **Mooney:** *risk*
>
> **Shah:** we should not be rating it
>
> **Mooney:** we rate every deal
>
> **Mooney:** it could be structured by cows and we would rate it
>
> **Shah:** but there's a lot of risk associated with it – I personally don't feel comfy signing off as a committee member.

171.    In an email sent on December 5, 2006, released during the House Oversight Committee Hearing, an S&P analytical manager in the same group as Shah and Mooney wrote to a senior analytical manager that the "[r]ating agencies continue to create and [sic] ***even bigger***

*monster – the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters*." (Emphasis added).

172.    On October 28, 2008, former Moody's Managing Director Jerome S. Fons ("Fons") testified before the House Oversight Committee (hereinafter "Fons Testimony").  Fons had been an Executive at Moody's for 17 years, in various positions including Managing Director of Credit Policy.  Fons testified that due to profit concerns, a loosening of ratings standards took place at his company: "[T]he focus of Moody's shifted from protecting investors to being a marketing-driven [sic] organization" and "management's focus increasingly turned to maximizing revenues" at the expense of ratings quality.

173.    Fons explained that the originators of structured securities were free to shop around for the ratings agency that would give them the highest rating and **"*typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality*."** Fons Testimony, at 3 (emphasis added).  Fons noted that the ratings agencies' "drive to maintain or expand market share made [them] willing participants in this [rating] shopping spree" and made it "relatively easy for the major banks to play the agencies off one another."  (*Id.*)  Fons said it was this business model that **"*prevented analysts from putting investor interests first*."** (*Id.*) (Emphasis added.)

174.    Raymond McDaniel, the current CEO of Moody's, also acknowledged the degradation of ratings standards.  In the same confidential presentation to Moody's Board of Directors in October 2007, cited *supra*, McDaniel told the Board: "The real problem is not that the market ... underweights ratings quality but rather that in some sectors, it actually penalizes quality .... It turns out that **_ratings quality has surprisingly few friends_**." (*Id.*) (Emphasis added.) He noted the pressure exerted on analysts to come up with high ratings, explaining "[a]nalysts

and MDs [managing directors] are continually 'pitched' by bankers, issuers, investors" and sometimes "we 'drink the kool-aid.'" (*Id.*)  In fact, *The Wall Street Journal,* in an article published on April 24, 2007, found that in at least one instance, Moody's increased the proportion of AAA ratings within a mortgage after its client complained and said it might go with a different ratings agency.

**H.    The Prospectus Supplements Did Not
Reflect the True Risk of the Certificates**

175.    The Ratings Agencies rated the Certificates based in large part on data about each mortgage loan that GCM provided to them – including appraisal values, LTV ratios, borrower creditworthiness, required levels of documentation provided by borrowers used verify assets and/or income levels and quality control or oversight procedures followed by the Originators in underwriting the mortgage loans.  As discussed above, much of this data was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation, disregard of Originator internal controls and procedures in addition to other facets of defective underwriting addressed in this Complaint.  Not only did GCM fail to conduct proper due diligence, as set forth above, but neither Moody's nor S&P engaged in any due diligence or otherwise sought to verify the accuracy or quality of the loan data underlying the RMBS pools they rated (and specifically disclaimed any due diligence responsibilities).  Nor did they seek representations from sponsors that due diligence had been performed.  During Moody's September 2007 "Town Hall Meeting," hosted by Moody's Managing Director, Raymond McDaniel, executives at Moody's acknowledged that the Ratings Agencies used inaccurate data to form their ratings:

> We're on notice that a lot of things that we relied on before just weren't true ...
> [W]e relied on reps and warrantees that no loans were originated in violation of
> any state or federal law.  We know that's a lie.

*       *       *

There's a lot of fraud that's involved there, things that we didn't see ... We're sort of retooling those to make sure that we capture a lot of the things that we relied on in the past that we can't rely on, on a going forward basis.

\*      \*      \*

[W]e're being asked to figure out how much everyone lied. .... [I]f all of the information was truthful and comprehensive and complete, we wouldn't have an issue here ...

What we're really being asked to do is figure out how much lying is going on and bake that into a credit ... which is a pretty challenging thing to do.  I'm not sure how you tackle that from a modeling standpoint.

Moody's Town Hall Meeting Transcript, at 16, 58.

176.    In response to the "Town Hall Meeting," a Moody's employee noted:

[W]hat really went wrong with Moody's sub prime ratings leading to massive leading to massive downgrades and potential more downgrades to come? We heard 2 answers yesterday: 1. people lied, and 2. there was an unprecedented sequence of events in the mortgage markets.  As for #1, it seems to me that *we had blinders on and never questioned the information we were given.* Specifically, why would a rational borrower with full information sign up for a floating rate loan that they couldn't possibly repay, and why would an ethical and responsible lender offer such a loan?  *As for #2, it is our job to think of the worst case scenarios and model them ... Combined, these errors make us look either incompetent at credit analysis, or like we sold our soul to the devil for revenue, or a little bit of both.*

Moody's Town Hall Meeting Transcript, at 79 (emphasis added).

177.    Because Moody's and S&P were using flawed information and models to generate their ratings, the ratings assigned to the Certificates did not accurately reflect their risk, and the Certificates were given investment grade ratings when in reality they were not of investment grade quality.  These artificially high ratings, which were published in the Prospectus Supplements, were false and misleading in that they did not reflect the true risk of the Certificates.

**I.     The Offering Documents Failed to Disclose**
        **Greenwich Capital's Ratings Shopping Practices**

178.    The Registration Statement disclosed the engagement of Ratings Agencies but omitted disclosure of the manner in which the Ratings Agencies were engaged – so-called "ratings shopping."  As noted, the SEC Report set forth that S&P and Moody's engaged in the practice of "ratings shopping," as indicative of one of the practices which may have pressured Ratings Agencies to issue faulty ratings for MBS.  (¶¶ 58-61, 178-190).

179.    In June, 2008, the NYAG announced that after an investigation of the Ratings Agencies in the MBS context, it had reached an agreement with S&P, Moody's and Fitch which contemplated a complete overhaul of the then-current ratings procedures and guidelines and to put an end to what had been termed "ratings shopping."  Instead of investment banks looking to issue mortgage-backed bonds going to all three agencies for a review, but only use, and pay for, the most optimistic rating, the agencies now will get paid up front regardless if they are hired to assign a rating, a move expected to remove any potential for conflicts of interest.

180.    As set forth above, in Fons' Testimony before the House Oversight Committee, he explained that Moody's provided inadequate ratings on RMBS because of conflicts of interest and being forced to "bid" or "shop" its ratings to obtain engagements:

> Why did it take so long for the rating agencies to recognize the problem?  Why were standards so low in the first place?  And what should be done to see that this does not happen again?
>
> ***My view is that a large part of the blame can be placed on the inherent conflicts of interest found in the issuer-pays business model and rating shopping by issuers of structured securities.***  A drive to maintain or expand market share made the rating agencies willing participants in this shopping spree.  It was also relatively easy for the major banks to play the agencies off one another because of the opacity of the structured transactions and the high potential fees earned by the winning agency.  Originators of structured securities typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality.  While the methods used to rate structured securities have rightly come

under fire, in my opinion, the business model prevented analysts from putting
investor interests first.

Fons Testimony, at 3 (emphasis added).

181.    In further testimony at the October 22, 2008 House Oversight Committee

Hearing, Sean J. Egan ("Egan"), Managing Director of Egan-Jones Rating Co., stated, in part:

Assigning ratings on structured finance bonds differs from the process for
corporate and municipal bonds.   In the unsecured corporate and municipal
markets, debt issuers are subject to being rated by all of the rating agencies
because financial information is publicly available to all parties.   The structured
finance market has been a "rating by request" market where the debt issuers invite
some or all of the major rating agencies to preview the collateral pools so the
rating agencies can provide preliminary rating indications that can be used to size
the bond classes and structure the bond transactions.

*Historically, all of the rating agencies have agreed to bow out of the rating
process if they are not actually selected by the debt issuer to rate a securities
transaction.  This has encouraged the debt issuers to shop for the best ratings so
they can optimize their securitization proceeds.*

House Oversight Committee Hearing, October 22, 2008, Egan Testimony, at 9 (emphasis added).

**J.    The Offering Documents Failed to Disclose the True
Roles of Ratings Agencies in Forming and Structuring
the Certificates for Sale as Primarily AAA Securities**

182.    An article appearing in *The Financial Times* on October 17, 2008, entitled "When

Junk Was Gold," addressed the unique role of the Ratings Agencies in structured finance deals

such as mortgage backed securities:

The first mortgage-backed bonds were created in the late 1980's, well before
Clarkson's time, by a trader called "Lewie" Ranieri.   Ranieri, the head of the
mortgage trading desk at the former investment bank Salomon Brothers, was
famous for the huge sums of money he netted for his employer and for the
quantity of cheeseburgers he ate.   What he struck upon in structured finance was a
process of pure alchemy: a way of turning myriad messy mortgage loans into
standardized, regimented and easy-to-assess bonds.

Ranieri knew that the magic of structuring was in the packaging.   Packaged in the
right way, mortgages could come to create a huge, new tradable bond market.
And this is where the rating agencies came in.   Structured bonds, like any other

bond, needed ratings in order to be sold. **But with a structured bond, the pools of debt could be built or modified in order to attain a particular rating. This wasn't a matter of disguising the risk, rather a way of reapportioning it and allowing investors with different risk appetites to buy the right product for them. "The rating is what gives birth to the structure in the first place," explains Sylvain Raynes, a financial modeling expert who was with Moody's in the 1990s, when Clarkson joined. In some cases, the ratings are known before the bonds have even been inked. "You start with a rating and build a deal around a rating," Clarkson told an investment magazine last year.**

(Emphasis added).

183.    The Ratings Agencies' unique role in influencing the structure of the securitization was more fully discussed in the July 2008 SEC Report. The SEC Report confirmed that S&P and Moody's provided "feed back" to the Sponsor of the Offerings as to the structure, which would result in the highest rating:

The three examined rating agencies generally followed similar procedures to develop ratings for subprime RMBS and CDOs. **The arranger of the RMBS initiates the ratings process by sending the credit rating agency a range of data on each of the subprime loans to be held by the trust (e.g., principal amount, geographic location of the property, credit history and FICO score of the borrower, ratio of the loan amount to the value of the property and type of loan: first lien, second lien, primary residence, secondary residence),** the proposed capital structure of the trust and the proposed levels of credit enhancement to be provided to each RMBS trance issued by the trust. Typically, if the analyst concludes that the capital structure of the RMBS does not support the desired ratings, this preliminary conclusion would be conveyed to the arranger. **The arranger could accept that determination and have the trust issue the securities with the proposed capital structure and the lower rating or adjust the structure to provide the requisite credit enhancement for the senior tranche to get the desired highest rating. Generally, arrangers aim for the largest possible senior tranche, i.e., to provide the least amount of credit enhancement possible, since the senior tranche – as the highest rated tranche – pays the lowest coupon rate of the RMBS' tranches and, therefore, costs the arranger the least to fund.**

SEC Report, at 22 (emphasis added).

**K.      The Offering Documents Failed to Disclose Material Financial
         Conflicts of Interest between Greenwich Capital and the Ratings Agencies**

184.    The Offering Documents make no mention of the material financial conflicts of

interest between GCM and the Ratings Agencies, including the fact that the analysts involved in

rating were also involved in the rating fees or the Ratings Agencies' business interests. The SEC

Report confirmed significant undisclosed conflicts of interest which gave the Ratings Agencies

an incentive to issue inflated ratings.  The SEC Report found, in violation of SEC Rules, that

"key participants" in the securitization process negotiated fees the Ratings Agency would receive

in exchange for its high ratings.  SEC Report, at 23-24.

185.    The SEC Report also noted, *inter alia*, that analysts are "aware" of the rating

firm's "business interests when securing the rating of the deal" as follows:

- ***While each rating agency has policies and procedures restricting analysts
  from participating in fee discussions with issuers,*** these policies still allowed
  key participants in the ratings process to participate in fee discussions.

- Analysts appeared to be aware, when rating an issuer, of the rating agency's
  business interest in securing the rating of the deal.  The Staff notes multiple
  communications that indicated that some analysts were aware of the firm's fee
  schedules, and actual (negotiated) fees.  There does not appear to be any
  internal effort to shield analysts from emails and other communications that
  discuss fees and revenue from individual issuers.

- ***"Rating agencies do not appear to take steps to prevent considerations of
  market share and other business intersts from the possibility that they could
  influence ratings or ratings criteria."***

SEC Report, at 24-25 (emphasis added).

186.    The July 2008 SEC Report found that a number of factors unique to the rating of

RMBS may have "exacerbated" the effect of conflicts of interest inherent in the fact that the

issuer or arranger pays for the ratings.  These factors include that the arranger of the deal has:

- ***"More flexibility to adjust the deal to obtain a desired credit rating as
  compared to arrangers of non-structured asset classes."***

- "Second, there is a high concentration in the firms conducting the underwriting function…   While 22 different arrangers underwrote subprime RMBS deals, 12 arrangers accounted for 80% of the deals, in both number and dollar volume."

- With a fast-changing market, rating processes are frequently and quickly changed.   The high concentration of arrangers with the influence to determine the **choice of rating agency heightened the inherent conflicts in the "issuer pays" compensation model.**   Compensation is calculated by volume of deals and total dollar volume, as a result arrangers prefer fast and predictable ratings processes.

- Ratings Agencies may be pressured by arrangers to produce a more **favorable outcome or reduce credit enhancement levels,** thus reducing **the cost of the debt for a given level of cash inflows from the asset pool.** When the arranger also sponsors the RMBS or CDO trust, pressure can influence an agency's decision to update a model when the update would lead to a less favorable outcome.

- **High profit margins may have provided an incentive for rating agencies to encourage the arrangers to route future business its way.** Unsolicited ratings were not available to provide independent checks on the rating agencies' ratings, nor was information regarding the structure of the security or portfolio of assets readily available to parties unrelated to the transaction, especially before issuance.

SEC Report, at 31-33 (emphasis added).

187.   As reported in *The Washington Post* on June 6, 2008, the NYAG announced that

it had reached an agreement with the credit-rating companies, S&P, Moody's and Fitch to:

> … change the way they evaluate mortgage securities that have roiled financial markets for the past year.
>
> The deal with Moody's Investors Service, Standard & Poor's and Fitch Ratings aims to restore confidence among investors -- who saw top-rated securities lose much of their worth in a matter of months -- by revising how the agencies are paid for issuing ratings.  The agreement also requires credit-rating agencies to direct investment banks to provide them with more data on the pools of mortgages that make up the bonds.
>
> The agencies have been under fire for the role they played in the subprime mortgage crisis by awarding top ratings to securities that soured.  Regulators and investors have alleged that the agencies have a conflict of interest because they

are paid by the investment banks issuing the securities, thus encouraging the credit agencies to give high ratings to win business.

The agreement seeks to end this practice by having the issuers pay the credit-rating agencies at four points during the rating process, not just at the end when the rating is given.

Credit-rating agencies will also be required to disclose information about all securities submitted for review, allowing investors to determine whether issuers sought, but subsequently decided not to use, ratings from a specific agency. This will allow investors to see whether investment banks shopped around for the agency that would give their securities the best rating, said Andrew M. Cuomo, New York's attorney general.

188.    As reported in *The Washington Post*, the NYAG further stated that:

The mortgage crisis currently facing this nation was caused in part by misrepresentations and misunderstanding of the true value of mortgage securities," Cuomo said in a statement.  "By increasing the independence of the rating agencies, ensuring they get adequate information to make their ratings, and increasing industry-wide transparency, these reforms will address one of the central causes of that collapse.

**L.    Federal District Court Rules That Moody's Non-Independence in MBS and CDO Ratings Is a Material Misrepresentation in Moody's Securities Fraud Case**

189.    On February 19, 2009, in *In re Moody's Corporation Securities Litigation*, Civ. No. 07-CV-8375 (SWK), 2009 U.S. Dist. LEXIS 13894, Judge Kram of the United States District Court for the Southern District of New York denied Defendant Moody's motion to dismiss, finding that statements regarding the ratings agency's independence in issuing ratings constituted an actionable and material misrepresentation (the Moody's Decision" or the "Moody's Dec.").  In that case, Moody's Corp. investors had filed a class action against Moody's claiming that the company had made material misrepresentations and omissions respecting, among other things, its business, the meaning and the method of its credit ratings and the manner in which it generated financial results and growth.  In her decision, Judge Kram stated in part:

- Plaintiff's core allegation I that Moody's falsely claimed that it was an independent body publishing ratings accurately and impartially. Defendants contend that the statements cited by plaintiffs are declarations of intent or vague pronouncements constituting "puffery." The Court disagrees with Defendants' characterizations. (Moody's Dec., at 28).

- The AC [Amended Complaint] adequately alleges that Moody's employees and clients attempted to raise questions about the Company's independence. In a confidential presentation, CEO McDaniel admits that **analysts and managing directors sometimes succumb to the pressure placed upon them by issuers and ignore the strictures of the ratings system.** (Moody's Dec., at 29).

- Collectively, the facts belie Defendants' claim of independence and ratings integrity. The acts alleged by Plaintiffs challenge the Company's assertion that it applies its "opinions consistently, fairly, and objectively." Similarly, the revelations that **it [Moody's] altered ratings at the request of issuers** called into question Moody's claim that it "maintains independence in its relationships with Issuers and other interested entities." (Moody's Dec., at 30).

- … Moody's statements regarding its own independence do not constitute inactionable puffery. They were neither "vague" nor "non-specific" pronouncements that were incapable of "objective verification." Moody's not only proclaimed its independence; it also listed verifiable actions it was taking to ensure its independence. Rather than being general statements, these were specific steps that Moody's was taking to ensure its independence and ratings integrity. (Moody's Dec., at 33).

- Plaintiffs have alleged sufficient facts to show that **Moody's rating methodologies were not "accurately disclosed"** by alleging that Moody's did not even start to assess originator practices until well after it claimed it had. (Moody's Dec., at 34).

(Emphasis added.)

190.    In or about July 2008, both Moody's and S&P sought to make internal changes to reform the conflicts of interest problems identified by the SEC. In a *Reuters* article, S&P Draws Criticism as Sets Ratings Reform, published on July 2, 2008, it was reported that S&P had "unveiled an overhaul of its ratings process on Thursday, responding to widespread criticism of the quality and accuracy of credit ratings" and had:

… [a]nnounced 27 steps that its aid would boost confidence in credit ratings.  It came on the heels of planned reforms announced this week by its major rivals, [Moody's and Fitch].

Ratings agencies have come under fire from regulators and investors who say they helped precipitate the U.S. subprime mortgage crisis and credit tightening that began in 2007.

"The supposed reforms announced today by Standard & Poor's and by Moody's on Tuesday are too little, too late," New York State Attorney General Andrew Cuomo said in a statement.  "Both S&P and Moody's are attempting to make piecemeal change that seem more like public relations window-dressing than systematic reform."  He pledged to continue investigating their roles in the mortgage crisis.

Critics say the agencies at first assigned high ratings to hundreds of billions of dollars of securities linked to low-quality debt, only to exacerbate market turmoil by later rapidly downgrading many of those same securities.

This has contributed to write-downs piling up in the financial industry, hurting stock prices and causing losses in a variety of pension and mutual funds.

## VI.

## MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS

**A.** **The Offering Documents Included Material Misstatements and Omitted Information Regarding Stated Mortgage Loan Underwriting Guidelines**

### 1.     The Registration Statements

191.    The 2006 Registration Statement described that generally the adequacy of the property financed by the loan will have been determined by an appraisal according to guidelines as follows:

In determining the adequacy of the mortgaged property as collateral, an appraisal is made of each property considered for financing.  The appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed.  The appraisal generally is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the subject home…

Greenwich Capital Acceptance, Inc., Form S-3/A Registration Statement, filed March 31, 2006, at 48.

192.     The 2007 Registration Statement also described that generally the adequacy of the property financed by the loan will have been determined by an appraisal according to guidelines as follows:

> In determining the adequacy of the mortgaged property as collateral, an appraisal is made of each property considered for financing.  The appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed.  The appraisal generally is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the subject home …

Greenwich Capital Acceptance, Inc., Form S-3/A Registration Statement, filed March 23, 2007, at 61.

193.     ***Omitted Information:*** In fact, GCM, GCA and GCFP made no attempt to confirm the standards actually used by mortgage brokers, correspondents and other third-parties from which they acquired mortgages.  As set forth above, since issuance of the Certificates, public disclosures revealed that the Originators ignored stated underwriting guidelines and appraisal requirements and in many cases employed fraudulent underwriting practices.  Higher deal fees and more profitable market conditions were motivation for Greenwich Capital not to spend the time and money to investigate the validity of appraisal values on the underlying mortgaged properties prior to securitization.   Specifically, only a small sampling of the mortgage loan pool, no more than 5% to 7%, was reviewed before GCM securitized the loans, leaving a substantial amount of bad loans to escape inspection.  Further, with GCM's use of the structuring software, the loans became numbers blindly plugged into a computer with little or no attention paid to the underlying collateral, as long as the averages of the loan pool fit within a certain loosely defined parameter.

194.    According to stated underwriting guidelines, borrowers were required to submit applications to the originators that were then verified for creditworthiness.  For example, the 2006 Registration Statement provided:

> Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available
>
> - to meet the borrower's monthly obligations on the proposed loan, generally determined on the basis of the monthly payments due in the year of origination, and other expenses related to the mortgaged property such as property taxes and hazard insurance, and
>
> - to meet monthly housing expenses and other financial obligations and monthly living expenses.

195.    ***Omitted Information:*** In fact, loan Originators were instructed to push certain types of mortgage loans, such as hybrid option-ARM loans also referred to as Neg Am loans historically reserved for only those borrowers with outstanding credit history and sufficient income.  These hybrid loan products allowed borrowers to "pick-a-payment" for an initial period of one to five years, with the difference between what was owed and what was paid then added on to the outstanding loan amount.  As set forth above, in an attempt to increase the amount of loans originated, the Originators failed to disclose to borrowers that once the outstanding loan amount reached a certain level, *i.e.,* 110% of original balance, the "pick-a-payment" period ended, and borrowers would be required to make monthly payments of an even larger outstanding amount at an adjusted, and significantly higher, interest rate.

196.    Moreover, the 2006 and 2007 Registration Statements further stated:

> Underwriting standards are applied by or on behalf of a lender to evaluate a prospective borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral.  In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information, including the principal balance and payment history of any senior lien loan on the related

mortgaged property.   As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.   Generally, an employment verification is obtained from an independent source, which is typically the borrower's employer.  The verification reports the borrower's length of employment with its employer, current salary, and expectations of continued employment.  If a prospective borrower is self-employed, the borrower may be required to submit copies of signed tax returns.   The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts.  Underwriting standards which pertain to the creditworthiness of borrowers seeking Multifamily Loans will be described in the related prospectus supplement.

*Id.* (Emphasis added).

197.   ***Omitted Information:*** GCM, GCA, GCFP and the Originators were not nearly as thorough in getting documentation from or about borrowers as these statements imply.  As set forth herein in detail, the Originators and "underwriting officers" placed the emphasis not on adherence to underwriting guidelines, but rather, on getting loans "done," severely hindering the quality of the mortgage loans and resulting in flawed and in many cases fraudulent loan applications which, among other things, inflated borrower income levels, failed to contain employment verification, over-valued properties at appraisal or required, in many cases, no proof in the form of documentation at all.  These statements wer e materially false and misleading since appraisal standards were largely disregarded and the values of the underlying mortgage properties were, in many instances, inflated in the loan origination process.

> **2.**   **The Prospectus Supplements**

>> **i.**   **Countrywide's Stated Mortgage Loan Underwriting Guidelines**

198.   The underlying loan collateral for a certain number of the Issuing Trusts (¶¶ 34-35) was originated by Countrywide.  The Prospectus Supplements described the underwriting guidelines used by Countrywide in originating Certificate Collateral.  For example, Countrywide

Originated 100% of the 5,470 loans underlying the HVMLT Series 2006-4 Certificate Offering –

all of which contained a Negative Amortization feature and only 670 of which were originated

under a full documentation program.

199.    Countrywide's underwriting guidelines generally required a description of the

borrower's income, employment documentation, FICO scores and a credit report.  For example,

the Prospectus Supplement for the HVMLT Series 2006-4 Certificate Offering states:

> Countrywide Home Loans' underwriting standards are applied by or on behalf of
> Countrywide Home Loans to evaluate the prospective borrower's credit standing
> and repayment ability and the value and adequacy of the mortgaged property as
> collateral…

\*          \*          \*

> As part of its evaluation of potential borrowers, Countrywide Home Loans
> generally requires a description of income.  If required by its underwriting
> guidelines, Countrywide Home Loans obtains employment verification providing
> current and historical income information and/or a telephonic employment
> confirmation.  Such employment verification may be obtained, either through
> analysis of the prospective borrower's recent pay stub and/or W-2 forms for the
> most recent two years, relevant portions of the most recent two years' tax returns,
> or from the prospective borrower's employer, wherein the employer reports the
> length of employment and current salary with that organization.

> In assessing a prospective borrower's creditworthiness, Countrywide Home Loans
> may use FICO Credit Scores.  "FICO Credit Scores" are statistical credit scores
> designed to assess a borrower's creditworthiness and likelihood to default on a
> consumer obligation over a two-year period based on a borrower's credit history
> …  Under Countrywide Home Loans' underwriting guidelines, borrowers
> possessing higher FICO Credit Scores, which indicate a more favorable credit
> history and who give Countrywide Home Loans the right to obtain the tax returns
> they filed for the preceding two years, may be eligible for Countrywide Home
> Loans' processing program (the "*Preferred Processing Program*").

\*          \*          \*

> **For all mortgage loans originated or acquired by Countrywide Home Loans,
> Countrywide Home Loans obtains a credit report relating to the applicant from
> a credit reporting company.  The credit report typically contains information
> relating to such matters as credit history with local and national merchants and
> lenders, installment debt payments and any record of defaults, bankruptcy,**

85

> *dispossession, suits or judgments.  All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.*

HVMLT Series 2006-4 Prospectus Supplement, Form 424B5, filed April 26, 2006, at S-81-82 (emphasis added).

200.    ***Omitted Information***:  As set forth above, Countrywide and the other Originators failed conduct proper due diligence and verify the information contained in borrower mortgage loan applications.  Further, Countrywide and the other Originators' emphasis on increasing the volume of loans at the expense of the quality of loans gave rise to an increasing number of fraudulently originated mortgage loans, with missing or completely fabricated borrower information, to go sight unseen by any review.

201.    Countrywide lending officers regularly dealt with adverse information in a borrower's credit report by ignoring such information.  Consumer credit rating agencies must remove non-confirmable adverse information within a certain time period from consumer credit reports.  Lending officers and originators knew that borrowers frequently complained to consumer credit rating agencies about accurate adverse information in an effort to increase their credit scores, and thus would not take such information into account.

202.    Moreover, as *The Wall Street Journal* reported on May 7, 2008, loan applications frequently included inflated borrower income levels, which Countrywide executives overlooked:

> [P]rosecutors in the Central District of California in Los Angeles, near Countrywide's headquarters, are investigating possible fraud in the company's origination of loans.  Representatives for the prosecutors' offices declined to comment.

> People involved in the California inquiry say the Federal Bureau of Investigation, which has carried out the probes under the direction of prosecutors, has seen evidence of extensive fraud during loan origination, with sales executives deliberately overlooking inflated income figures for many borrowers.

203.    The Prospectus Supplements describe the importance of appraisals of mortgaged

properties.  For example, the HVMLT Series 2006-4 Prospectus Supplement also states that:

> Except with respect to the mortgage loans originated pursuant to its Streamlined
> Documentation Program, whose values were confirmed with a Fannie
> Mae proprietary automated valuation model, Countrywide Home Loans obtains
> appraisals from independent appraisers or appraisal services for properties that are
> to secure mortgage loans.  The appraisers inspect and appraise the proposed
> mortgaged property and verify that the property is in acceptable condition.
> Following each appraisal, the appraiser prepares a report which includes a market
> data analysis based on recent sales of comparable homes in the area and, when
> deemed appropriate, a replacement cost analysis based on the current cost of
> constructing a similar home.  ***All appraisals are required to conform to Fannie
> Mae or Freddie Mac appraisal standards then in effect.***

*Id.*, at S-83 (emphasis added).

204.    ***Omitted Information***: As stated herein, Countrywide's home loan appraisals were

not obtained from independent appraisers or appraisal services, but rather from appraisers who

understood that their appraisals must conform to predetermined levels at which a loan could be

approved, or risk their association and employment with Countrywide or brokers working with

Countrywide.   The effect was that purportedly independent appraisals were not prepared in

conformance with Fannie Mae or Freddie Mac appraisal standards.   Countrywide failed to

confirm that appraisers were following the guidelines described, and this, combined with the

implied or express pressures placed on appraisers to appraise to the desired value, created

enormous upward pressure on appraisal values, distorting loan-to-value ratios and making the

mortgage loans in the pool much riskier than suggested by the Offering Documents.  This was

particularly true in 2006 and 2007 when real estate values in many of the areas where the

mortgage pools were located had stopped increasing at the rapid pace of 2004 and 2005.  Thus,

the aggressive lending practices introduced during those years where, for example, borrowers

with mortgages in excess of their ability to pay were assured that by the promise of refinancing to a lower rate, were unavailable.

205.    The Prospectus Supplements detailed Countrywide's programs for issuing mortgage loans where less than full documentation was required.  However, even those programs were subject to underwriting procedures and required appraisals (as set forth in ¶¶ 191-233, herein).  For example, the HVMLT Series 2006-4 Prospectus Supplement states that:

> The Alternative Documentation Program permits a borrower to provide W-2 forms instead of tax returns covering the most recent two years, permits bank statements in lieu or verification of deposits and permits alternative methods of employment verification.
>
> Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived.  Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment.   Since information relating to a prospective borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio ranges up to 95%.
>
> *            *            *
>
> Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan file, they are not taken into account for purposes of the underwriting analysis.  ***This program is limited to borrowers with excellent credit histories.***   Under the No Income/No Asset Documentation Program, the maximum Loan-to-Value Ratio, including secondary financing, ranges up to 95%.  Mortgage loans originated under the No Income/No Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.
>
> Under the Stated Income/Stated Asset Documentation Program, ***the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income.*** ….

*Id.*, at S-84-86 (emphasis added).

206.   ***Omitted Information***: These statements contain material misstatements and omissions because, as stated herein, Countrywide materially disregarded underwriting requirements for mortgages requiring lesser borrower documentation and inflated fees throughout the loan process.  Despite assurances that lesser documentation loans were limited to borrowers with excellent credit histories, Countrywide routinely extended these loans to borrowers with weak credit histories.

207.   Countrywide's debt-to-income ratios were misstated by the manipulation of reported income levels on loan applications, many times with the knowledge of the mortgage broker.  Brokers were compensated when loans were approved – even with false information – and denied compensation when they questioned obviously distorted income levels.  Because Countrywide was financially motivated to close and securitize loans, it took no meaningful steps to prevent these practices regardless of the underlying risk profile.  In fact, during the summer of 2007, when there was increasing publicity about suspect lending practices, Countrywide did an audit of lending practices by certain mortgage brokers and found many inconsistencies in loan applications, but did nothing about it.

208.   In addition, stated income amounts far in excess of those reasonable for the borrowers' employment were regularly ignored in order to approve loans under the stated income and stated asset documentation programs.  Countrywide offered stated income loans up to 100% loan-to-value until March 2007.

209.   Indeed, in March 2007, Countrywide assured borrowers that 100% financing was still available:

> "We want to assure homeowners that there is still an extensive selection of mortgage loans to suit a multitude of personal and financial circumstances," said Tom Hunt, managing director of Countrywide Home Loans.  "We recognize it's

been widely reported that some major lenders, like Countrywide, no longer offer 100% financing.  In fact, we have made changes to certain subprime and other special mortgage programs, but we have not eliminated 100% financing.  We still offer one of the widest selections of low- and no-down payment options to qualified customers, including those with less-than-perfect credit.

*MortgageDaily.com*, <u>Press Release: Countrywide Home Loan Assures Homeowners and Homebuyers That they Still Have Many Mortgage Loan Choices</u>, March 17, 2007.

### ii.    **American Home's Mortgage Loan Underwriting Guidelines**

210.    The underlying loan collateral for a certain number of the Issuing Trusts (¶¶ 34-35) was originated principally by American Home.[9]  The Prospectus Supplements describe the underwriting guidelines used by American Home in originating the Certificate Collateral.  American Home purported to have rigorous underwriting standards designed to evaluate borrower creditworthiness.  For example, the Prospectus Supplement for the HVMLT Series 2006-7 Certificate Offering states:

> American Home's underwriting philosophy is to ***weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt.***
>
> *       *       *
>
> American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.
>
> *       *       *
>
> In addition to reviewing the borrower's credit history and credit score, American Home underwriters closely review the borrower's housing payment history.  In general, for non-conforming loans the borrower should not have made any mortgage payments over 30 days after the due date for the most recent twelve months.  In general, for Alt-A loans, the borrower may have no more than one payment that was made over 30 days after the due date for the most recent twelve months.

---

[9]      The Issuing Trusts which offered Certificates collateralized by underlying mortgage loans originated principally by AHM were the HVMLT Series 2006-6, the HVMLT Series 2006-7, the HVMLT Series 2006-14, the HVMLT Series 2007-2, the HVMLT Series 2007-5, and the HVMLT Series 2007-7 Certificate Offerings.

\*       \*       \*

American Home's Alt-A loan products generally have been approved manually by contract underwriters provided by certain mortgage insurance companies or by American Home's senior underwriters. American Home Solutions products must receive an approval from the Assetwise automated underwriting system. For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis. Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period. In addition to the monthly housing expense, the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility.

HVMLT Series 2006-7 Prospectus Supplement, Form 424B5, filed August 10, 2006, at S-70-71 (emphasis added).

211. ***Omitted Information***: These statements contain material misstatements and omissions because, as stated herein, American Home disregarded its stated underwriting standards in order to obtain larger fees and profits by increasing loan origination volume. As such, American Home disregarded crucial risk factors in making determinations on loan applications - specifically approving loan applications for Option-Arm and loans with negative amortization features to borrowers with bad credit history or insufficient income to repay the loan once the rates adjusted upwards. Moreover, American Home's controls were inadequate to prevent it from originating suspect loans which were sure to default absent rapid, significant price appreciation of the underlying property.

212. In fact, lending officers were regularly satisfied about adverse information in a borrower's credit report by ignoring such adverse information. Ratings agencies must remove

non-confirmable adverse information within a certain time period from consumer credit reports.

Lending officers and originators knew that borrowers frequently complained to credit ratings

agencies about accurate adverse information in an effort to increase their credit scores.

213.    American Home purported to require and rely upon standard appraisals.   For

example, the HVMLT Series 2006-7 Prospectus Supplement stated, in part:

> Every mortgage loan is secured by a property that has been appraised by a
> licensed appraiser in accordance with the Uniform Standards of Professional
> Appraisal Practice of the Appraisal Foundation.   The appraisers perform on-site
> inspections of the property and report on the neighborhood and property condition
> in factual and specific terms.   Each appraisal contains an opinion of value that
> represents the appraiser's professional conclusion based on market data of sales of
> comparable properties and a logical analysis with adjustments for differences
> between the comparable sales and the subject property and the appraiser's
> judgment.   In addition, each appraisal is reviewed for accuracy and consistency by
> American Home's vendor management company or an underwriter of American
> Home or a mortgage insurance company contract underwriter.

*Id*., at S-71.

214.    ***Omitted Information***:   These statements contain material misstatements and

omissions because, as stated herein, American Home largely disregarded its appraisal standards

and the values of the underlying mortgage properties were materially inflated in the loan

underwriting process.

215.    The Prospectus Supplements also provide for prudent underwriting for mortgages

where less borrower documentation was required.   For example, the HVMLT Series 2006-7

Prospectus Supplement provides that:

> ... Certain non-conforming stated income or stated asset products allow for less
> verification documentation than Fannie Mae or Freddie Mac require.   Certain
> non-conforming Alt-A products also allow for less verification documentation
> than Fannie Mae or Freddie Mac require.   For these Alt-A products, the borrower
> may not be require to verify employment income, assets required to close or both.
> For some other Alt-A products, the borrower is not required to provide any
> information regarding employment income, assets required to close or both.   Alt-
> A products with less verification documentation generally have other

compensating factors such as higher credit score or lower loan-to-value requirements.

*     *     *

American Home realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting. Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation.  Therefore, each case is weighed individually on its own merits and exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.

*Id.*, at S-72.

216.   ***Omitted Information:***  These statements contain material misstatements and omissions because, as set forth herein, American Home materially disregarded underwriting requirements for mortgages requiring lesser borrower documentation and regularly made exceptions to the underwriting guidelines in the absence of sufficient compensating actors to offset the additional risk.

### iii.   IndyMac's Mortgage Loan Underwriting Guidelines

217.   IndyMac was a principal originator for the HVMLT Series 2006-14 Certificate Offering.  (¶ 34).  The Prospectus Supplements describe the underwriting guidelines used by IndyMac in originating the Certificate Collateral.   IndyMac purported to have rigorous underwriting standards designed to evaluate borrower creditworthiness.   For example, the Prospectus Supplement for the HVMLT Series 2006-14 Certificate Offering stated in part:

IndyMac Bank approves each mortgage loan seller prior to the initial transaction on the basis of the seller's financial and management strength, reputation and prior experience. Sellers are periodically reviewed and if their performance, as measured by compliance with the applicable loan sale agreement, is unsatisfactory, IndyMac Bank will cease doing business with them.

*     *     *

Mortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac Bank according to IndyMac Bank's underwriting guidelines, which also accept mortgage loans meeting Fannie Mae or Freddie Mac guidelines regardless of whether such mortgage loans would otherwise meet IndyMac Bank's guidelines, or pursuant to an exception to those guidelines based on IndyMac Bank's procedures for approving such exceptions.

HVMLT Series 2006-14 Prospectus Supplement, Form 424B5, filed December 20, 2006, at S-69.

218.    ***Omitted Information***:    As stated herein, by the time of the Prospectus Supplements, IndyMac, a large originator of Alt-A loans, had become more and more aggressive in the types of loans it would acquire, blurring the line between Alt-A and subprime borrowers. Some industry analysts dubbed these loans "Alt-B" products.  The more aggressive acceptance by IndyMac of more questionable borrowers led to higher delinquencies overall.  More than 80% of Alt-A mortgages that were securitized in 2006 were low-documentation, stated-income loans, according to *Inside Mortgage Finance*.  This was an increase from 68% in 2005.  Thus, IndyMac was disregarding its responsibility to ensure compliance with its producers to the extent it had represented.  Moreover, IndyMac did not monitor its mortgage loan sellers in either pre-purchase quality control due diligence or post-purchase quality control due diligence, as is made evident in litigation filed by IndyMac against recidivist mortgage originators, such as Silver State Mortgage ("Silver State"), which revealed that IndyMac continued to purchase loans from originators who were in default for breaches of their early payment defaults and first-payment default repurchase obligations to IndyMac.

219.    In addition, IndyMac, prior to August 2007, had been granting stated income loans at relatively high loan-to-value ratios.  As *blownmortgage.com* noted on August 16, 2007:

Stated income loans at high loan-to-value ratios have been a major source of abuse over the last few years by lenders and brokers.  It is a loan that has put a large portion of the home buying public in jeopardy of losing their homes –

wittingly or unwittingly.  It needs to go; or it needs to be heavily curtailed – and we're definitely seeing that.

220.     Furthermore, the Prospectus Supplement for the HVMLT Series 2006-14 Offering

stated that the appraisal value of the underlying property must support the loan amount:

> To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession Appraisal Practice. The appraiser generally inspects the property, analyzes data including the sales prices of comparable properties and issues an opinion of value using a Fannie Mae/Freddie Mac appraisal report form, or other acceptable form. In some cases, an automated valuation model (AVM) may be used in lieu of an appraisal. AVMs are computer programs that use real estate information, such as demographics, property characteristics, sales prices and price trends to calculate a value for the specific property. ***The value of the property, as indicated by the appraisal or AVM, must support the loan amount.***

HVMLT Series 2006-14 Prospectus Supplement, Form 424B5, filed December 20, 2006, at S-71 (emphasis added).

221.     ***Omitted Information:*** As stated herein, the above statements were misleading and

omitted key information including the fact that the appraisals of the underlying mortgaged

properties were inflated due to the inherently flawed valuation process and incentive of not only

appraisers but IndyMac and the other Originators to artificially increase the appraised value

thereby increasing the price of the mortgage at securitization.

222.     The Prospectus Supplements also provide for prudent underwriting for mortgages

where less borrower documentation was required.  For example, the Prospectus Supplement for

the HVMLT Series 2006-14 Certificate Offering states that:

> Under the Full/Alternate Documentation Program, the prospective borrower's employment, income and assets are verified through written or telephonic communications.   All loans may be submitted under the Full/Alternate Documentation Program.   The Full/Alternate Documentation Program also provides for alternative methods of employment verification generally using W-2 forms or pay stubs.  Borrowers applying under the Full/Alternate Documentation Program may, based on certain credit and loan characteristics, qualify for IndyMac Bank's FastForward program and be entitled to income and asset documentation relief.  Borrowers who qualify for FastForward must state their

95

income, provide a signed Internal Revenue Service Form 4506 (authorizing IndyMac Bank to obtain copies of their tax returns), and state their assets; IndyMac Bank does not require any verification of income or assets under this program.

*      *      *

Under the No Income/No Asset Documentation Program and the No Doc Documentation Program, emphasis is placed on the credit score of the prospective borrower and on the value and adequacy of the mortgaged property as collateral, rather than on the income and the assets of the prospective borrower. Prospective borrowers are not required to provide information regarding their assets or income under either program, although under the No Income/No Asset Documentation Program, employment is orally verified.

*Id.,* at S-70.

223.   **Omitted information**: As state herein, in the industry, these loans were referred to as "liar loans" which were much riskier than suggested by the Prospectus Supplements.  The Prospectus Supplements failed to disclose that IndyMac advertised to mortgage loan originators that IndyMac would not check Internal Revenue Service Form 4506, thereby insuring that fabricated applications submitted to mortgage underwriters would be approved by IndyMac without review of verification check.

### iv.   BankUnited's Mortgage Loan Underwriting Guidelines

224.   BankUnited was a principal originator for the HVMLT Series 2006-8, the HVMLT Series 2006-10 and the HVMLT Series 2006-14 Certificate Offerings.  (¶ 34).  The Prospectus Supplements described the underwriting guidelines used by BankUnited in originating the Certificate Collateral.  For example, the Prospectus Supplement for the HVMLT Series 2006-8 Certificate Offering stated that:

A prospective borrower may be eligible for a loan approval process that limits or eliminates BankUnited's' standard disclosure or verification requirements or both. Such underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the

mortgaged property as collateral.  ***Exceptions to the underwriting standards are permitted where compensating factors are present.***

HVMLT Series 2006-8 Prospectus Supplement, Form 424B5, filed August 28, 2006, at S-60 (emphasis added).

225.   ***Omitted Information***: As set forth above, BankUnited was very liberal in granting exceptions to its underwriting standards and was not nearly as thorough in getting documentation from or about borrowers as the underwriting guidelines set forth herein implied.  The emphasis was on getting loans done - meaning more volume led to higher fees and profits for BankUnited. Exceptions not only were granted in situations where compensating factors existed but also were extensively granted to maintain loan volume.

226.   The Prospectus Supplements also provide for prudent underwriting for mortgages where less borrower documentation was required.  For example, the Prospectus Supplement for the HVMLT Series 2006-8 Certificate Offering stated that:

> Under the No Ratio Documentation type, the borrower's employment and assets are verified.  The borrower's income is not disclosed on the loan application and therefore debt-to-income ratios are not calculated or included in the underwriting analysis.  This documentation type is limited to borrowers with excellent credit histories…

*     *     *

> Under the No Income No Asset Documentation type, the borrower's employment is verified. The borrower's income and assets are not disclosed on the loan application and therefore debt-to-income ratios are not calculated or included in the underwriting analysis. This documentation type is limited to borrowers with excellent credit histories…

*     *     *

> Under the No Documentation type, neither disclosure nor documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis. This documentation type is limited to borrowers with excellent credit histories.

\*     \*     \*

> Under the Stated Income/Stated Asset Documentation type, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income.  Since information relating to a prospective borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application.

*Id.* at S-62.

227.   ***Omitted Information***: As set forth above, BankUnited did not adhere to this stated "excellent credit history only" guideline for issuing these risky loans.  In addition, BankUnited and its top executives had employed poor underwriting standards in their loan origination process and had failed to disclose the extent to which these standards were relaxed or disregarded in the underwriting process, including with respect to the "lesser" documentation programs, where BankUnited would approve loans that misstated or completely omitted borrower income and credit information.

### v.   Downey's Mortgage Loan Underwriting Guidelines

228.   Downey was a principal originator for the HVMLT Series 2006-13 and the HVMLT Series 2007-7 Certificate Offerings. (¶¶ 34-35).  The Prospectus Supplements described the underwriting guidelines used by Downey in originating the Certificate Collateral.  For example, the Prospectus Supplement for the HVMLT Series 2006-13 Certificate Offering stated that:

> Downey's underwriting guidelines are applied to evaluate the applicant, the property and the applicant's income, employment and credit history, as applicable in the context of the loan program and documentation requirements.  These are guidelines only and each loan is evaluated based upon its own merits.  ***Exceptions to the guidelines may be acceptable if there are mitigating factors.***

HVMLT Series 2006-13 Prospectus Supplement, Form 424B5, filed December 11, 2006, at S-31.

229.   **Omitted Information**: These statements contain misstatements and omissions because, as stated herein, Downey disregarded these underwriting requirements for mortgages requiring lesser borrower documentation and, among other things, regularly made exceptions to the underwriting guidelines in the absence of mitigating factors require by the guidelines.

230.   Moreover, in regards to Downey's appraisals of the underlying mortgaged properties, the HVMLT Series 2006-13 Prospectus Supplement states, in part:

> Under each program, Downey obtains appraisals using staff appraisers, automated valuation models, independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisal report includes a market data analysis based on recent sales and/or listings of comparable homes in the area; a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Uniform Standards of Professional Appraisal Practices. These are the standards accepted by Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation.

*Id.,* at S-33.

231.   **Omitted Information:** As stated herein, the above statements were misleading and omitted key information including the fact that the appraisals of the underlying mortgaged properties were inflated due to the inherently flawed valuation process and incentive of not only appraisers but Downey and the other Originators to artificially increase the appraised value thereby increasing the price of the mortgage at securitization.

232.   As set forth above, Downey routinely approved mortgage loans to sub-prime and Alt-A borrowers under less than "full-documentation" programs.  However, the HVMLT Series 2006-13 Prospectus Supplement stated:

> The Lite Doc program requires verification of reserves, if required, and permits stated income. Downey obtains from a prospective borrower either a verification of deposit or a bank statement for the one-month period immediately preceding the date of the mortgage loan application. Because information relating to a prospective borrower's income and employment is not verified, the borrower's

debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application.

*       *       *

The Downey Express program is a stated income/stated assets program. Under the program the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment, and that the stated assets are consistent with the borrower's income.

*Id.,* at S-33-34.

233.    ***Omitted Information:***    These statements contain material misstatements and omissions because, as set forth herein, Downey materially disregarded underwriting requirements for mortgages requiring lesser borrower documentation and regularly made exceptions to the underwriting guidelines in the absence of sufficient compensating actors to offset the additional risk.

**B.    The Offering Documents Included Material Misstatements and Omitted Information Regarding Delinquencies as of the Cut-Off Dates**

234.    The Registration Statements contained a section which described the percentage of delinquencies at a cut-off date just prior to the Offering date.   The precise figures were left blank.

[As of the cut-off date, not more than [ ]% of the mortgage loans were more than 30 days delinquent in payments of principal and interest.   No more than approximately [___]% of the mortgage loans have been 30 to 59 days delinquent one time during the twelve months preceding the cut-off date.   No more than approximately [___]% of the mortgage loans have been 30 to 59 days delinquent two times during the twelve months preceding the cut-off date.   No more than approximately [___]% of the mortgage loans have been more than 60 days delinquent one time during the twelve months preceding the cut-off date.   No more than approximately [___]% of the mortgage loans have been more than 60 days delinquent two times during the twelve months preceding the cut-off date.] [No mortgage loan will be more than 30 days delinquent as of the Cut-off Date.] A loan is considered to be delinquent when a payment due on any due date remains unpaid as of the close of business on the last business day immediately prior to the next monthly due date.   The determination as to whether a loan falls into this category is made as of the close of business on the last business day of

each month.

Greenwich Capital Acceptance, Inc., Form S-3/A Registration Statement, filed March 31, 2006, at 164; *cf.,* Greenwich Capital Acceptance, Inc., Form S-3/A Registration Statement, filed March 23, 2007, at 265.

235.    Each of the Prospectus Supplements contained the language set forth above or some variation of it, indicating, as of the "cut-off date" (defined differently in each Prospectus Supplement), the percentage of mortgage loan collateral that was 30-59 and 60 days delinquent. For each Offering, the 60-day delinquency figures were all zero or negligible values.  For the 30-59 day mortgage loan delinquency rates, ten of the fifteen Offerings had zero delinquencies of 30 days or more, and 15 of the 15 had delinquency rates as of the cut-off date of below 0.5%.  For example, the Prospectus Supplements for the HVMLT Series 2006-4, HVMLT Series 2006-6 and HVMLT Series 2007-1 Certificate Offerings stated:

> As of April 24, 2006, approximately 0.33% of the mortgage loans were 30 days or more delinquent in payment.

> None of the mortgage loans have been 30 or more days delinquent in the twelve months preceding the cutoff date.

HVMLT Series 2006-4 Prospectus Supplement, Form 424B5, filed April 26, 2006, at S-29.

> As of the close of business on May 31, 2006, approximately 0.85% of the mortgage loans were 30 days or more delinquent in payment, and none of the mortgage loans were 60 days or more delinquent in payment.

HVMLT Series 2006-6 Prospectus Supplement, Form 424B5, filed June 27, 2006, at S-24.

> As of February 1, 2007, approximately 0.04% of the mortgage loans were at least 30 days but less than 60 days delinquent in payment and approximately 0.03% of the mortgage loans were 60 days or more delinquent in payment, as determined by the OTS method.

HVMLT Series 2007-1 Prospectus Supplement, Form 424B5, filed March 7, 2007, at S-25.

236.    ***Omitted Information:*** These statements masked the true impaired nature of the collateral since the delinquency rates for these loan pools followed the same pattern of

skyrocketing delinquencies immediately following the Offering dates.  Specifically, within four months after the respective "cut-off dates, delinquencies and defaults increased by an average of 652%, from 0.3% to almost 2.5% of the outstanding collateral balance, and within six months that figure further rose to over 3.2%, another 25% increase within just two months.  As of the date of the filing of this Complaint, borrower delinquency and defaults have increased to over 39.3% of the outstanding collateral balance.

**C.     The Offering Documents Included Material Misstatements
         and Omitted Information Regarding Credit Support**

237.    "Credit enhancement" refers to excess mortgage loan collateral which provides support to the mortgage collateral underlying the Offered Certificates and generates additional interest to protect security holders in the event of borrower default or other event which may impair the collateral underlying the certificates.

238.    With respect to credit enhancement, the Registration Statements provided explanations of the two methods used by Greenwich Capital in the Certificate Offerings as follows:

> ***Overcollateralization:*** The mortgage loans are expected to generate more interest than is needed to pay interest on the related securities because the weighted average interest rate on the mortgage loans is expected to be higher than the weighted average interest rate on the related securities.  If the mortgage loans generate more interest than is needed to pay interest on the related securities the "excess spread" will be used to make additional principal payments on those securities, which will reduce the total outstanding principal balance of those securities below the aggregate principal balance of the related mortgage loans, thereby creating "overcollateralization."

> Overcollateralization is intended to provide limited protection to security-holders by absorbing the security's share of losses from liquidated mortgage loans.  However, there can be no guaranty that enough excess spread will be generated on the mortgage loans to maintain the required level of overcollateralization.  The excess spread available on any distribution date will be affected by the actual amount of interest received, advanced or recovered in respect of the mortgage loans during the preceding month.  Such amount may be influenced by changes in

the weighted average of the mortgage rates resulting from prepayments, defaults and liquidations of the mortgage loans.    If the protection afforded by overcollateralization is insufficient, then you could experience a loss on your investment.

*Subordination:* This form of credit enhancement uses collections on the mortgage loans otherwise payable to the holders of the subordinated classes to pay amounts due on the more senior classes.  Such collections are the sole source of funds from which such credit enhancement is provided.  Realized losses will be allocated, first, to reduce the amount of excess spread, second, to reduce the overcollateralization amount, third, to each class of subordinate securities, beginning with the class with the lowest payment priority, in each case until the principal amount of that class has been reduced to zero, and fourth, to the senior securities.  Accordingly, if the aggregate principal balance of a subordinated class were to be reduced to zero, delinquencies and defaults on the mortgage loans would reduce the amount of funds available for distributions to holders of the remaining subordinated class or classes and, if the aggregate principal balance of all the subordinated classes were to be reduced to zero, delinquencies and defaults on the mortgage loans would reduce the amount of funds available for monthly distributions to holders of the senior securities.

Greenwich Capital Acceptance, Inc., Form S-3/A Registration Statement, filed March 31, 2006, at 3-4; *cf*., Greenwich Capital Acceptance, Inc., Form S-3/A Registration Statement, filed March 23, 2007, at 3-4.

239.    Furthermore, the Prospectus Supplements each contained further explanation of the credit enhancement specific to each of the Offerings.  For example, the Prospectus Supplement for the HVMLT Series 2006-5 Offering provided that credit enhancement would include:

Credit enhancement will be provided for the offered certificates, first, by the right of the holders of offered certificates to receive payments before the classes subordinate to them, second, by the allocation of realized losses on the mortgage loans to the subordinated classes in reverse order of their numerical class designations and third, by the primary mortgage insurance policy.  In addition, the Class 1-A1B Certificates have the benefit of a certificate insurance policy. None of the other classes of certificates are insured under the certificate insurance policy.

The first form of credit enhancement uses collections on the mortgage loans otherwise payable to holders of subordinated classes to pay interest or principal due on more senior classes of certificates of the related loan group.

The second form of credit enhancement provides that, except as described below, realized losses on any loan group are allocated:

> *first,* to the subordinate certificates in the reverse order of their priority of payment, beginning with the subordinate certificates with the lowest payment priority, until the class principal balance of each such class has been reduced to zero, and

> *second,* to the class or classes of related senior certificates (other than the Class X-1, Class X-2 and Class X-B Certificates) or components, pro rata based on the related class principal balance or component principal balance, until their respective principal balances are reduced to zero, in addition to other losses allocated to that class of certificates, until the class principal balance thereof has been reduced to zero; provided, that realized losses allocable to the Class 1-A1A and Class 1-A1B Certificates will be allocated to the Class 1-A1B and Class 1- A1A Certificates, in that order, until the class principal balance of each such class has been reduced to zero; and provided, further, that realized losses allocable to the Class 2-A1A, Class 2-A1B and Class 2- A1C Certificates will be allocated to the Class 2-A1C, Class 2-A1B and Class 2-A1A Certificates, in that order, until the class principal balance of each such class has been reduced to zero.

Accordingly, if the total principal balance of each subordinated class were to be reduced to zero, delinquencies and defaults on the mortgage loans in a loan group would reduce the amount of funds available for monthly payments to holders of the related senior certificates. In addition, higher than expected losses on one group of mortgage loans will decrease the amount of credit support provided by the subordinate certificates to the senior certificates with respect to the other group of mortgage loans.

The third form of credit enhancement is the primary mortgage insurance policy. Approximately 10.76% of all of the mortgage loans, and approximately 17.55% and 7.06% of the group 1 and group 2 mortgage loans, respectively, are mortgage loans having original loan-to-value ratios greater than 60%, calculated as described under "The Mortgage Loan Groups—General." On the closing date, a loan-level primary mortgage insurance policy will be acquired on behalf of the trust fund from Mortgage Guaranty Insurance Corporation, providing initial insurance coverage for approximately 32.62% of the mortgage loans. This loan-level primary mortgage insurance policy will generally have the effect of reducing the original loan-to-value ratios of those covered mortgage loans to approximately 60%. However, the primary mortgage insurance policy is subject to various other limitations and exclusions. As a result, coverage may be limited or denied on some mortgage loans. In addition, because the amount of coverage under the primary mortgage insurance policy depends on the loan-to-value ratio of the related mortgaged property at the inception of the primary mortgage insurance

policy, a decline in the value of the related mortgaged property will not result in increased coverage, and the trust fund may still incur a loss on a covered mortgage loan. Accordingly, the primary mortgage insurance policy will provide only limited protection against losses on the covered mortgage loans.

The Class 1-A1B Certificates will be insured by a certificate insurance policy issued by XL Capital Assurance Inc. None of the other classes of certificates are insured under the policy. In the absence of payments under the policy, holders of the Class 1-A1B Certificates will directly bear the credit risks associated with their certificates.

HVMLT Series 2006-5 Prospectus Supplement, Form 424B5, filed June 27, 2006, at S-24.

240. **_Omitted Information:_** The above statements failed to disclose that the Ratings Agencies largely determined the amount and kind of Credit Support or Credit Enhancement to be provided for each Certificate, both before and after Ratings Agencies were formally "engaged" by Greenwich, in order for the Certificates to be assigned predetermined ratings. The above statements also failed to disclose that the amounts and kind of Credit Support the Ratings Agencies determined was appropriate for the Certificates, as specifically set forth in each Prospectus Supplement, were faulty, erroneous and inaccurate since the Ratings Agency models had not been updated and failed to accurately or adequately reflect the performance of the Certificate mortgage loans. Furthermore, as the statements purport to convey to the investor that credit support levels are determined by the exposure to risk of default or delinquency by the underlying borrowers, this was far from the truth. In fact, credit enhancement levels were set at the absolute minimum level that was required not to protect investors, but rather to achieve and be awarded the highest possible credit rating by the Ratings Agency Underwriters.

D.       **The Prospectus Supplements Misstated The True Loan-to-**
         **Value Ratios Associated With The Underlying Mortgages**

241.     Each of the Prospectus Supplements contained detailed information about the
LTV ratios of the loans underlying the trusts. In a series of charts, investors were provided with
LTV ratio data, including information about the number of loans containing LTV ratios within a
given range.  The following chart, taken from the Prospectus Supplement for HVMLT Series
2006-4, stated:

**Original Loan-to-Value Ratios of the Mortgage Loans**

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Stated Principal Balance as of the Cut-off Date | % of Aggregate Stated Principal Balance as of the Cut-off Date | Weighted Average Gross Coupon | Weighted Average Stated Remaining Term | Weighted Average Original Loan-to-Value | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 0.01 - 49.99 | 195 | $53,395,294.75 | 2.85% | 4.182% | 373 | 40.45% | 721 |
| 50.00 - 54.99 | 98 | 29,103,156.98 | 1.56 | 4.529 | 366 | 52.51 | 700 |
| 55.00 - 59.99 | 114 | 42,149,536.69 | 2.25 | 4.304 | 374 | 57.39 | 701 |
| 60.00 - 64.99 | 198 | 73,001,766.18 | 3.90 | 3.969 | 371 | 62.67 | 705 |
| 65.00 - 69.99 | 323 | 125,203,014.95 | 6.69 | 3.970 | 375 | 67.86 | 704 |
| 70.00 - 74.99 | 660 | 242,784,097.07 | 12.98 | 3.982 | 379 | 71.32 | 700 |
| 75.00 - 79.99 | 885 | 343,832,295.17 | 18.38 | 4.038 | 374 | 76.87 | 698 |
| 80.00 - 80.00 | 2,189 | 746,675,682.18 | 39.92 | 4.015 | 376 | 80.00 | 701 |
| 80.01 - 84.99 | 30 | 7,653,773.94 | 0.41 | 4.484 | 359 | 83.51 | 692 |
| 85.00 - 89.99 | 198 | 55,025,234.13 | 2.94 | 5.651 | 359 | 88.33 | 694 |
| 90.00 - 94.99 | 431 | 113,148,443.31 | 6.05 | 5.184 | 361 | 90.40 | 696 |
| 95.00 - 99.99 | 149 | 38,675,534.28 | 2.07 | 5.141 | 363 | 95.00 | 706 |
| Total | 5,470 | $1,870,647,829.63 | 100.00% | 4.173% | 374 | 75.94% | 701 |

The weighted average original loan-to-value ratio of the mortgage loans was approximately 75.94% as of the cut-off date.

HVMLT Series 2006-4 Prospectus Supplement, Form 424B5, filed April 26, 2006, at S-32.

242.     ***Omitted Information***: As explained above, the appraisal value of the properties
underlying the mortgage loans and borrower incomes and credit were grossly inaccurate and
significantly inflated.  Furthermore, due to hidden incentives, the stated sales price of properties
underlying the mortgage loans did not accurately reflect the true value of the properties. These
inflated appraisals and misleading sales price figures were used to form the LTV ratios set forth

106

in the prospectus supplements.  Incorporating an inflated appraisal into the LTV calculation will result in a lower LTV ratio for a given loan.  For instance, as described above, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000 or 90%. If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75% ($90,000/$120,000).

243.    Due to the inflated appraisals, the LTV ratios listed in the prospectus supplements were artificially low, making it appear that the loans underlying the trusts were less risky than they really were.  Due to the fact that such a large percentage of each Offering contained mortgage loan collateral which had the option or negative amortization feature, understated and misleading LTV ratios had a direct correlation to the skyrocketing delinquency and default rates within the first six months of the Offerings.  Incorporating the example above, if a borrower's $90,000 loan application on a home appraised by an originator at $100,000, the LTV ratio is 90%.  In a negative amortization scenario, if the true appraisal value of the underlying property for the borrower's mortgage is actually $80,000, the LTV ratio increases to 112.5%, triggering the automatic adjustment in rate and loss of the negative amortization feature.  Since many of the negative amortization loans underlying the Certificates were made to subprime and Alt-A borrowers, the resulting payments would be considerably more than what they could have been able to afford.

244.    The Prospectus Supplement for the HVMLT Series 2006-4 Certificates also stated that:

> High Loan-to-Value Mortgage Loans. **As of the cut-off date, approximately 11.47% of all of the mortgage loans, and approximately 19.81%, 13.99%, 4.18% and 8.98% of the group 1A1, group 1A2, group 2 and group 3 mortgage loans, respectively, have original loan-to-value ratios in excess of 80%.**  Generally all such mortgage loans are covered by a primary mortgage guaranty insurance policy (which policy insures, generally, any portion of the unpaid principal

balance of a mortgage loan in excess of 80% of the value of the related mortgaged property).  No such primary mortgage guaranty insurance policy will be required to be maintained with respect to any such mortgage loan after the date on which the related loan-to-value ratio is 80% or less.

HVMLT Series 2006-4 Prospectus Supplement, Form 424B5, filed April 26, 2006, at S-28 (emphasis added).

245.   ***Omitted Information***: Due to the artificially inflated appraisals (as detailed above) mortgages were extended to borrowers whose true LTV ratio did not support the amount of the mortgage loan.  Moreover, contrary to the statement that these many of the mortgages were in fact "limited documentation," or not "full documentation" loans, they were not extended to borrowers who have a credit history that demonstrates an established ability to repay indebtedness in a timely fashion.  In fact, the originators implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage such as:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under the originators' underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs.

- Steering borrowers to more expensive loans that exceeded their borrowing capacity.

- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes.

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the adjustable rate adjusted.

- Allowing non-qualifying borrowers to be approved for loans under exceptions to the originators' underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors.

- Incentivizing their employees to approve borrowers under exceptions to the originators' underwriting policies.

- Failing to determine whether stated income or stated assets were reasonable.

**E.      The Prospectus Supplements Misstated the Certificates' True Investment Rating**

246.    The Registration Statements and Prospectus Supplements contained statements regarding the ratings of the Certificates that were supported by the mortgage loans.   The Registration Statements referred the investor to the Prospectus Supplements for specific information as to the ratings for each of the Certificates.

247.    Each of the Prospectus Supplements provided: (1) both S&P's and/or Moody's actual rating for each class of Offered Certificate within each Offering; or (2) stated that the Certificates in each class would not be offered unless they received ratings from both Moody's and/or S&P that were at least as high as those set forth in the Prospectus Supplement. All of the ratings set forth in all of the Prospectus Supplements were within the "Investment Grade" range of Moody's (Aaa through Baa3) and S&P (AAA through BBB) and the majority of Offered Certificates, over 92% of the total Offering values for each Moody's and S&P, received the highest rating of AAA.

248.    The following chart, taken from the Prospectus Supplement for HVMLT Series 2006-4 is an example of this representation:

### The Offered Certificates

The certificates consist of the classes of certificates listed in the tables below, together with the Class B-11 and Class B-12 and Class A-R-II Certificates.  Only the classes of certificates listed in the tables below are offered by this prospectus supplement.

| Class | Class Principal Balance[1] | Interest Rate Formula (until Initial Optional Termination Date)[2] | Interest Rate Formula (after Initial Optional Termination Date)[3] | Final Scheduled Distribution Date[4] | Expected Final Distribution Date[5] | CUSIP Number | Moody's | S&P | Fitch |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Initial Certificate Ratings[11] | | |
| Class 1-A1A | $ 353,429,000 | LIBOR + 0.180%[7] | LIBOR + 0.360%[7] | 5/19/2046 | 8/19/2014 | 41161P L2 7 | Aaa | AAA | AAA |
| Class 1-A1B | $ 151,470,000 | LIBOR + 0.195%[7] | LIBOR + 0.390%[7] | 5/19/2047 | 8/19/2014 | 41161P L3 5 | Aaa | AAA | AAA |
| Class 1-A2A | $ 278,494,000 | LIBOR + 0.190%[7] | LIBOR + 0.380%[7] | 5/19/2046 | 8/19/2014 | 41161P P9 8 | Aaa | AAA | AAA |
| Class 1-A2B | $ 69,623,000 | LIBOR + 0.190%[7] | LIBOR + 0.380%[7] | 5/19/2047 | 8/19/2014 | 41161P Q2 2 | Aaa | AAA | AAA |
| Class 2-A1A | $ 381,176,000 | LIBOR + 0.200%[7] | LIBOR + 0.400%[7] | 5/19/2046 | 8/19/2014 | 41161P L4 3 | Aaa | AAA | AAA |
| Class 2-A1B | $ 158,823,000 | LIBOR + 0.240%[7] | LIBOR + 0.480%[7] | 5/19/2047 | 8/19/2014 | 41161P L5 0 | Aaa | AAA | AAA |
| Class 2-A1C | $ 95,294,000 | LIBOR + 0.210%[7] | LIBOR + 0.420%[7] | 5/19/2047 | 8/19/2014 | 41161P L6 8 | Aaa | AAA | AAA |
| Class 3-A1A | $ 125,333,000 | LIBOR + 0.220%[7] | LIBOR + 0.440%[7] | 5/19/2046 | 8/19/2014 | 41161P L7 6 | Aaa | AAA | AAA |
| Class 3-A1B | $ 48,205,000 | LIBOR + 0.350%[7] | LIBOR + 0.700%[7] | 5/19/2046 | 8/19/2014 | 41161P P6 4 | Aaa | AAA | AAA |
| Class 3-A1C | $ 19,282,000 | LIBOR + 0.240%[7] | LIBOR + 0.480%[7] | 5/19/2047 | 8/19/2014 | 41161P P7 2 | Aaa | AAA | AAA |
| Class X-1 | Notional Balance[6] | Variable[8] | Variable[8] | 5/19/2046 | 8/19/2014 | 41161P L8 4 | Aaa | AAA | AAA |
| Class X-3A | Notional Balance[6] | Variable[8] | Variable[8] | 5/19/2046 | 8/19/2014 | 41161P M2 6 | Aaa | AAA | AAA |
| Class X-B | Notional Balance[6] | Variable[8] | Variable[8] | 5/19/2046 | 8/19/2014 | 41161P M3 4 | Aaa | AAA | AAA |
| PO-1 | $ 5,000 | 0.000% | 0.000% | 5/19/2046 | 8/19/2014 | 41161P M4 2 | Aaa | AAA | AAA |
| PO-3A | $ 50 | 0.000% | 0.000% | 5/19/2046 | 8/19/2014 | 41161P M6 7 | Aaa | AAA | AAA |
| PO-B | $ 200 | 0.000% | 0.000% | 5/19/2046 | 8/19/2014 | 41161P M7 5 | Aaa | AAA | AAA |
| A-R | $ 100 | Weighted Average[9] | Weighted Average[9] | 5/19/2046 | 8/19/2014 | 41161P M8 3 | Aaa | AAA | AAA |
| B-1 | $ 47,089,000 | LIBOR + 0.400%[10] | LIBOR + 0.600%[10] | 5/19/2046 | 8/19/2014 | 41161P M9 1 | Aa1 | AA+ | AA+ |
| B-2 | $ 32,963,000 | LIBOR + 0.440%[10] | LIBOR + 0.660%[10] | 5/19/2046 | 8/19/2014 | 41161P N2 5 | Aa2 | AA | AA |
| B-3 | $ 13,185,000 | LIBOR + 0.460%[10] | LIBOR + 0.690%[10] | 5/19/2046 | 8/19/2014 | 41161P N3 3 | Aa2 | AA- | AA- |
| B-4 | $ 15,069,000 | LIBOR + 0.630%[10] | LIBOR + 0.945%[10] | 5/19/2046 | 8/19/2014 | 41161P N4 1 | Aa3 | A+ | A+ |
| B-5 | $ 11,302,000 | LIBOR + 0.670%[10] | LIBOR + 1.005%[10] | 5/19/2046 | 8/19/2014 | 41161P N5 8 | A1 | A | A |
| B-6 | $ 9,418,000 | LIBOR + 0.750%[10] | LIBOR + 1.125%[10] | 5/19/2046 | 8/19/2014 | 41161P N6 6 | A2 | A- | A- |
| B-7 | $ 7,534,000 | LIBOR + 1.750%[10] | LIBOR + 2.625%[10] | 5/19/2046 | 8/19/2014 | 41161P N7 4 | A2 | BBB+ | A- |
| B-8 | $ 7,534,000 | LIBOR + 1.750%[10] | LIBOR + 2.625%[10] | 5/19/2046 | 8/19/2014 | 41161P N8 2 | A3 | BBB | BBB+ |
| B-9 | $ 7,534,000 | LIBOR + 1.750%[10] | LIBOR + 2.625%[10] | 5/19/2046 | 8/19/2014 | 41161P N9 0 | Baa1 | BBB- | BBB |
| B-10 | $ 16,011,000 | LIBOR + 1.750%[10] | LIBOR + 2.625%[10] | 5/19/2046 | 8/19/2014 | 41161P P2 3 | Baa3 | N/R | N/R |

HVMLT Series 2006-4 Prospectus Supplement, Form 424B5, filed April 26, 2006, at S-1.

249.    ***Omitted Information***:  The ratings stated in the Prospectus Supplements were based on outdated models, lowered ratings criteria, and inaccurate loan information as set forth in great detail above.  These flaws produced artificially high credit ratings for the Certificates, making them appear less risky than they really were.

250.    Furthermore, the Prospectus Supplements contained the following language or slight variation thereof pertaining to the Certificates' ratings:

It is a condition to the issuance of the certificates that the offered certificates

initially have the ratings from Moody's Investors Service, Inc., Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and Fitch Ratings set forth in the table on page S-1.

HVMLT Series 2006-4 Prospectus Supplement, Form 424B5, filed April 26, 2006, at S-15.

251.    Buried deep in the back of each Prospectus Supplement appears the following language or variation thereof:

> The ratings assigned by each rating agency named above address the likelihood of the receipt of all distributions on the mortgage loans by the related certificate holders under the agreement pursuant to which the certificates are issued.  The ratings of each rating agency take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on that mortgage pool is adequate to make payments required by the certificates.  However, ratings of the certificates do not constitute a statement regarding frequency of prepayments on the related mortgage loans.

HVMLT Series 2006-4 Prospectus Supplement, Form 424B5, filed April 26, 2006, at S-158.

252.    ***Omitted Information:*** The ratings stated in the Prospectus Supplements were based on outdated models, lowered ratings criteria, and inaccurate loan information as set forth in great detail above.  These flaws produced artificially high credit ratings for the Certificates, making them appear less risky than they really were.  As such, the ratings set forth in the Prospectus Supplements issued in connection with the Offerings did not accurately address the likelihood of receipt of any distributions, let alone "all distributions," as is apparent from the staggering percentage initially AAA rated Certificates which have since been downgraded to speculative or junk grades.

## VII.

## CLASS ACTION ALLEGATIONS

253.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure behalf of a class consisting of all persons or entities who acquired the Certificates issued by the Issuers, as set forth in ¶¶ 34-35, above, pursuant and/or traceable to the false and misleading Registration Statements and who were damaged thereby (the "Class").

254.    Excluded from the Class are Defendants, the officers and directors of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

255.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Defendants and/or Relevant Non-Parties, including, but not limited to, RBSG, GCH, GCM, GCFP, or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Billions of dollars worth of Certificates were issued pursuant to the Registration Statements.

256.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

257.    The Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

258.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether Defendants violated the Securities Act; whether the Registration Statements issued by Defendants to the investing public negligently omitted and/or misrepresented material facts about the underlying mortgage loans comprising the pools; and to what extent the members of the Class have sustained damages and the proper measure of damages.

259.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**VIII.**

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**For Violation of § 11 of the Securities Act**
**(Against GCA, The Individual Defendants, GCM**
**and the Ratings Agency Underwriters)**

260.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full

herein, to the extent that such allegations do not sound in fraud.

261.    This Cause of Action is brought pursuant to § 11 of the Securities Act, on behalf

of Plaintiffs and the Class, against the Issuer of the Registration Statements, the Individual

Defendants, the Underwriter of the Offerings and the Ratings Agency Underwriters.  This Cause

of Action is predicated upon Defendants' strict liability for making material misleading

statements and omitting material information from and in the Offering Documents.

262.    The Offering Documents were materially misleading, contained untrue statements

of material fact, omitted to state other facts necessary to make the statements not misleading, and

omitted to state material facts required to be stated therein.

263.    GCA, the Individual Defendants, GCM and the Ratings Agency Underwriters are

strictly liable to Plaintiffs and the Class for making the misstatements and omissions in issuing

the Certificates.

264.    The Individual Defendants each signed one or both of the Registration

Statements.

265.    GCM acted as underwriter in the sale of Certificates issued by the Issuing Trusts,

directly and indirectly participated in the distribution of the Certificates, directly and indirectly

solicited offers to purchase the Certificates, and directly and indirectly participated in drafting

and disseminating the Offering Documents for the Certificates.  GCM was an Underwriter for the respective Issuing Trusts.

266.    The Ratings Agency Underwriters acted as Underwriters in the sale of Certificates issued by the Issuing Trusts, directly participated in the formation and structuring so they would be marketable investments for sale to pension funds and insurance companies, and thereby indirectly solicited offers to purchase the Certificates.  The Ratings Agency Underwriters also directly participated in drafting and disseminating the Offering Documents for the Certificates.

267.    GCA, the Individual Defendants, GCM and the Ratings Agency Underwriters owed to the Plaintiffs and other Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

268.    GCA, the Individual Defendants, GCM and the Ratings Agency Underwriters knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Offering Documents as set forth herein.

269.    GCA, the Individual Defendants, GCM and the Ratings Agency Underwriters failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

270.    GCA, the Individual Defendants, GCM and the Ratings Agency Underwriters issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the

Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

271.    By reason of the conduct alleged herein, GCA, the Individual Defendants, GCM and the Ratings Agency Underwriters violated § 11 of the Securities Act, and are liable to Plaintiffs and the Class.

272.    Plaintiffs and other Class members acquired the Certificates pursuant and/or traceable to the Registration Statements.  At the time Plaintiffs and Class members obtained their Certificates they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

273.    Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of GCA, the Individual Defendants, GCM and the Ratings Agency Underwriters.  Specifically, as set forth herein, the delinquency, foreclosure, repossession and bankruptcy rates for the collateral underlying the Certificates - arising from defective collateral and faulty origination practices - triggered unprecedented downgrades of the Certificates' credit ratings by the Ratings Agencies and attendant declines in the value of the Certificates.

274.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the GCA, the Individual Defendants, GCM and the Ratings Agency Underwriters, as set forth in § 11 of the Securities Act.

275.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not

have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

## SECOND CAUSE OF ACTION

### For Violation of § 12(a)(2) of the Securities Act
### (Against GCM)

276.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

277.    This Cause of Action is brought pursuant to § 12(a)(2) of the Securities Act, on behalf of Plaintiffs and the Class, against the Underwriter of the Offerings, GCM.

278.    GCM promoted and sold the Certificates pursuant to the defective Prospectus Supplements for its own financial gain.   The Prospectus Supplements contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

279.    GCM owed to Plaintiffs and the other Class members who purchased Certificates pursuant to the Offering Documents, a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents, to ensure that such statements were true and that there was no omission of material fact necessary to make the statements contained therein not misleading.   GCM knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents, as set forth herein.

280.    Plaintiffs and other Class members purchased or otherwise acquired Certificates pursuant to and/or traceable to the defective Offering Documents.   Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Offering Documents.

281.    By reason of the conduct alleged herein, GCM violated § 12(a)(2) of the Securities Act, and is liable to Plaintiffs and other Class members who purchased Certificates pursuant to and/or traceable to the Offering Documents.

282.    Plaintiffs and other Class members were damaged by GCM's wrongful conduct. Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in § 12(a)(2) of the Securities Act. Those Class members who have sold their Certificates are entitled to rescissory damages, as set forth in § 12(a)(2) of the Securities Act.  Specifically, as set forth herein, the delinquency, foreclosure, repossession and bankruptcy rates for the collateral underlying the Certificates - arising from defective collateral and faulty origination practices - triggered unprecedented downgrades of the Certificates' credit ratings by the Ratings Agencies and attendant declines in the value of the Certificates.

283.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents, within one year after reasonable discovery of the untrue statements and material omissions and within three years of when the Certificates were sold to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

### THIRD CAUSE OF ACTION

**Violations of § 15 of the Securities Act**
**(Against RBSG, GCH, GCM, the Individual Defendants and**
**the Ratings Agency Underwriters)**

284.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

285.    This Cause of Action is brought pursuant to § 15 of the Securities Act against RBSG, GCH, GCM, the Individual Defendants and the Rating Agency Underwriters.

286.    Each of the Individual Defendants, by virtue of his or her control, ownership, offices, directorship, and specific acts set forth above was, at the time of the wrongs alleged herein, a controlling person of GCA, GCFP and the Issuing Trusts within the meaning of Section 15 of the Securities Act.  Each of the Individual Defendants had the power to influence, and exercised that power and influence, to cause GCA, GCFP and the Issuing Trusts to engage in violations of the Securities Act, as described above.

287.    GCM, by virtue of its control, influence, participation and solicitation of offers to purchase the Certificates and specific acts set forth above were, at the time of the wrongs alleged herein, a controlling person of GCA, GCFP and the Issuing Trusts within the meaning of Section 15 of the Securities Act.  GCM had the power to influence, and exercised that power and influence, to cause GCA, GCFP and the Issuing Trusts to engage in violations of the Securities Act, as described above.

288.    The Ratings Agency Underwriters, by virtue of their control, influence, participation and solicitation of offers to purchase the Certificates and specific acts set forth above were, at the time of the wrongs alleged herein, a controlling person of GCA, GCFP and the Issuing Trusts within the meaning of Section 15 of the Securities Act.  GCM had the power to influence, and exercised that power and influence, to cause GCA, GCFP and the Issuing Trusts to engage in violations of the Securities Act, as described above.

289.    The Individual Defendants, RBSG, GCH, GCM and Rating Agency Underwriters' control, position and influence made them privy to, and provided them with actual

knowledge of, the material facts and omissions concealed from Plaintiffs and the other Class members.

290.    Each of the Individual Defendants was a participant in the violations alleged herein, based on their having prepared, signed or authorized the signing of the Registration Statements and having otherwise participated in the consummation of the Offerings detailed herein.   The Defendants named herein were responsible for overseeing the formation and operation of the Issuing Trusts, including routing payments from the borrowers to investors.

291.    Individual Defendants prepared, reviewed and/or caused the Registration Statements and Prospectus Supplements to be filed and disseminated.

292.    Since the Defendants named herein controlled the ultimate decision of which mortgage loans would be included and excluded from the securitized pools of loans as well as the ultimate amount of credit enhancement required in order for the Certificates to be sold to investors, they controlled all material aspects relating to the acquisition, structure and sale of the Certificates and thus, the activities of the Issuing Trusts and Individual Defendants within the meaning Section 15 of the Securities Act.

293.    By virtue of the wrongful conduct alleged herein, RBSG, GCH, GCM, the Individual Defendants and the Rating Agency Underwriters are liable to Plaintiffs and the other Class members for the damages sustained.   Specifically, as set forth herein, the delinquency, foreclosure, repossession and bankruptcy rates for the collateral underlying the Certificates - arising from defective collateral and faulty origination practices - triggered unprecedented downgrades of the Certificates' credit ratings by the Ratings Agencies and attendant declines in the value of the Certificates.

## IX.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying Plaintiffs as Class representative;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Awarding such additional equitable, injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury

Dated: New York, New York
May 19, 2009

Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

By: _____

Joel P. Laitman (JL-8177)
Christopher Lometti (CL-9124)
Daniel B. Rehns (DR-5506)
Kenneth M. Rehns (KR-9822)
150 East 52nd Street, Thirtieth Floor
New York, New York 10022
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
*jlaitman@cohenmilstein.com*
*clometti@cohenmilstain.com*
*drehns@cohenmilstein.com*
*krehns@cohenmilstein.com*

Avi Garbow
S. Douglas Bunch
1100 New York Avenue, NW, Suite 500 West
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
*agarbow@cohenmilstein.com*
*dbunch@cohenmilstein.com*

*Counsel for Lead Plaintiffs and the Proposed Class*

## **CERTIFICATE OF SERVICE**

I, Daniel B. Rehns, counsel for the Plaintiffs, hereby certify that on May 19, 2009, I filed an original of the foregoing by hand with the Clerk of the Court and delivered a copy to all parties named herein and/or counsel of record in the within action by hand or first-class mail.

Daniel B. Rehns