UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
NEW JERSEY CARPENTERS VACATION FUND     :
And BOILERMAKER BLACKSMITH NATIONAL    :
PENSION TRUST, on Behalf of Themselves and All   :
Others Similarly Situated,                                :
                                                :
                    Plaintiffs,             :
                                                     :       **08 CV 5093 (HB)**
             - against -              :
                                                    :       **OPINION &**
THE ROYAL BANK OF SCOTLAND GROUP, PLC,   :       **ORDER**
GREENWICH CAPITAL HOLDINGS, INC.,          :
GREENWICH CAPITAL ACCEPTANCE, INC.,       :
GREENWICH CAPITAL FINANCIAL PRODUCTS,   :
INC., ROBERT J. MCGINNIS, CAROL P. MATHIS,   :
JOSEPH N. WALSH, III, JOHN C. ANDERSON,    :
JAMES M. ESPOSITO, RBS SECURITIES, INC.,    :
f/k/a GREENWICH CAPITAL MARKETS, INC.,     :
d/b/a RBS GREENWICH CAPITAL, MOODY'S     :
INVESTOR SERVICE, INC., and                 :
THE MCGRAW-HILL COMPANIES, INC.,        :
                                                :
                  Defendants.          :
                                                :
------------------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

       Lead Plaintiffs New Jersey Carpenters Vacation Fund ("Carpenters Fund") and

Boilermaker Blacksmith National Pension Trust ("Boilermaker Trust") (collectively "Lead

Plaintiffs" or "Plaintiffs") bring claims charging the defendants with violations of sections 11,

12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k(a), 77*l*(a)(2), 77o (2010).  These

sections, the Plaintiffs opine, were violated as a consequence of alleged omissions and

misstatements in registration statements and prospectuses filed with the SEC as part of a series of

mortgage-backed securities known as the Harborview Mortgage Loan Trusts.  The Harborview

Trust securities, or "Certificates," were issued in a series of different offerings, each with its own

prospectus supplement but traceable to two primary "shelf" registration statements, between

April 2006 to October 2007.  Plaintiffs bring suit against essentially two groups of defendants,

the "RBS Defendants," who were the primary issuers and underwriters of the Harborview Trusts,

and the "Ratings Agency Defendants," the two agencies who provided credit ratings for the Certificates and also allegedly acted as underwriters based on their role in the structuring of the Certificates. For the reasons that follow, the claims against the Ratings Agency Defendants are dismissed because they cannot be held liable under this set of facts as "underwriters." Claims against the RBS Defendants related to offerings that Plaintiffs did not purchase from, are dismissed for lack of standing. Finally, claims against the RBS Defendants related to undisclosed conflicts of interest with rating agencies and to inadequate credit enhancements and outdated rating models are dismissed for failure to state a claim; Plaintiffs' claims related to misstatements and nondisclosure of mortgage originators' "disregard" of loan underwriting guidelines may proceed.

## I.   FACTUAL BACKGROUND[1]

*Parties*

Plaintiffs are two pension funds, who purport to represent a class that "purchased or otherwise acquired interests" in mortgage-backed securities known as the Harborview Mortgage Loan Trusts (the "Harborview Trusts" or "Harborview"), which were registered pursuant or traceable to two registration statements and accompanying prospectuses filed with the SEC on March 31, 2006, and March 23, 2007. Consol. First. Am. Secs. Class Action Compl. ("Consolidated Amended Complaint" or "CAC") ¶¶ 1, 19-20. The various defendants (collectively "Defendants") can be grouped into two sets. First, there are the "RBS Defendants," made up of the defendant corporate entities The Royal Bank of Scotland Group, PLC ("RBSG"), Greenwich Capital Holdings, Inc. ("GCH"), Greenwich Capital Financial Products, Inc. ("GCFP"), Greenwich Capital Acceptance, Inc. ("GCA"), Greenwich Capital Markets, Inc. ("GCM"),[2] who collectively securitized and issued the Harborview Trust Certificates. The RBS Defendants also include certain individual defendants ("Individual Defendants"), Robert J. McGinnis, Carol P. Mathis, Joseph N. Walsh, III, John C. Anderson, and James C. Esposito, who were all senior employees of GCA, and signed the two registration statements filed with the SEC

---

[1] The following facts are taken from the Consolidated Amended Complaint, the factual allegations of which are accepted as true for purposes of Defendants' motion to dismiss, as well as from public filings referenced and relied upon in the Amended Complaint and public information of which the court may take judicial notice.

[2] Now known as RBS Securities, Inc., and doing business as RBS Greenwich Capital. CAC ¶ 2; *see also* Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("RBS Defs.' Mem.") at 2 n.3 (describing the changes in the names of the corporate entities).

for the Harborview Trusts.  *See* CAC ¶¶ 21-36.  As for the second group, Plaintiffs bring claims against the "Ratings Agency Defendants," made up of The McGraw-Hill Companies, Inc., of which Standard & Poor's Rating Service is a division (hereafter "S&P") and Moody's Investors Service, Inc. ("Moody's"), both of whom provided credit ratings for the various Harborview Trusts and also allegedly acted as underwriters of the offerings.  *See* CAC ¶¶ 37-39.

**Mortgage Backed Securities and the GCM Securitization**

Mortgage-backed securities ("MBS") come about "where mortgage loans are acquired, pooled together, and then sold to investors [in the form of a security], who acquire rights in the income flowing from the mortgage pools."  CAC ¶ 40. The securities are often divided into groups ("tranches") based on the relative riskiness of the underlying loans, the order in which the Certificates are paid out, and their corresponding interest rates.  *Id.*  Due to the varying levels of risk of the individual loans – i.e. the potential that a borrower may be delinquent or default on payment – a MBS may be created with a degree of "credit enhancement" built into its structure. CAC ¶ 50.  The enhancements enable the MBS to receive a high enough credit rating sufficient for sale, and provide a degree of protection to the investor from this risk. [3]  *Id.*  The issuance of these securities may be accomplished in one or more offerings based on a single "shelf" registration statement.  *See* SEC Rule 415: Delayed or continuous offering and sale of securities, 17 C.F.R. § 230.415(1)(vii)(2010). [4]

The RBS Defendants, specifically GCH, GCA, GCFP, and GCM (collectively "Greenwich Capital"), derived their profit through the sale of the Certificates at an excess of the purchase price for the underlying mortgages they used to create the MBS.  CAC ¶ 45.  They would purchase the loans in bulk from a mortgage originator at an auction.  CAC ¶¶ 47-49.  Prior to this purchase, Greenwich Capital would perform due diligence, typically through a subcontractor firm, to get a sense of the loans and determine that they "conformed to the Originators' underwriting guidelines and contained the requisite legal documentation."  CAC ¶57.  The auction process allegedly incentivized Greenwich Capital not to "kick out" too many

---

[3] There are a number of different forms of credit enhancements, the specifics of which are not particularly relevant to this motion.

[4] "Securities may be registered for an offering to be made on a continuous or delayed basis in the future, *Provided*, That…The registration statement pertains only to…Mortgage related securities, including such securities as mortgage backed debt and mortgage participation or pass through certificates." As is the case with the securities here, mortgage-backed securities based on a single registration statement, but with multiple offerings in a single year, will often name a particular offered security based on what number offering it was in a given year, i.e., "Mortgage-Backed Security 2010-1," "Mortgage-Backed Security 2010-3," etc.

"faulty" loans, because then the mortgage originator was less likely to sell loan pools to them in the future. *Id.* Before they would sell a MBS, Greenwich Capital would have the securities rated by S&P or Moody's. For the securitization process to be worthwhile to Greenwich Capital, "approximately 80% of the securitization had to have the highest rating by the rating agencies." CAC ¶ 46. Consequently, they sought to sell as many certificates with an "AAA" (or "Aaa") rating since they were "significantly more profitable," and also sought to limit the amount of costly overcollateralization. CAC ¶ 51.

In order to secure the highest ratings possible, Greenwich Capital would allegedly engage in "ratings shopping" between the rating agencies. CAC ¶ 58-61. First, they would provide the rating agencies with a preliminary deal structure. Then, the agencies would analyze the structure, advise Greenwich Capital how much of the securitization could be given a top credit rating, and help decide what credit enhancements were needed to maximize high ratings. CAC ¶ 59. For example, "S&P would advise Greenwich Capital…that 94.25% of the Certificates would be rated AAA as long as 5.75% of the total collateral balance supporting those Certificates were subordinate [i.e. given a lower credit rating and subordinating their payment to the higher-rated certificates]." *Id.* Greenwich Capital would then negotiate with the rating agencies to reduce the amount of credit enhancement needed, and would ultimately select the agency who provided the highest rating for the most certificates in the securitization. *Id.* According to Plaintiffs, the shopping process allowed Greenwich Capital to pressure rating agencies to provide high ratings and minimum credit enhancements in order to receive the profitable rating business.

According to Plaintiffs, the Rating Agency Defendants played a substantial role in the securitization process. They provided Greenwich with guidance on the selection of loans at the loan auction, so that there would be sufficient collateral to support a high credit rating; they likewise played a role in suggesting the bid price for those loans. CAC ¶¶ 50, 54. This "bid package" was done without compensation in the hope of being engaged to rate the loans at the underwriting stage. CAC ¶ 55. As stated, *supra*, at the underwriting stage they would provide a preliminary rating and determine the necessary credit enhancement as part of the "ratings shopping" process. CAC ¶ 58-61. Through this procedure, "the Rating Agencies assisted in determining which of the purchased loans were to be included in the mortgage pools underlying the Certificates and thereafter the structure of the Certificates themselves." CAC ¶ 7. After being selected, they would provide the actual rating given to the mortgage-backed certificates.

*See* CAC ¶ 58-61.  In sum, Plaintiffs allege that the Rating Agencies "directly participate[d] in the formation and structuring of the Certificates prior to issuance."  CAC ¶ 7.

***The Harborview Trust Securitization***

The MBS created by Greenwich Capital at issue here, the Harborview Trust securitization, is made up of mortgage collateral from a variety of mortgage originators.  The names of some are now synonymous with sub-prime lending and the housing market collapse: "principally Countrywide Home Loans, Inc. ("Countrywide"), American Home Mortgage Corporation ("American Home"), IndyMac Bank, F.S.B. ("IndyMac"), Bank United, FSB ("BankUnited"), and Downey Savings & Loan Association ("Downey")."  CAC ¶ 6.  Many, if not most, of the underlying loans were some form of sub-prime or otherwise risky "low documentation" or "no documentation" loans – i.e. loans where there was a higher risk of default based on weak credit history and personal finances, or fraud because borrowers either self-reported their income or were allowed to provide less information than in a typical loan.  CAC ¶ 13.  The certificates were sold in fifteen separate offerings between April 26, 2006 and October 1, 2007 – Harborview Mortgage Loan Trust ("HVMLT") Series 2006-4  through 2006-14, and Series 2007-1, -2, -5, and -7.  CAC ¶¶ 34-35.  Collectively, the RBS Defendants "underwrote and sold to Plaintiffs and the Class $25.78 billion of Mortgage Loan Pass-Through Certificates."  CAC ¶ 2.

The Certificates were filed with the SEC pursuant to two registration statements, in 2006 and 2007, each of which contained a base prospectus, along with subsequently filed prospectus supplements (collectively the "Offering Documents") for each particular HVMLT offering.  CAC ¶ 1.  The registration statements and prospectus supplements contained detailed information about the securitization and the underlying loan pools.  This included, among other things, (1) "descriptions of the loan origination practices" of the mortgage originators, including the "underwriting guidelines"[5] of the originators, *see, e.g.,* CAC ¶ 10; (2) details about the underlying loans themselves, such as delinquency rates and loan-to-value ("LTV") ratios, *see, e.g.,* CAC ¶ 241; (3) the credit ratings given to the various classes of Certificates, *see, e.g.,* CAC

---

[5] The terms "underwriter" and "underwriting" are used in two separate ways in this action and may cause some confusion.  For the purposes of this opinion, "underwriting guidelines" or "guidelines" refer to the standards and practices used by the mortgage originators to determine the eligibility of borrowers for their loan products.  The term "underwriter" refers to the defined term for one of the five enumerated classes of individuals subject to liability under § 11 of the Securities Act.  *See* 15 U.S.C. § 77k(a)(5) ("every underwriter with respect to such security"); 15 U.S.C. § 77b(a)(11) ("The term 'underwriter' means…").

¶ 37, and; (4) the credit enhancement for the Certificates, *see, e.g.,* CAC ¶ 51.  As with a typical MBS, "the value of the Certificates was directly tied to repayment of the underlying mortgage loans since the principal and interest payments due to investors were secured and derived from cash flows from those loans."  CAC ¶ 5.  According to Plaintiffs, the RBS Defendants engaged in "ratings shopping" in the Harborview Trust securitization process, seeking the highest rating for the most Certificates, and the least necessary credit enhancements.  CAC ¶ 7.

Upon issuance, the great majority of Certificates originally received high credit ratings from the Rating Agency Defendants – Moody's assigned its highest investment grade, "Aaa," to 92.7% of the Certificates it rated, while S&P assigned its highest grade, "AAA," to 92.2% of the Certificates it rated.  CAC ¶ 8.  None initially were rated below "investment grade" ("Ba1" for Moody's, "BB+" for S&P).  *Id.*  Shortly after their sale, however, defaults and delinquencies on the underlying mortgage collateral quickly piled up, and as a result, "the value of the Certificates collapsed."  CAC ¶ 9.  As a result of the "massive increases in borrower delinquency, foreclosure, repossession and bankruptcy in the underlying Certificate collateral" Plaintiffs claim the Certificates have lost "a combined 68% of their initial value."  *Id.*  Today, over 39% of the underlying loans are delinquent, or in default, foreclosure or bankruptcy.  *Id.*  In mid-2007, both Moody's and S&P revised their rating method, re-analyzed the Harborview Trusts, and downgraded almost all of the Certificates, some many levels below their original rating.  CAC ¶¶ 155-56.  According to Plaintiffs, the rating agencies downgraded the certificates due to the "aggressive underwriting used in the origination of the collateral."  CAC ¶ 156.  More than 95% of the Certificates have been "downgraded to speculative junk bond investments."  CAC ¶ 9.

### Causes of Action & Allegations

Plaintiffs allege that the Offering Documents for the Harborview Trust Certificates violated section 11 of the Securities Act, due to the Individual Defendants, GCA, GCM, and the Rating Agency Defendants' omissions and misstatements of material information from the two registration statements and various prospectus supplements.  CAC ¶¶ 260-75.  They further allege that GCM violated Section 12(a)(2) of the Securities Act based on "untrue statements of material fact" and "omitted facts necessary to make statements not misleading" in the prospectus supplements.  CAC ¶¶ 276-83.  Finally, Plaintiffs bring a cause of action under Section 15 of the Securities Act against RBSG, GCH, GCM, the Individual Defendants, and the Rating Agency Defendants for "control person liability."  CAC ¶¶ 284-93.  Plaintiffs' group their allegations

into three basic categories of omitted and misstated information: (1) the underwriting guidelines were "systematically disregarded;" (2) the credit enhancements built into the Certificates were "inadequate" and the model for credit rating was "outdated" and (3) there were material conflicts of interest with regard to the Rating Agency Defendants' activities.

## II.  DISCUSSION

### A.  Legal Standard

A complaint will be dismissed under Rule 12(b)(6) if there is a "failure to state a claim upon which relief can be granted."  Fed.R.Civ.P. 12(b)(6).  To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must "plead enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Landmen Partners Inc. v. Blackstone Group, L.P.*, 659 F.Supp.2d 532, 538 (S.D.N.Y. 2009).  A facially plausible claim is one where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  Where the court finds well-pleaded factual allegations, it should assume their veracity and determine whether they "plausibly give rise to an entitlement to relief." *Id.* at 1950.  "Bald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations and will not defeat the motion." *Garber*, 537 F.Supp.2d 597, 610 (S.D.N.Y. 2008).  In addition to well-pleaded factual allegations in the complaint, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *In re Morgan Stanley Tech. Fund Secs. Litig.*, Nos. 02 Civ. 6153, 02 Civ. 8579 (BSJ), 2009 WL 256005 (S.D.N.Y. Feb. 2, 2009)(applying *ATSI* to Securities Act claims), *aff'd*, Nos. 09-0837-cv, 09-0858-cv, 2010 WL 252294 (2d Cir. Jan. 25, 2010).[6]

---

[6] Claims premised on fraud, including claims brought under the Securities Act, must satisfy the heightened particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure, whereas Securities Act claims that "sound in negligence" are governed by the standard notice pleading requirements of Rule 8.  *See In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010).  Defendants do not argue that Plaintiffs' claims sound in fraud, Plaintiffs expressly disclaim any allegations of fraud, and their allegations focus on the alleged negligent omission of information.  "Therefore, notice pleading supported by facially plausible factual allegations is all that is required – nothing more, nothing less." *Id.*; *see also Landmen Partners*, 659 F.Supp.2d at 539, n.5 ("Plaintiff's allegations in this case clearly sound in negligence and not fraud.  Indeed, Blackstone does not argue to the contrary.").

&ast;   &ast;   &ast;

Defendants have raised a number of different arguments as to why Plaintiffs' claims should be dismissed.  The RBS Defendants argue that (1) the Plaintiffs lack standing for at least 13 of the 15 offerings in dispute; (2) the statute of limitations bars Plaintiffs' claims; (3) Plaintiffs fail to sufficiently allege actionable omissions or misstatements under sections 11 or 12 of the Securities Act; and (4) control person liability under section 15 should be dismissed for failure to adequately plead a primary violation.  The Rating Agency Defendants argue that claims against them should be dismissed because (1) SEC regulations preclude a section 11 claim against rating agencies; (2) they are not "underwriters" as defined by the Securities Act and do not fall within any of the other specifically enumerated categories of parties that may be liable under section 11; (3) Plaintiffs fail to allege actionable omissions under section 11; and (4) control person liability under section 15 should be dismissed because they fail to allege a primary violation and because they are not a "control person."

## B.  The Rating Agency Defendants

Plaintiffs contend that the Rating Agency Defendants are liable for violations of sections 11 and 15 of the Securities Act due to actionable misstatements or omissions in the Harborview Trust Offering Documents.  Based on the facts alleged in this case, however, Plaintiffs simply cannot properly bring claims against the Rating Agency Defendants as "underwriters" as that term is understood in the Securities Act.

### 1.  **Section 11 and "Underwriter" Liability**

A cause of action may be brought under section 11 of the Securities Act where a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983).  There are five categories of enumerated parties that may be sued under the statute, which, most importantly, includes "every underwriter with respect to such security."  § 77k(a)(5).  An "underwriter" is defined in the Securities Act as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or

participates or has a participation in the direct or indirect underwriting of any such undertaking."
§ 77b(a)(11).

As both the text of the statute and accompanying legislative history suggest[7], the definition revolves around the sale and distribution of securities.   The Second Circuit determined that an underwriter includes persons "engaged in steps necessary to the distribution of security issues." *S.E.C. v. Kern*, 425 F.3d 143, 152 (2d Cir. 2005) (quoting *S.E.C. v. Chinese Consol. Benev. Ass'n*, 120 F.2d 738, 741 (2d Cir. 1941)).   An underwriter is one who "buys securities directly or indirectly from the issuer and resells them to the public, or he performs some act (or acts) that facilitates the issuer's distribution." *In re Refco, Inc. Secs Litig.*, 503 F.Supp.2d 611, 629 (S.D.N.Y. 2007); (internal quotations omitted); *see In re Worldcom, Inc. Secs. Litig.*, 308 F. Supp. 2d 338, 343 (S.D.N.Y. 2004); *see also Harden v. Raffensperger, Hughes & Co., Inc.*, 65 F.3d 1392, 1400 (7th Cir. 1995)("necessary to the distribution of securities"); *Ackerberg v. Johnson*, 892 F.2d 1328, 1335 (8th Cir. 1989)("underwriter" is generally defined in close connection with the definition and meaning of "distribution."); *SEC v. Int'l Chem. Dev. Corp.*, 469 F.2d 20, 32-33 (10th Cir. 1972) (party was "unquestionably one who participated or had a direct or indirect participation in the undertaking" because he "served as a conduit for the distribution of these shares to numerous investors").

While the Rating Agency Defendants may have played a significant role in the creation of the securities at issue in this action, the alleged activities are insufficient to impose "underwriter" liability under section 11.   Plaintiffs make no factual allegation that the Rating Agency Defendants directly participated in the sale or distribution of the Harborview Trusts by, for instance, marketing the securities to the public, assisting in investor "road shows," or purchasing the securities themselves for re-sale.   "Congress enacted a broad definition of underwriter status in order to 'include as underwriters all persons who might operate as **conduits for securities being placed into the hands of the investing public**.'"   *S.E.C. v. Lybrand*, 200

---

[7] According to the House Report, "The term is defined broadly enough to include not only the ordinary underwriter, **who for a commission promises to see that an issue is disposed of at a certain price**, but also includes as an underwriter the person who **purchases an issue outright with the idea of then selling that issue to the public**. The definition of underwriter is also broad enough to include two other groups of persons **who perform functions, similar in character, in the distribution of a large issue**. The first of these groups may be designated as the underwriters of the underwriter, a group who, for a commission, agree to take over pro rata the underwriting risk assumed by the first underwriter. The second group may be termed participants in the underwriting or outright purchase, who may or may not be formal parties to the underwriting contract, but who are given a certain share or interest therein."   H.R. Rep. No. 85, 73rd Cong., 1st Sess. 13 (1933) (emphasis added).

F.Supp.2d 384, 393 (S.D.N.Y. 2002) (quoting Thomas Lee Hazen, *The Law of Securities Regulation* 431 (4th Ed. 2002)) (emphasis added); *see also Ackerberg*, 892 F.2d at 1335-36. Plaintiffs have sufficiently alleged that Moody's and S&P played a significant, if not major, role in initial securitization decisions, but this alone is insufficient to create underwriter liability. "Having a relationship with an issuer or an underwriter, however, does not transform one into an underwriter." *Worldcom*, 308 F. Supp. 2d at 344; *see also In re Refco, Inc. Secs. Litig.*, No. 05 Civ. 8626 (GBL), 2008 WL 3843343, at *3 (S.D.N.Y. Aug. 14, 2008) (Plaintiffs cite no case where a party "that participated in the drafting of a registration statement, but who was not identified to the public as endorsing the truth of representations contained therein, has been held liable under § 11 as an underwriter."). The Rating Agency Defendants efforts came at the "back end" of the securitization process, and Plaintiffs offer no allegations here that these defendants "held themselves out in any respect as to the public offering" or "suggest that the [defendants] bore any risk with respect to that transaction." *Refco*, 503 F.Supp.2d at 629. While Plaintiffs' allegations are correct, i.e. that the Rating Agency Defendants' activities were not necessarily innocent, they were not related to the core functions of an underwriter, i.e. the marketing, distribution, and sale of offerings to investors.

A recent decision in this district analyzed the definition of "underwriter" under the Securities Act in nearly the same factual setting. *See In re Lehman Brothers Secs. and ERISA Litig.*, No. 09 MD 2017 (LAK), 2010 WL 337997 (S.D.N.Y. Feb. 1, 2010). According to Judge Kaplan, while "the Rating Agencies' alleged activities may well have a good deal to do with the composition and characteristics of the pools of mortgage loans and the credit enhancements of the Certificates that ultimately were sold…[] there is nothing in the complaint to suggest that they participated in the relevant 'undertaking'-that of purchasing the securities here at issue, the Certificates-'from the issuer with a view to their resale.'" *Id.* at *3. I agree with Judge Kaplan, and likewise find that Plaintiffs' allegations do not support an inference that the Rating Agency Defendants were involved in the sale or distribution of the securities such that they can be considered "underwriters" pursuant to the Securities Act. Claims against the Ratings Agency Defendants for section 11 violations are dismissed.

2. **Control Person Liability**

Plaintiffs also bring a cause of action against the Rating Agency Defendants for "control person liability" under section 15 of the Securities Act.  "[T]he success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under sections 11 and 12."  *In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010); *see also Rombach v. Chang*, 355 F.3d 164, 177-78 (2d Cir. 2004).  Since Plaintiffs have failed to allege primary liability against the Ratings Agency Defendants, their claims under section 15 must also be dismissed.

## C.  RBS Defendants

### 1.  <u>Standing</u>

The Harborview Trust securities were filed in two separate registration statements, and issued in fifteen distinct offerings.  Named plaintiffs allegedly purchased Certificates in two of the offerings, HVMLT Series 2006-4 and 2007-7, respectively traceable to the 2006 and 2007 registration statements.  CAC ¶¶ 19-20.  Since they did not purchase certificates in the other thirteen, the RBS Defendants argue that Plaintiffs lack standing for these offerings.  Standing is challenged on the basis of the pleadings, and a district court must "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *W.R. Huff Asset Mgmt Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008).  In a putative class action setting, "**named** plaintiffs…must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Id.* at 106 n.5 (internal quotations omitted, emphasis in original).  Plaintiffs' argument that this should be held in abeyance until class certification is not persuasive.[8]  "That a suit may be a class action…adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured." *Lewis v. Casey*, 518 U.S. 343, 357 (1996).

To demonstrate Article III standing, Plaintiffs must allege (1) injury in fact, a "concrete and particularized harm to a legally protected interest;" (2) causation, a "fairly traceable connection between the asserted injury-in-fact and the alleged actions of the defendants," and;

---

[8] Plaintiffs' reliance on my decision in *In re Dreyfus Aggressive Growth Mutual Fund Litigation* is misplaced. *See* No. 98 Civ. 4318 (HB), 2000 WL 1357509, at *3 (S.D.N.Y. Sept. 19, 2000).  The decision, rendered on a motion for class certification, only analyzed whether Plaintiffs had "standing to represent a class" in terms of the "typicality" requirement for class actions in Rule 23(a) of the Federal Rules for Civil Procedure. *Id.* at *5.  It did not directly pass upon the issue of plaintiffs' Article III standing.

(3) redressability, "a nonspeculative likelihood that the injury can be remedied by the requested relief." *See Huff*, 549 F.3d at 106-07 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Section 11 does not create any obligation to allege damages but a plaintiff "must nevertheless satisfy the court that she has suffered a cognizable injury under the statute." *In re AOL Time Warner, Inc. Secs. and "ERISA" Litig.*, 381 F.Supp.2d 192, 246 (S.D.N.Y. 2004) (internal citations omitted).

Plaintiffs seek to focus on the commonality of the registration statements, and argue that "purchasers are not required for each offering where the claims arise out of common alleged misstatements and omissions."  Pls.' Mem., at 9.  But the shelf registration statements and related base prospectuses are general in content and, as Plaintiffs themselves note, the statements point investors to specific details contained in the supplements to the individual and distinct prospectus for each offering.  *See, e.g.*, CAC ¶¶ 138, 234-35  Most of Plaintiffs' factual allegations focus on the underlying details contained in the HVMLT prospectus supplements and are unique to each of the offerings: the downgrade in credit ratings, the particular guidelines used by the mortgage originator for that pool of loans, and the default and delinquency rates all differ based on the particular offering.  Although the makeup of each offering in this case is similar, there is no necessary reason for this; just because one offering was comprised of Countrywide-originated subprime loans and allegedly omitted Countrywide's fraudulent lending practices, does not mean that another offering could have been structured with less risky loans and included all necessary disclosures.  Put another way, the harm Plaintiffs may have suffered based on misstatements in the Offering Documents for the Certificates they purchased has no bearing on any harm suffered by other investors based on alleged misstatements in other offering documents with details about other offerings that Plaintiffs did not purchase.

Courts in this circuit and elsewhere have come to similar conclusions on this question.  In *In re Salomon Smith Barney Mutual Fund Fees Litigation*, Judge Crotty determined that named plaintiffs in a putative class action "who own shares in twenty of the eighty-eight mutual funds offered" at issue in the case lacked standing to bring suit based on the defendant's other sixty-eight mutual fund offerings.  441 F. Supp. 2d 579, 582-83 (S.D.N.Y. 2006).  Judge Kaplan likewise found no standing in a factually similar Securities Act case based on alleged omissions and misstatements in MBS offering documents.  *In re Lehman Brothers Secs. and ERISA Litig.*, No. 09 MD 2017 (LAK), slip op. at 2-5. (S.D.N.Y. Feb. 17, 2010) ("Named plaintiffs have

purchased in six of the ninety-four offerings.  They have not alleged any personal injury stemming from the other eighty-eight.  They therefore have no standing to assert those claims."); *see also NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 08 Civ. 10783 (MGC), Hr'g Tr. at 40:5-41:20 (S.D.N.Y. Jan. 28, 2010) (Denying standing because "plaintiff has not shown that the injuries it alleges based upon purchases of those two trusts are the same injury as those allegedly suffered by purchasers of outlying trusts backed by distinct sets of loans."); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F.Supp.2d 299, 303 (D.Mass. 2009) ("[T]he named plaintiffs are incompetent to allege an injury caused by the purchase of Certificates that they themselves never purchased.").  I concur with these reasoned and common-sense opinions that Plaintiffs need to show an injury connected to the offerings they challenge as misleading, and therefore Plaintiffs' claims with regard to offerings they did not purchase are dismissed for lack of standing.

## 2.  <u>Statute of Limitations</u>

The RBS Defendants also allege that Plaintiffs' claims should be dismissed because they are time-barred.  The statute of limitations for both section 11 and 12(a)(2) under the Securities Act is one year "after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence" and in no event greater than three years after the public offering or sale of the security.  15 U.S.C. § 77m; *see also Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993)  Circumstances that suggest the existence of these misstatements or omissions, typically known as "storm warnings," create a duty to inquire.  *See Dodds*, 12 F.3d at 350.  Prior to removal to federal court, Plaintiffs filed their original complaint on May 14, 2008 in New York Supreme Court.  *See* Notice of Removal, Ex. A. (Verified Complaint) (Docket No. 1).  The complaint included allegations related to HVMLT Series 2006-4 Certificates, one of the two remaining offerings for which Plaintiffs have standing.  *Id.* at ¶ 1.  On May 19, 2009, Plaintiffs filed the consolidated amended complaint presently before this Court, which added the other remaining offering, HVMLT Series 2007-7. *See* CAC ¶¶ 19, 20.  As such, if Plaintiffs were on notice of facts constituting the alleged misrepresentation before May 14, 2007, there claims must be dismissed.

As an initial matter, the RBS Defendants' argument that Plaintiffs' claims in the Consolidated Amended Complaint do not "relate back" is unpersuasive.  The Federal Rules of

Civil Procedure state that an amended pleading relates back when "[t]he claim…asserted in the amended pleading arose out of the conduct, transaction, or occurrences set forth or attempted to be set forth in the original pleading." Fed.R.Civ.P. 15(c)(2).  An amended pleading will relate back if "adequate notice of the matters raised in the amended pleadings has been given to the opposing party within the statute of limitations by the general facts situation alleged in the original pleading." *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86-87 (2d Cir. 1999) (internal quotation omitted); *see also Slayton v. American Exp. Co.*, 460 F.3d 215, 228 (2d Cir. 2006). Where no new cause of action is alleged, relation back under Rule 15 is to be liberally granted. *Stevelman*, 174 F.3d at 87.  The Consolidated Amended Complaint does not allege new causes of action.  Although Plaintiffs included more Harborview Trusts that had Offering Documents that allegedly contained material misstatements and omissions, it shares the same core factual allegations contained in the initial, state court complaint with regard to the central issues of the claim: misstatements about the underwriting guidelines, conflicts of interest with the rating agencies, and outdated credit rating models.  *See Slayton*, 460 F.3d at 228 ("entirely distinct set" of factual allegations will not relate back).  Defendants had adequate notice of the nature of this action sufficient to relate back the added offerings in the Consolidated Amended Complaint.

Contrary to the RBS Defendants' argument, there is insufficient information at this stage of the proceedings to determine that Plaintiffs' claims are time-barred as a matter of law.  *See Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 411-12 (2d Cir. 2008) (inquiry notice often inappropriate for resolution on a motion to dismiss, but can be done where "the facts needed for determination…can be gleaned from the complaint and papers…integral to the complaint.").  The facts the RBS Defendants point to as providing notice prior to May 14, 2007, while relevant to their disclosure duty, are insufficiently related to Plaintiffs' allegations for statute of limitations purposes.  "For inquiry notice to exist, the triggering information must relate directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants." *Id.* at 427 (internal quotations omitted); *see also Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006) ("Storm warnings in the form of company-specific information probative of fraud will trigger a duty to investigate.").  Although Defendants point to a number of publicly available documents generally related to the weakening and outright disregard for underwriting guidelines by subprime originators, this information alone does not "relate directly" to the misrepresentations and omissions alleged in the Consolidated Amended Complaint.  None

of the articles are directly related to the Harborview Trusts specifically at issue. *Compare Shah*, 435 F.3d at 251 ("An article specifically describing the business practices **at Morgan Stanley** that serve as the basis of Shah's complaint as a holder of stock **in Morgan Stanley** must be regarded as a "storm warning" of the fraud alleged.") (emphasis in original).  Further, Plaintiffs point out that they could not have known that the originators' disregard for underwriting guidelines specifically included the underwriting of the loans used for the Harborview Trusts until the Certificates were downgraded by the rating agencies after May 14, 2007.  Defendants have not demonstrated, at this stage of the proceedings, that Plaintiffs should have been on notice as of May 14, 2007 of the alleged misstatement or omissions by the RBS Defendants.

### 3. <u>Failure to Allege Actionable Omissions Under Section 11 and 12(a)(2)</u>

RBS Defendants next argue that Plaintiffs have failed to state actionable omissions or misstatements under sections 11 or 12(a)(2).  The arguments are specific to each of the three categories of alleged omissions and misstatements, but boil down to claims that (1) the allegedly omitted risks were in fact disclosed; (2) to the extent omitted material was left out of the offering documents, they were under no duty to disclose that information; and (3) the alleged omissions were otherwise insufficiently pled or immaterial as a matter of law.

To state a claim under section 11, Plaintiffs must allege that they (1) purchased a registered security either from the issuer or in the aftermarket; (2) defendants participated in the offering in a manner sufficient to give rise to liability under section 11 and; (3) the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a); *Morgan Stanley*, 592 F.3d at 358-59.  Section 12(a)(2) "provides similar redress" to section 11 claims, "where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions."  15 U.S.C. § 77*l*(a)(2); *Morgan Stanley*, 592 F.3d at 359.  "Issuers are subject to 'virtually absolute' liability under section 11, while the remaining potential defendants under sections 11 and 12(a)(2) may be held liable for mere negligence."  *Morgan Stanley*, 592 F.3d at 359 (quoting *Huddleston,* 459 U.S. at 382).  The analysis of claims made pursuant to section 11 and section 12(a)(2) is essentially the same.  *See, e.g., Landmen Partners*, 659 F.Supp.2d at 539 n.6; *Rubin v. MF Global, Ltd.*, 634 F.Supp.2d 459, 466 (S.D.N.Y. 2009).

For misstatement or omission to be actionable under sections 11 or 12(a)(2), a defendant must have a duty to disclose the information, and the omitted or misstated info must be material to the investor.  In terms of a duty to disclose, these sections "create[] three potential bases for liability based on registration statements and prospectuses filed with the SEC: (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading."  *Morgan Stanley*, 592 F.3d at 360; *see* 15 U.S.C. §§ 77k(a), 77*l*(a)(2).  If Plaintiffs demonstrate that Defendants bears some duty of disclosure, they must still demonstrate that the alleged omission or misstatement is material, or "whether the defendants representations, taken together and in context, would have misled a reasonable investor." *Morgan Stanley*, 592 F.3d at 360; *see also DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003).

***Mortgage Originator Underwriting Guidelines***

According to Plaintiffs, the descriptions of the underwriting guidelines "contained material misstatements and omissions" because each of the mortgage originators "systematically disregarded the stated underwriting guidelines set forth in the Offering Documents."  CAC ¶ 10.  Defendants first contend that they have sufficiently discharged their duty to disclose, based on Section 1111 of SEC Regulation AB, which provides disclosure requirements for "asset-backed securities," and requires "[a] description of the solicitation, credit-granting or underwriting criteria used to originate or purchase the pool assets, including, to the extent known, any changes in such criteria and the extent to which such policies and criteria are or could be overridden." 17 C.F.R. § 229.1111(a)(3) (2010).  Because of the phrase "to the extent known" in the regulation, the RBS Defendants argue that Plaintiffs' claims are insufficient because they fail to allege that the RBS Defendants knew of the problems associated with the underwriting guidelines beyond what they already disclosed.

Plaintiffs' allegations about the loan underwriting guidelines are not precluded by this regulation.  Although Plaintiffs focus largely on omissions in the Offering Documents, the Consolidated Amended Complaint can be fairly read to include allegations of affirmative misstatements with regard to the underwriting guidelines.  *See In re Lehman Brothers Secs. and ERISA Litig.*, No. 09 MD 2017 (LAK), slip op. at 13. (S.D.N.Y. Feb. 17, 2010) (noting in case with similar claims about underwriting guidelines that, "[i]f the plaintiffs' claims were based on omissions only, this theory might have some merit").  Plaintiffs' allege not only that RBS

Defendants failed to disclose information about the underwriting guidelines, but that the statements about the guidelines were themselves incorrect because the originators "totally disregarded" them. *See, e.g.,* CAC ¶¶ 10, 206. For example, the HVMLT Series 2006-4 Prospectus Supplement described Countrywide's underwriting practices for their "Stated Income/Stated Asset" program, the so-called "liar's loans" which allowed a borrower to state their income with little or no documentation,: "the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income." CAC ¶ 205. This prospectus language allegedly contained misstatements, along with omissions, because Countrywide knew that income levels were routinely fraudulently inflated and therefore did not "determine that the stated income is reasonable" for the borrower. *See* CAC ¶ 207. In *Landmen Partners*, this Court found allegations that the defendants failed to disclose that "certain of the Company's portfolio companies were not performing well and were of declining value" insufficient in part because, pursuant to Item 303 of SEC Regulation S-K, plaintiffs did not plead that it was a "currently known trend." 659 F.Supp.2d at 538-39. However, unlike Plaintiffs' allegations here, the pleadings in that case focused on what the registration statement *failed to disclose*, and not that the disclosures themselves were incorrect misstatements. *See, e.g., id.* at 537 ("The Registration Statement, however, **did not mention** Blackstone's investment in FGIC…" and "Plaintiff alleges that the Registration Statement **failed to mention that**…"); *see also Garber*, 537 F.Supp.2d at 607-08 (necessary to allege "known trends" because plaintiffs alleged only that defendants *omitted* disclosure of distribution fees). In other words, Plaintiffs allege that RBS Defendants failed to live up to their additional duty not to make misrepresentations because they affirmatively misstated the guidelines used – or rather, disregarded – by the mortgage originators of the underlying loans. *See Morgan Stanley*, 592 F.3d at 360 (duty to disclose misstatements). "As this claim relies on Section 11 of the Securities Act, and not Section 10(b) of the Securities Exchange Act or Rule 10b-5, the [RBS Defendants] knowledge is immaterial." *Lehman Brothers*, No. 09 MD 2017(LAK), slip op. at 13.

Furthermore, the risks associated with the underwriting guidelines were not otherwise adequately disclosed in the Offering Documents or suffused with cautionary language to "bespeak caution." Under the "bespeaks caution" doctrine, "certain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable

investor could consider them important in light of adequate cautionary language set out in the same offering."  *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002). Although the Offering Documents disclosed the underlying loan pool data and indicated that underwriting guidelines included riskier types of loan programs, it did not indicate, as Plaintiffs allege, that mortgage originators like Countrywide would disregard even the most minimum of the stated guidelines.  Plaintiffs can overcome cautionary language if the "language did not expressly warn or did not directly relate to the risk that brought about plaintiffs' loss." *Id.* at 359; *see also Panther Partners*, 538 F.Supp.2d at 669 ("general risk disclosures in the face of specific known risks which border on certainties do not bespeak caution.")(internal quotations omitted). Disclosures that described lenient, but nonetheless existing guidelines about risky loan collateral, would not lead a reasonable investor to conclude that the mortgage originators could entirely disregard or ignore those loan guidelines.  *See DeMaria*, 318 F.3d at 179.

Plaintiffs have pled sufficient factual allegations to plausibly infer that the underwriting guidelines were disregarded by mortgage originators, and in conflict with the disclosures made in the Offering Documents.  The Consolidated Amended Complaint details how each of the relevant mortgage originators, who underwrote the loans contained in the Harborview Trusts, sought to maximize the volume of loans they underwrote in order to benefit from the lucrative securitization process.  As Plaintiffs allege through a myriad of press reports, government hearing testimony, and other factual sources, the originators did so at least in part by ignoring the guidelines, such as providing "stated income" loans to unqualified individuals; Plaintiffs even provide examples of outright fraud by employees of the originators.  *See, e.g.,* CAC ¶¶ 91, 101. Taken together, the factual allegations demonstrate that this behavior permeated the originators such that that they systematically ignored their stated underwriting practices in order to process the most loans at the least cost.  Plaintiffs have also sufficiently, albeit just barely, connected these allegations to the offerings in question.  They allege a wholesale downgrade of credit ratings in the HVMLT offerings, *e.g.,* CAC ¶¶ 62-65, highlight statements by rating agencies which indicate that they believed downgrades occurred because they were "lied" to and underwriting was not done as they expected, *e.g.,* CAC ¶¶ 175-76, and also point to very high rates of delinquency and default that occurred in the loan collateral that underlay the Certificates, *e.g.,* CAC ¶¶ 67-68.

18

In *Morgan Stanley*, the Second Circuit found that alleged nondisclosure of a conflict of interest between brokers and internal researchers which could "potentially taint the objectivity of its stock research" provided an insufficient connection to the securities at issue. *See* 592 F.3d at 353-54. There, however, the plaintiffs failed to provide an inference that allegations about conflicts of interest had any tie to the mutual funds at issue, because there was no allegation that it affected investment decisions. *Id.* at 364. Similarly, in *Landmen Partners*, this Court found no link between the allegations and the investments because the allegations were related to residential real estate while the great majority of the investments at issue "were in commercial and hotel properties." 659 F.Supp.2d at 544. Here, Plaintiffs provide a credible inference that originators of these underlying loan pools systematically disregarded underwriting guidelines. They allege widespread evidence that the mortgage originators disregarded underwriting guidelines, and the loan pools provided by those same originators failed at considerable levels and were near-universally downgraded to "speculative junk bund investments." It is at least plausible that the subprime loans sold to RBS did not meet the stated underwriting guidelines described in the Offering Documents because those guidelines were largely, if not totally, disregarded. *See Lehman*, No. 09 MD 2017 (LAK), slip op. at 13 (similar underwriting guideline allegations "are sufficient at this stage to support a reasonable inference that the Offering Documents' description of the underwriting guidelines was materially misleading").

***Outdated Modeling and Inadequate Credit Enhancement Omissions***

Plaintiffs next allege that the Offering Documents were misleading because they did not disclose that the models relied on to rate the Certificates were outdated and unable to accurately assess their risk, and the credit enhancements added to protect investors were inadequate given high risk of defaults and delinquencies in the loan pools. *See* CAC ¶¶ 237-240. Defendants again point to a statutory disclosure obligation, Section 1120 of SEC Regulation AB, which governs "disclosure for asset backed securities offerings," and requires only "disclosure of whether issuance or sale of any class of offered securities is conditioned on the assignment of a rating by a rating agency, and the actual rating itself." 17 C.F.R. § 229.1120 (2010). This, however, is beside the point. Plaintiffs' allege that RBS Defendants violated their duty to prevent misleading disclosures by failing to disclose the inadequacies of the stated credit ratings and enhancements. As such, the alleged statutory duty is unrelated to Plaintiffs' allegations of misleading omissions, and their claims cannot be dismissed based on adequate disclosures under

Section 1120.  *See Morgan Stanley*, 592 F.3d at 360 (duty to disclose based on "an omission of information that is necessary to prevent existing disclosures from being misleading").

In this instance, however, the Offering Documents adequately bespoke caution about the risks entailed by the credit ratings and credit enhancements.  The Offering Documents disclosed the risks of relying on credit ratings, the potential inadequacy of credit enhancement, and that a lack of historical data made future predictions about value inherently difficult.[9]  In other words, the Offering Documents "warn investors of exactly the risk the plaintiffs claim [were] not disclosed."  *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996); *see also Halperin*, 295 F.3d at 361.

Plaintiffs claim that the risk disclosures are insufficient, because they warn of potential risks while Plaintiffs allege that the Offering Documents failed to disclose actual, existing risks.  Even if this were the case, Plaintiffs' claims fail as they are hindsight allegations.  The Harborview Trusts actually received the ratings listed in the prospectus supplements, and Plaintiffs do not allege to the contrary, so there is no misstatement on the face of the documents.  "The truth of a statement made in the prospectus is adjudged by the facts as they existed when the registration statement became effective."  *In re Agria Corp. Secs. Litig.*, 08 Civ. 3536 (WHP), 2009 WL 4276967, at *5 (S.D.N.Y. Nov. 30, 2009) (quoting *In re Flag Telecom Holdings Ltd. Sec. Litig.*, 308 F.Supp.2d 249, 254 (S.D.N.Y.2004)); *see also Landmen Partners*, 659 F.Supp.2d at 539 ("The veracity of a registration statement is determined by assessing the facts as they existed when the statement became effective.").  Further, credit ratings and the relative adequacy of protective credit enhancements are statements of opinion, as they are predictions of future value and future protection of that value.  "[A]ccurate statements of historical fact and statements of opinion, including statements of hope, opinion, or belief about…future performance or general market conditions are non-actionable" under Section 11 or 12(a)(2).  *Panther Partners*, 538 F.Supp.2d at 668 (internal quotations omitted).  Plaintiffs can only demonstrate an actionable misstatement if "the opinion is both (1) not believed by the speaker and (2) objectively untrue."  *In re AOL Time Warner, Inc. Secs. and "ERISA" Litig.*, 381

---

[9] *See, e.g.,* HVMLT Series 2006-4 Prospectus, at 39-40 ("Ratings of the securities do not address all investment risks and must be viewed with caution."); at 7-10 ("Credit Enhancement may not be adequate to prevent losses on your securities."); and at 16, 20 ("[T]here is no material statistical information showing payment and default trends under a variety of macroeconomic conditions.").

F.Supp.2d 192, 243 (S.D.N.Y. 2004) (citing *Va. Bankshares*, 501 U.S. at 1092-96).    Plaintiffs have failed in this regard.

***Conflict of Interest Omissions***

Finally, Plaintiffs allege that RBS Defendants omitted disclosure of material conflicts of interest with the Rating Agency Defendants, particularly with regard to their role in structuring the securitizations and the practice of "ratings shopping." *See, e.g.,* CAC, ¶¶ 237-240.   Here, Plaintiffs allegations fail because Defendants were under no duty to disclose the alleged omissions, which were publicly known.  "Sections 11 and 12(a)(2) do not require the disclosure of publicly available information."  *Landmen Partners*, 659 F.Supp.2d 532 at 545; *see also Garber*, 537 F.Supp.2d at 611-12 (no duty to disclose departure of key employee where it was "already publicly reported in several news articles").   Among other things, they point out that the SEC considered in 1994 whether its regulations should include disclosure of "rating organization involvement in the structuring of the security," was directed in 2002 by the Sarbanes-Oxley Act to issue a report regarding rating agency conflicts of interest and, in 2003, issued a detailed, publicly-available report that considered among other things, whether "rating agencies should implement procedures to manage potential conflicts of interest that arise when issuers pay for ratings."  *See* Decl. of Thomas C. Rice ("Rice Decl."), Ex. 10 (SEC Proposed Rules, August 31, 1994); Ex. 14 (SEC, *Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets* (2003)).   Additionally, Defendants also point to numerous trade journal and popular press articles that highlight that rating agencies were paid by the investment banks for their ratings.  *See,* Rice Decl., Ex. 11-13.   A reasonable investor would be expected to know that the rating agencies were paid by the investment banks that hired them, and that they had a hand in determining the structure of securitizations.   "Although the underlying philosophy of federal securities regulations is that of full disclosure, there is no duty to disclose information to one who reasonably should already be aware of it."  *See Seibert v. Sperry Rand Corp.,* 586 F.2d 949, 952 (2d Cir. 1978) (internal citations omitted).

4.   Control Person Liability

To state a cause of action for control person liability under section 15, 15 U.S.C. § 77*o*, a plaintiff must allege (1) a primary violation of the Securities Act and (2) "control" by the defendant.  *See Rombach*, 355 F.3d at 178.  RBS Defendants' only argument for dismissal of this

claim is that Plaintiffs failed to allege a primary violation under section 11 or 12(a)(2).  As described above, Plaintiffs have sufficiently alleged a primary violation with regard to their allegations about the loan underwriting guidelines.  Plaintiffs also have sufficiently alleged control by GCH, GCM, RBSG and the Individual Defendants, and therefore the cause of action under section 15 is sufficient to survive a motion to dismiss.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs' causes of action against the Ratings Agency Defendants are dismissed.  Plaintiffs' claims against the RBS Defendants with regard to the offerings they did not purchase are dismissed for lack of standing.  Plaintiffs' claims related to allegations of conflicts of interest between the RBS Defendants and the rating agencies, as well as claims related to allegations of outdated rating models and inadequate credit enhancements, are dismissed for failure to state a claim.  Plaintiffs' claims related to the disregard of underwriting guidelines may proceed.

The Clerk of the Court is instructed close the relevant motions (Docket Nos. 62 and 65) and remove them from my docket.

**SO ORDERED**
**March 20, 2010**
**New York, New York**

**Hon. Harold Baer, Jr.**
**U.S.D.J.**

22