**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NEW JERSEY CARPENTERS HEALTH FUND, ET AL., | Civ. No. 08-5093-LAP (DCF) |
| Plaintiffs, | |
| *v.* | |
| ROYAL BANK OF SCOTLAND GROUP PLC, ET AL., | |
| Defendants. | |

**DECLARATION OF JOEL P. LAITMAN IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION, AND MOTION FOR APPROVAL OF ATTORNEYS' FEES AND EXPENSES**

I, Joel P. Laitman of the law firm of Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein"), submit this declaration in support of Lead Plaintiffs' motion for final approval of the proposed Settlement and approval of the Plan of Allocation, as well as Lead Counsel's motion for approval of attorneys' fees and reimbursement of Litigation Expenses. I am a partner at Cohen Milstein and have actively supervised and participated in the prosecution of this Action since its inception in 2008.  As a result, I have personal knowledge of all material matters related to this Action. The statements in this declaration are made based on my personal knowledge unless otherwise indicated.

I.      **PRELIMINARY STATEMENT**

1.      My law firm is the Court-appointed Lead Counsel in this Action and counsel for Lead Plaintiffs New Jersey Carpenters Vacation Fund and Boilermaker-Blacksmith National Pension Trust, additional class representatives Midwest Operating Engineers Pension Trust Fund ("Midwest OE") and Iowa Public Employees' Retirement System ("IPERS"), and additional plaintiff Laborers' Pension Fund and Health and Welfare Department of the Construction and

General Laborers' District Council of Chicago and Vicinity ("Chicago Laborers") (collectively "Plaintiffs").

2. This Declaration does not seek to detail each and every event that occurred since the Action was commenced over six years ago. Rather, the Declaration provides the Court with highlights of the litigation, the events leading to the Settlement, and the basis upon which Lead Counsel and Lead Plaintiffs recommend its approval.

3. In entering into the Stipulation and Agreement of Settlement dated April 18, 2014 (the "Stipulation," Dkt. No. 265), Lead Plaintiffs and Lead Counsel were fully informed about the strengths and weaknesses of the case.[1] As detailed below, Lead Counsel conducted an extensive investigation; filed three amended complaints; opposed three rounds of motions to dismiss; moved for intervention of additional named plaintiffs; conducted class certification discovery and moved for class certification three separate times; fully litigated on an appeal to the Second Circuit of the District Court's initial denial of class certification decision; completed merits discovery including analyzing more than a 5.8 million pages of documents and taking depositions in connection with the twelve RMBS public Offerings at issue; engaged and conferred with experts and consultants on issues such as damages, negative causation, underwriting and materiality; analyzed hundreds of loan files related to the Offerings; and researched the applicable law with respect to the claims and potential defenses.

4. The parties reached an agreement to settle in April 2014—six years after the commencement of the action only after extensive litigation before both the District Court and the Second Circuit. The settlement was also only achieved after protracted negotiations facilitated by the Hon. Layn R. Phillips (Ret.), an experienced and highly respected mediator. *See* Declaration

---

[1] All terms with initial capitalization not otherwise defined herein shall have the meanings ascribed to them in the Stipulation.

of the Mediator, Hon. Layn R. Phillips (Ret.), in Support of Motion for Final Approval of Settlement and Plan of Allocation, and Motion for Approval of Attorneys' Fees and Expenses ("Phillips Decl."), attached hereto as Exhibit 1.

5.      Based upon our experience, evaluation of the facts and applicable law and the recognition of the risk and expense of continued litigation, Lead Plaintiffs and Lead Counsel submit that the proposed Settlement is fair, reasonable and adequate. In our view, the Settlement represents an excellent result, and is in the best interest of the Class.

6.      From the outset of this case, Lead Plaintiffs supervised Lead Counsel, participated in all aspects of the litigation, remained informed throughout the settlement negotiations, and ultimately approved the Settlement. *See* Declarations of George R. Laufenberg on behalf of the New Jersey Carpenters Vacation Fund ("Laufenberg Decl") and Mario Rodriguez, General Counsel and Chief Investment Officer of the Boilermaker-Blacksmith National Pension Trust ("Rodriguez Decl"), in Support of (A) Lead Plaintiffs' Motion for Approval of Settlement and Plan of Allocation; (B) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses; and (C) Lead Plaintiffs Request for Reimbursement of Costs and Expenses, attached hereto as Exhibit 2 and Exhibit 3, respectively.  *See also*, Declarations of Gregg A. Schochenmaier on behalf of Iowa Public Employees' Retirement System ("Schochenmaier Decl.") and Thomas M. Bernstein on behalf of Midwest Operating Engineers Pension Trust Fund ("Bernstein Decl"), attached hereto as Exhibits 4 and 5, respectively.

7.      In addition to understanding the support for, and challenges to, their claims and damages, Lead Plaintiff and Lead Counsel became intimately familiar with Defendants' affirmative defenses – including, for example, defenses based on the statute of limitations; due

diligence defenses; defenses based on investors' "actual knowledge" of the false and misleading statements at the time they purchased the securities; and the "negative causation" defense to damages pursuant to § 11(e) of the Securities Act of 1933 ("Securities Act") (*i.e.*, the causes of any claimed damages were factors other than the alleged untrue statements and omissions, such as the national economic downturn).  In our view, the settlement here is fair and reasonable given the relative strength of these claims and defenses.

8.      The Settlement requires Defendants to pay or cause to be paid $275,000,000 in cash (the "Settlement Amount").  On August 1, 2014, Defendants caused the Settlement Amount to be deposited into an escrow account for the benefit of the Class in accordance with the terms of the Stipulation. The Settlement Fund has been invested in Treasury Bills. The Settlement benefits the Class by conferring a guaranteed, immediate and substantial benefit of $275,000,000 and avoids the risks and expenses of continued litigation, including the risk of recovering less than the Settlement Amount after substantial delay, or of no recovery at all.

9.      In addition to seeking final approval of the Settlement, Lead Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. To prepare the Plan of Allocation, Lead Counsel engaged Michael Hartzmark, Ph.D., a well-recognized expert who has worked on several mortgage-backed securities ("MBS") cases. Under the proposed Plan of Allocation, the Settlement Amount (plus interest accrued and after deduction of Court-approved expenses and attorneys' fees) will be distributed on a *pro rata* basis to members of the Class who timely submit valid proofs of claim based on their "Recognized Claim" amount as calculated based on the Plan of Allocation. The Plan of Allocation is based on the methodology for calculating damages set forth in § 11(e) of the Securities Act. *See* Declaration of Michael

4

Hartzmark Ph.D., in Support of Plan of Allocation ("Hartzmark Decl."), attached hereto as Exhibit 6.

10.     In addition, Lead Counsel requests an award of attorneys' fees and reimbursement of litigation expenses. Specifically, Lead Counsel is applying for a fee award of 19% of the Settlement Fund, and for reimbursement of Lead Counsel's Litigation Expenses in the amount of $2,243,198.13.

11.     Lead Counsel submits that the fee and expense application is fair and reasonable. As explained in our accompanying brief in support of Lead Counsel's request for attorneys' fees and reimbursement of Litigation Expenses, the requested fee of 19% of the Settlement Fund is consistent with or less than the amount awarded in other residential mortgage-backed securities class actions. In addition, the reasonableness is confirmed with a lodestar cross-check resulting in a multiplier of 2.548, which is similar to the multiplier awarded in comparable class action settlements, both in the Second Circuit and other Circuits. Moreover, as detailed further below, the Action involved unusual risks and complex factual and legal issues, many of which had not been addressed by any court in the country at the time of the filing of the Complaint in the Action.

II.     **HISTORY OF THE ACTION**

A.  **Six Years Ago No Other Law Firm Was Willing To Assume The Risks Of Prosecuting This Novel Case**

12.     This action was first commenced on May 14, 2008 when the New Jersey Carpenters Vacation Fund filed a complaint against, *inter alia*, the Defendants, in the Supreme Court of the State of New York, County of New York, Index No. 601451/08 (the "Complaint"), asserting claims under Sections 11, 12and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l, and 77o (the "Securities Act"). On June 3, 2008, the action was removed to the United

States District Court for the Southern District of New York, Civ. No. 08-cv-5093 (Dkt. No. 1). The case was assigned to the Honorable Harold Baer, Jr.

13.     The Complaint asserted claims on behalf of investors who purchased certificates in three mortgage-backed securities ("MBS") issued during 2006 by Royal Bank of Scotland ("RBS") affiliated entities.   MBS are asset-backed securities that entitle their holders to payments from the underlying pools of residential mortgage loans.

14.     When this action was commenced, no other law firm was willing to take the risk to prosecute this novel action. Specifically, after full PSLRA notice, not a single other lawyer sought appointment as Lead Counsel in this action. The Consolidated First Amended Securities Class Action Complaint (the "FAC," Dkt. No. 54), filed on May 19, 2009 by court-appointed Lead Plaintiffs New Jersey Carpenters Vacation Fund and Boilermaker-Blacksmith National Pension Trust asserted Securities Act claims concerning the purchase of MBS issued in fifteen (15) residential MBS offerings[2] ("Offerings"), pursuant or traceable to two Registration Statements filed with the Securities and Exchange Commission ("SEC") by RBS affiliated entities. The claims were asserted against the RBS entities as well as the individual signatories on the registration statements.[3] On July 15, 2009, Defendants moved to dismiss the First Amended Complaint (Dkt. No. 62).

## B.  District Court  Ruling Dismisses 13 of 15 Offerings on Standing Grounds

15.     On March 26, 2010, the Court issued a memorandum and order (the "March 26, 2010 Order") granting in part and denying in part Defendants' motions to dismiss. *See N.J.*

---

[2] The Harborview Mortgage Loan Trust Series: 2006-4, 2006-5, 2006-6, 2006-7, 2006-8, 2006-9, 2006-10, 2006-11, 2006-12, 2006-13, 2006-14, 2007-1, 2007-2, 2007-5, and 2007-7 offerings.

[3] The FAC also asserted claims against the Individual Defendant signatories, including Robert J. McGinnis, Carol P. Mathis, Joseph N. Walsh, III, John C. Anderson and James M. Esposito (collectively, the "Individual Defendants"). Claims were also asserted against Moody's Investors Service, Inc. and The McGraw-Hill Companies, Inc. ("Rating Agencies"), but the claims against them were dismissed by the Court and the dismissal of the Action with prejudice, as contemplated by this Settlement, will bring these claims to an end.

*Carpenters Vacation Fund v. Royal Bank of Scot. Group, PLC*, 720 F. Supp. 2d 254 (S.D.N.Y. 2010).  In the March 26, 2010 Order, the Court found that Lead Plaintiffs adequately alleged violations of the Securities Act against the Defendants by alleging they systematically disregarded the underwriting guidelines stated in the Offering documents. However, the Court dismissed thirteen of the Offerings on standing grounds because neither of the Lead Plaintiffs had purchased from these MBS Offerings. The Court also dismissed claims based on the allegations that credit rating models were outdated, that credit enhancements were inadequate, and that Defendants omitted disclosure of material conflicts of interest with the Rating Agencies.[4] On April 16, 2010, Defendants answered the First Amended Complaint (Dkt. No. 84).

### C.  Intervention Motion Granted

16.    As a result of the District Court's dismissal ruling requiring a purchaser for each Offering, joint motions to intervene were filed by Lead Plaintiffs, Laborers' Pension Fund and Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity ("Chicago Laborers"), Midwest Operating Engineers Pension Trust Fund ("Midwest OE") and Iowa Public Employees' Retirement System ("IPERS") seeking permission for IPERS, Midwest OE, and Chicago Laborers to intervene in the case to represent investors in six of the dismissed Offerings. *See* Dkt. Nos. 102, 116.  On December 22, 2010, the District Court issued an opinion and order granting the motions to intervene, restoring six of the Fifteen Original Offerings to the action (the "Intervenor Offerings"). *N.J. Carpenters Health Fund v. The Royal Bank of Scotland Group PLC*, No. 08-cv-5093, 2010 U.S. Dist. LEXIS 135261 (S.D.N.Y. Dec. 21, 2010).

---

[4] The District Court also dismissed claims against the Rating Agencies.

**D.**   **Class Certification Is Denied By The District Court; Denial Is Affirmed By The Second Circuit "Without Prejudice To Further Motion Practice"**

17.     On July 15, 2010, Lead Plaintiffs moved to certify a class of purchasers of certificates in the two Offerings in the case at that time, Harborview Mortgage Loan Trust, Series 2006-4 and 2007-7, to certify Lead Plaintiffs as Class Representatives and to appoint Cohen Milstein Sellers & Toll PLLC as Lead Counsel (the "First Class Certification Motion") (Dkt. No. 107).

18.     On January 18, 2011, the District Court denied the First Class Certification Motion. *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160 (S.D.N.Y. 2011) (the "First Class Decision"). While the District Court found that Lead Plaintiffs had satisfied all of the Rule 23(a) factors, including numerosity, commonality, adequacy and typicality, it found, pursuant to Rule 23(b)(3), that individual issues of knowledge predominated and that the class action device was not the superior method of adjudication, precluding class certification. *Id.*

19.     On February 1, 2011, Lead Plaintiffs filed a petition under Federal Rule of Civil Procedure 23(f) with the Second Circuit requesting interlocutory appeal of the District Court's First Class Decision. On April 29, 2011, the Second Circuit granted Lead Plaintiffs' Rule 23(f) motion for an interlocutory appeal of the District Court's First Class Certification Decision. On April 30, 2012, after full briefing and oral argument, the Second Circuit affirmed the District Court's denial of class certification in a summary order on the ground that individual issues of knowledge predominated "without prejudice to further motion practice in the District Court."

**E.**   **District Court Allows Supplemental Class Discovery and Then Certifies Modified Class; Second Circuit Subsequently Denies Defendants' Two 23(f) Petitions**

20.     In light of the Second Circuit's decision, Lead Plaintiffs moved the District Court for permission to conduct additional discovery, and on May 7, 2012, the District Court granted that motion, setting an August 6, 2012 deadline for the submission of any additional class certification motions. After the filing of the first motion for class certification, more than 18,000 loans files that were produced, more than 41,000 documents were obtained from non-parties and more than 404,000 documents were obtained from Defendants. Plaintiffs also took a 30(b)(6) deposition of the RBS defendants on class certification issues. On August 6, 2012, utilizing this new evidence, Lead Plaintiffs filed their renewed motion for class certification as to the two Offerings they purchased (the "Second Class Certification Motion") (Dkt. No. 182). Lead Plaintiffs restricted the temporal scope of the class to encompass only purchases prior to any downgrades of the MBS and eliminated the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") from the class definition.

21.     On October 15, 2012, the Court granted in part the Second Class Certification Motion and appointed Lead Plaintiffs as the class representatives for the two Offerings they purchased (the "Second Class Certification Order") (Dkt. No. 196). The Court, however, further limited the class definition to those purchasers who bought the certificates on the date of each initial offering directly from the issuers. On October 31, 2012 Defendants petitioned the Second Circuit for permission to appeal the District Court's Second Class Certification Order.

## F.   District Court Rules On Multiple Motions for Reconsideration and Expands the Class Definition

22.     On November 5, 2012, Lead Plaintiffs sought reconsideration of the Second Class Certification Order, seeking to expand the class to include those purchasers who bought the certificates up to ten trading days after the initial offering date, which Defendants opposed. On

November 16, 2012, Lead Plaintiffs also moved for reconsideration of the Court's March 26, 2010 Order dismissing claims as to those offerings in which no Lead Plaintiff purchased securities in light of *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012) ("*NECA-IBEW*") – a recent Second Circuit opinion which dealt differently with the issue of standing than the District Court's original decision. Plaintiffs' reconsideration motion sought to reinstate claims with respect to twelve of the Fifteen Original Offerings that had previously been dismissed. On November 16, 2012, Defendants filed a motion to dismiss the Intervenor Offerings as barred by the statute of repose. On January 3, 2013, the District Court denied Defendants' motion to dismiss the Intervenor Offerings. In the same Order, the District Court denied Lead Plaintiffs' motion for reconsideration under *NECA-IBEW* without prejudice to renewal of the motion following a determination by the U.S. Supreme Court on whether or not to grant *certiorari* in *NECA-IBEW*. The District Court, also in the same Order, granted Lead Plaintiffs' application for modification of the class definition (the "Amended Second Class Certification Order") (Dkt. No. 210).  Defendants filed another Rule 23(f) petition on January 17, 2013 challenging this ruling. The Second Circuit denied this Rule 23(f) petition as well as the previously filed petition in a single order on March 26, 2013.

23.     On April 30, 2013, following the U.S. Supreme Court's denial of the *certiorari* petition in *NECA-IBEW*, the Court granted Lead Plaintiffs' motion for reconsideration of the Court's March 26, 2010 Order.  After this decision, twelve of the Fifteen Original Offerings were restored to the case, resulting in a total of fourteen offerings being at issue ("Fourteen Remaining Offerings").[5]  On June 25, 2013, Lead Plaintiffs filed a motion to modify the class to encompass the additional Offerings reinstated by *NECA-IBEW* and add IPERS and Midwest OE as

---

[5] The Harborview Mortgage Loan Trust, Series 2006-4, 2006-5, 2006-6, 2006-7, 2006-8, 2006-9, 2006-10, 2006-11, 2006-12, 2006-14, 2007-1, 2007-2, 2007-5, and 2007-7 offerings.

Additional Class Representatives ("Lead Plaintiffs' Third Class Certification Motion") (Dkt. No. 224).

24.     On December 27, 2013, the District Court granted Lead Plaintiffs' Third Class Certification Motion, expanding the class to encompass the Fourteen Remaining Offerings and appointing Midwest OE and IPERS as additional Class Representatives. On January 10, 2014, Defendants filed their third 23(f) Petition for interlocutory review of the District Court's certification ruling. This motion was pending when a settlement in principle was reached and the Second Circuit, at the request of both parties, suspended consideration of petition until the finalization of settlement, at which point it will be dismissed.

### G.  In February 2014, Fact Discovery Completed on 12 MBS Offerings

25.     While motions were being litigated, Lead Counsel simultaneously pressed forward vigorously with fact discovery.  On February 15, 2014, Lead Counsel completed merits discovery regarding the Fourteen Remaining Offerings and the claims asserted with respect to them.   This involved, *inter alia*, reviewing over 5.8 million pages of documents produced by Defendants and third parties and gathering and closely examining thousands of loan files.  Over 125 subpoenas were issues to non-parties seeking documents and/or transaction data. Five merits depositions were taken of RBS witnesses involved in the 12 MBS Offerings at issue. Lead Counsel also litigated a number of discovery issues before Magistrate Freeman including a motion to compel production from the Rating Agencies, a motion to compel due diligence documents from Defendants and sought Judge Freeman's endorsement of a supplemental stipulation and order for the production of confidential information from the Federal Deposit Insurance Corporation as receiver for OneWest Bank, N.A., one of the originators for the offerings.  *See* Dkt Nos. 140, 235, 264.

### H.  Multiple Expert Reports Prepared to Be Filed

26.     Since experts reports were due to be served on March 1, 2014 and a settlement was reached only two weeks earlier, on February 14, 2014, Plaintiffs had already engaged and worked extensively with experts to prepare reports from a loan underwriter who reunderwrote a sample of 1,088 loans from the MBS loan pools at issue; a statistical expert that opined on the validity of the loan sample size; and a damages expert.

### I.     Five Month Mediation Results in $275 Million Settlement

27.     In September 2013, Lead Counsel and Defendants began mediation under the auspices of Judge Layn Phillips, a former Federal District Court Judge and United States Attorney.  After months of effort, including multiple days of in person mediation, the Settling Parties reached an agreement in principle on February 14, 2014 with respect to the Settlement Amount of $275 million and certain related terms. The same day, Lead Counsel and Defendants' Counsel notified the District Court and Second Circuit of the agreement in principle to settle the Action. Dkt. No. 263.  On February 24, 2014, the Settling Parties executed a term sheet setting forth certain terms of the Settlement subject to the completion of definitive documentation and Court approval.

### III.     THE SETTLEMENT

28.     The Settlement of $275,000,000 (plus interest) was the result of arm's-length negotiations overseen by Judge Phillips. The Settlement provides the Class an immediate and substantial benefit and eliminates the significant risks of continued litigation under circumstances where a favorable outcome could not be assured. Lead Counsel believes that the Settlement is fair, reasonable, and an excellent result for Class Members considering the risk of recovering nothing or less after substantial delay.

### A.     Reasons For The Settlement

29.     Plaintiffs and Lead Counsel endorse the Settlement. Plaintiffs are sophisticated institutional investors who have actively overseen and/or participated in the prosecution of this Action. Lead Counsel is a national law firm that specializes in complex securities litigations, including litigation involving MBS, and is highly experienced in such litigation. Based on their experience and close knowledge of the facts and applicable law developed over more than six years of litigation, Lead Counsel and Lead Plaintiffs determined that the Settlement was in the best interest of the Class.

30.     As described herein, at the time of settlement, the most immediate risk that the Second Circuit would grant Defendants' pending Rule 23(f) petition and reverse the District Court's granting of class certification. Because the District Court's decision to permit New Jersey Carpenters to represent offerings in which it did not purchase was a pioneering opinion and the Second Circuit had earlier in the litigation affirmed a previous denial of a smaller class on appeal, there was a real danger that the Second Circuit might grant Defendants' Rule 23(f) petition and potentially reverse the District Court. This was particularly evident as the Second Circuit had recently granted two Rule 23(f) petitions on other mortgage-backed securities cases that settled (on less favorable terms presumably) after a grant of Defendants' Rule 23(f) petition, leaving the issues which presumably interested the Second Circuit unsettled. *See, e.g., Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199 (S.D.N.Y. 2012), *permission to appeal granted*, No. 12-2790 (2d Cir. Nov. 8, 2012); *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, 280 F.R.D. 130 (S.D.N.Y. 2012), *permission to appeal granted*, No. 12-614 (2d Cir. Jun. 6, 2012).

31.     Lead Plaintiffs and the Class also faced serious risks associated with the issue of loss causation. During discovery, Lead Counsel engaged a consultant to assist in estimating

potentially recoverable damages using the statutory formula under § 11 of the Securities Act. This amount was substantial. However, under § 11(e) of the Securities Act, damages may be reduced or eliminated if the defendant proves that a portion or all of the statutory damages are attributable to causes other than the misstatements or omissions. Throughout the litigation, Defendants claimed that factors other than the untrue statements or omissions (such as the overall economic downturn and general decline in housing prices) caused all alleged losses. Defendants also would have likely argued that Lead Plaintiff would have difficulty establishing damages because many of the Certificates had not missed a single principal and interest payment.

32.    Lead Counsel and Lead Plaintiffs were also aware that they faced numerous affirmative defenses to the claims at issue in this case, including statute of limitations and that Lead Plaintiff and the Class had "actual knowledge" of the false and misleading statements at the time they purchased the securities. For example, Defendants contended that Lead Plaintiffs' claims were untimely because Lead Plaintiffs should have been on notice well before one year prior to the filing of the original complaint in this Action, based on a variety of "unmistakable storm warnings" alerting them to the claims. Although the Court denied Defendants' motion to dismiss on this ground, Defendants would have likely raised this argument again at summary judgment and at trial.

33.    In addition, Defendants would likely have asserted a defense to liability under § 11 based on their contention that they had conducted a "reasonable investigation" of the loans and the Certificates at issue and, therefore, "had reasonable ground to believe and did believe" that the Offering Documents contained no untrue statements or omissions. While Defendants would have borne the burden of establishing this "due diligence" defense, if successful, this

defense could provide a complete defense to liability for the underwriter and Individual Defendants.  Moreover, the question as to what constituted a "reasonable investigation" in these circumstances would likely have involved a battle of experts at trial.

34.   Finally, in order to avoid summary judgment and prevail at trial, Lead Plaintiff would need to present evidence that the Offering Documents contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein. Lead Plaintiffs expected Defendants to argue that there was insufficient evidence to support a potential jury finding of false statements in the Offering Documents, and that the Offering Documents contained substantial disclosures of the very economic risks that occurred and the effect they might have on the Certificates.

35.   The Settlement eliminates the above litigation risks and guarantees the Class a cash recovery now. Lead Counsel firmly believes that settling the Action at this juncture and for the amount negotiated was and is in the best interests of the Class.

**B.   Notice To The Class Meets The Requirements Of Due Process And Rule 23 Of The Federal Rules Of Civil Procedure**

36.   As required by the Court's Preliminary Approval Order, beginning on July 31, 2014, Lead Plaintiffs, through the Claims Administrator, Kurtzman Carson Consultants, LLC ("KCC"), notified potential Class Members of the Settlement by mailing a copy of the Notice to potential Class Members. Lead Counsel had obtained the identity of certain known holders of the mortgage pass-through Certificates, and had researched the contact information for the investors. Specifically, to identify potential Class Members, Lead Counsel: (i) reviewed Defendants' internal files for information about the initial purchasers of the MBS; and (ii) served 125 subpoenas on major custodial and investment banks whose internal records could reflect holdings and transactions in the MBS at issue, including Bank of America Securities, LLC; Bank

of New York Mellon Corporation; Barclays Capital, Inc.; Brown Brothers Harriman; Cantor Fitzgerald L.P.; Charles Schwab & Co., Inc.; Citigroup, Inc.; ING Bank, F.S.B.; Merrill Lynch, Pierce, Fenner & Smith, Inc.; Mesirow Financial, Inc.; Morgan Stanley & Co., Inc.; Pershing, LLC; Raymond James & Associates, Inc.; RBC Capital Markets Corporation; State Street Corporation; Stifel Nicolaus & Co., Inc.; U.S. Bank N.A.; and UBS Financial Services, Inc.

37.     Lead Counsel forwarded to the Claims Administrator a total of 2,722 names and addresses of known holders of the Certificates. The list was supplemented by a proprietary database maintained by the Claims Administrator, containing the names and addresses of 747 largest and most common U.S. nominees (*i.e.,* brokerage firms, banks, and institutions who hold securities in the name of the nominee, on behalf of the beneficial purchasers). The Court-approved Notice requires nominees, within 14 days, to either (i) send a copy of the Notice and the Claim Form to the beneficial owner of such certificates, or (ii) provide to KCC the names and addresses of such persons. In the aggregate, as of September 29, 2014, KCC has disseminated 4,775 copies of the Notice to potential Class Members and their nominees. *See* Declaration of Justin R. Hughes Regarding Mailing of the Notice and Proof of Claim; Publication of the Summary Notice; and Report on Requests for Exclusion Received to Date ("Hughes Decl."), attached hereto as Exhibit 7, ¶¶ 3-4, 6, 8.

38.     In addition, a Summary Notice was published in the national edition of *The Wall Street Journal* and disseminated on *PR Newswire* on July 30, 2014. *See id.* at ¶ 9. Information regarding the Settlement, including downloadable copies of the Notice and Claim Form, was also posted on the website established by the Claims Administrator specifically for this Settlement, www.HarborviewMBSSettlement.com, *id.* at ¶ 11, as well as on Lead Counsel's website, www.cohenmilstein.com. This method of giving notice, previously approved by the Court, is

appropriate because it directs notice in a "reasonable manner to all class members who would be bound by the propos[ed judgment]." Fed. R. Civ. P. 23(e)(1).

39.     The Notice advises Class Members of the essential terms of the Settlement, sets forth the procedure for objecting to or opting out of the Settlement, and provides specifics on the date, time and place of the final approval hearing. The Notice also contains information regarding Lead Counsel's fee application and the proposed plan of allocating the Settlement proceeds among Class Members.

40.     As explained in the accompanying Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation, the Notice fairly apprises Class Members of their rights with respect to the Settlement and therefore is the best notice practicable under the circumstances and complies with the Court's July 18, 2014 Preliminary Approval Order (ECF No. 270), Federal Rule of Civil Procedure 23, and due process.

**C.   Plan Of Allocation**

41.     Lead Plaintiff has proposed a plan to allocate the proceeds of the Settlement among Class Members who submit valid Proofs of Claim. The objective of the proposed Plan of Allocation is to equitably distribute the Settlement proceeds to those Class Members who suffered economic losses as a result of the alleged misrepresentations and omissions taking into account the relative strength of their legal claims.

42.     Lead Plaintiff engaged Michael Hartzmark, Ph.D. to examine the plan to allocate the Settlement proceeds among claimants. The Hartzmark Declaration, attached hereto as Exhibit 6, explains the methods used to determine the Recognized Claims and the basis for the analysis. As explained more fully in the Notice – including through illustrative examples – and in the Hartzmark Declaration, a Claimant's Net Recognized Losses will be calculated for each

17

Claimant's purchases of the Certificates. The calculation will depend on several considerations, including: (a) the face value of the Certificates purchased; (b) when the Certificates were purchased or acquired and the price paid; (c) any principal payments received; (d) whether the Certificates were sold, and if so, when they were sold and for how much; and/or (e) if held on the applicable Date of Suit for the Certificates, the price of the Certificates on that date. Hartzmark Decl. ¶ 12.

43.     The Plan of Allocation, as set forth in the Notice, is based on the statutory calculation embodied in § 11 of the Securities Act.  Specifically, § 11 provides for calculation of damages as the "difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the  difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought . . . ." Securities Act, § 11(e). The proposed Plan of Allocation takes into account the statutory damages permitted under § 11 and was explained in the Notice sent to Class Members. It was prepared in consultation with Lead Plaintiffs' damages consultant, tracks the theory of damages asserted by Lead Plaintiffs and is necessarily fair, reasonable and adequate to the Class as a whole.

44.     In response to over 4,775 Notices, there have been no objections to date to the proposed Plan of Allocation.

## IV.     THE APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

45.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is also applying to the Court for an award of attorneys' fees and expenses.

46.     Specifically, Lead Counsel are applying for a fee of 19% of the Settlement Fund (*i.e.,* $52.25 million, plus interest at the same rate as that earned on the Settlement Fund), and for reimbursement of $2,243,198.34 in Lead Counsel's Litigation Expenses.

47.     In determining whether a requested award of attorneys' fees is fair and reasonable, district courts are guided by the factors first articulated by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974). As summarized in *Goldberger v. Integrated Res., Inc.,* 209 F.3d 43 (2d Cir. 2000), these factors include: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation…; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations. *Id.* at 50. Based on consideration of each of the foregoing factors as further discussed below, and on the additional legal authorities set forth in the accompanying Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Fee Memorandum") filed contemporaneously herewith, I respectfully submit that Lead Counsel's requested fee should be granted.

A.  <u>**Application For Attorneys' Fees**</u>

i.  **The Requested Fee Of 19% Of The Settlement Fund Is Fair And Reasonable**

48.     For the extensive efforts on behalf of the Class, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis. As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the Class in achieving the maximum recovery in the shortest amount of time required under the circumstances, is supported by public policy, has been recognized as appropriate by the United

States Supreme Court for cases of this nature and represents the overwhelming current trend in the Second Circuit and most other circuits.

49.     Based on the result achieved for the Class, the extent and quality of work performed, the risks of the litigation and the contingent nature of the representation, Lead Counsel submits that a 19% fee award is justified and should be approved. The sophisticated institutional investor Plaintiffs approve of Lead Counsel's fee request. *See* Ex. 2-3, Laufenberg, Rodriguez Decls, ¶¶ 9-10, 15-17 and Exs. 4-5, Schochenmaier and Bernstein Decls., ¶ 8-9.

50.     As discussed in the Fee Memorandum, a 19% fee award is fair and reasonable for attorneys' fees in common fund cases such as this, and is well within, or below, the range of the percentages typically awarded in securities class actions in this Circuit.

51.     I maintained daily control and monitoring of the work performed in this case. While I personally devoted substantial time to this case, other experienced attorneys at my firm undertook particular tasks appropriate to their levels of expertise, skill and experience, and more junior attorneys and paralegals worked on matters appropriate to their experience levels.

52.     To review the more than 5.8 million pages of documents that were produced during the course of discovery in this case, my firm hired discovery counsel. Each discovery counsel retained was an experienced attorney with, on average, 11 years as a barred attorney and each of them possessing extensive complex securities litigation experience.

53.     I respectfully submit that the work undertaken by Lead Counsel in prosecuting this case and arriving at this Settlement has been time-consuming and challenging. From the outset, Lead Counsel and Lead Plaintiffs appreciated the unique and significant risks inherent in this litigation arising from complex structured securities. As explained above, as of the filing of this Action, to our knowledge, no court had ever sustained similar securities law claims relating

to MBS; accepted the theory of damages; certified a class of similar MBS investors; or addressed many of the legal and factual issues presented in the Action. The risks of pursuing the case were also heightened by the absence of any parallel government action. Indeed, it was not until 2013-five years after this action was commenced – that the U.S. Justice Department first formed a task force to begin to investigate the role of investment banks in the sale of mortgage-backed securities. As a result, it was unclear at the time of the filing of the original complaint whether Lead Plaintiffs would overcome Defendants' anticipated motions to dismiss – much less obtain class certification, survive summary judgment, and prevail at trial and on any post-trial appeals. In fact, it was only Lead Counsel and Lead Plaintiffs, who, at the necessary deadline, came forward seeking to represent this class of investors. Moreover, many of the risks and novel issues present at the outset of the case continued to effect the litigation as it progressed up through the date that the settlement was reached.

54.     This Action settled only after Lead Counsel overcame multiple legal and factual challenges. To do so, Lead Counsel: conducted an extensive investigation (including reviewing numerous documents, articles and publications related to the Offerings and the mortgage industry generally, and reviewing the Offering Documents and other publicly-filed materials associated with the Offerings); filed three amended complaints; opposed several rounds of motions to dismiss; sought class certification on three separate occasions; briefed four separate Rule 23(f) petitions; argued appeals to the Second Circuit; sought the reinstatement of claims through intervention and reconsideration motions after changes in established Circuit precedent; analyzed a massive amount of evidence, including well over 5.8 million pages of documents produced by Defendants and third parties; took and defended many depositions; engaged and conferred with experts and consultants on issues such as damages, negative causation,

materiality, reunderwriting, due diligence and class certification; conducted a re-underwriting of thousands of loan files related to the Offerings; researched the applicable law with respect to the claims of Lead Plaintiffs and the Class, as well as Defendants' potential defenses and other litigation issues; and engaged in hard-fought settlement negotiations with experienced defense counsel for more than five months. The requested fee is justified given the substantial uncertainties and risks surrounding complex securities such as the securities at issue here.

55.     As described in Lead Counsel's Fee Memorandum, the requested fee is not only fair and reasonable under the percentage approach, but a lodestar cross-check confirms the reasonableness of the fee.

56.     Listed here in ¶¶ 56 and 69 is a schedule that summarizes Lead Counsel's lodestar, as well as the expenses incurred by category (the "Fee & Expense Schedules"). The Fee and Expense Schedules indicate the amount of time spent by each attorney and paraprofessional employed by Lead Counsel, and the lodestar calculations based on their current billing rates and titles. The Schedules and this Declaration were prepared from contemporaneous daily time records regularly prepared and maintained by the respective firms, which records are available at the request of the Court. The hourly rates for attorneys and paraprofessionals included in these schedules are the same as the current rates charged for their services in non-contingent matters and/or which have been accepted in other securities or shareholder litigation. For attorneys or paraprofessionals who are no longer employed by Lead Counsel, the lodestar calculations are based upon the billing rates for such person in his or her final year of employment.

| Cohen Milstein Sellers & Toll PLLC Lodestar | | | |
|---|---|---|---|
| Name | Hours | Current Rate | Current Rate Total |
| Partners | | | |
| Devore, Joshua, S. | 163.75 | $635 | $104,044.75 |

| | | | |
|---|---|---|---|
| Eisenkraft, Michael | 2,133.50 | $585 | $1,248,097.50 |
| Garbow, Avi | 20.25 | $550 | $11,137.50 |
| Gilden, Carol, V. | 153.50 | $795 | $122,032.50 |
| Laitman, Joel, P. | 3,128.25 | $800 | $2,502,600.00 |
| Lometti, Christopher | 1,739.00 | $800 | $1,391,200.00 |
| Mezzetti, Lisa, M. | 2.00 | $745 | $1,490.00 |
| Nugent, Victoria, S. | 0.25 | $655 | $163.75 |
| Reiser, Julie, G. | 79.00 | $665 | $52,535.00 |
| Richards, John, D. | 1.00 | $835 | $835.00 |
| Sommers, Daniel, S. | 29.00 | $795 | $23,055.00 |
| Toll, Steven, J. | 408.25 | $895 | $365,383.75 |
| **Total Partner Time** | **7,857.75** | | **$5,822,574.75** |
| | | | |
| **Of Counsel** | | | |
| Speirs, Richard | 820.25 | $780 | $639,795.00 |
| **Total Of Counsel Time** | **820.25** | | **$639,795.00** |
| | | | |
| **Associates** | | | |
| Bunch, Stephen, D. | 410.50 | $505 | $207,302.50 |
| Fontan, Genevieve | 315.50 | $415 | $130,932.50 |
| Kaplan, Matthew, B. | 94.00 | $495 | $46,530.00 |
| Rehns, Daniel | 1,204.50 | $535 | $644,407.50 |
| Rehns, Kenneth | 2,343.25 | $475 | $1,113,043.75 |
| **Total Associate Time** | **4,367.75** | | **$2,142,216.25** |
| | | | |
| **Discovery Counsel (years of experience)** | | | |
| Arluck, Samantha, J. (11 years) | 299.00 | $385 | $115,115.00 |
| Armand, Nelcida, M. (9 years) | 1,297.25 | $385 | $499,441.25 |
| Asharia, Akbar, A. (7 years) | 6.25 | $350 | $2,187.50 |
| Bates, John Alexander (10 years) | 20.00 | $430 | $8,600.00 |
| Butler, Jason, M. (15 years) | 31.50 | $415 | $13,072.50 |
| Butler, Michael (24 years) | 1,228.75 | $490 | $602,087.50 |
| Castro, Jeffrey (9 years) | 36.00 | $385 | $13,860.00 |
| Daniels, Mashariki (5 years) | 50.50 | $325 | $16,412.50 |
| Datta, Davee, L. (8 years) | 42.00 | $385 | $16,170.00 |
| deVolpi, Pietro (5 years) | 55.75 | $310 | $17,282.50 |
| Doebele, Daniel, J. (15 years) | 55.00 | $450 | $24,750.00 |
| George, Lisa (15 years) | 353.00 | $490 | $172,970.00 |
| Gill, Cynthia (22 years) | 840.50 | $480 | $403,440.00 |
| Gillane, Timothy (24 years) | 249.75 | $490 | $122,377.50 |
| Grant, Tracey, A. (14 years) | 354.00 | $415 | $146,910.00 |

| | | | |
|---|---|---|---|
| Handley, Wil, S. (10 years) | 675.75 | $385 | $260,163.75 |
| Hoffman, Jonathon, T. (7 years) | 783.50 | $375 | $293,812.50 |
| Holman, Lisa (17 years) | 1,159.75 | $420 | $487,095.00 |
| Ismayilov, Samir (22 years) | 504.50 | $325 | $163,962.50 |
| Jordan, Eunice (23 years) | 1,027.75 | $470 | $483,042.50 |
| Kemnitzer, Paul, A. (11 years) | 695.50 | $385 | $267,767.50 |
| Kwon, Jenny (6 years) | 788.00 | $405 | $319,140.00 |
| Larry, Jay (21 years) | 60.50 | $455 | $27,527.50 |
| Leopold, Brett (12 years) | 700.50 | $430 | $301,215.00 |
| Levasseur, Audwin (10 years) | 355.00 | $385 | $136,675.00 |
| Lucas, Romola (8 years) | 578.25 | $350 | $202,387.50 |
| Lustberg, Adam (9 years) | 236.50 | $335 | $79,227.50 |
| Malikzay, Sania (5 years) | 25.00 | $270 | $6,750.00 |
| Marino, William, L. (7 years) | 785.00 | $405 | $317,925.00 |
| Nagel, Marcus (18 years) | 1,614.00 | $325 | $524,550.00 |
| O'Connor, Sarah (9 years) | 357.00 | $385 | $137,445.00 |
| Ollinger, Bradley (7 years) | 233.50 | $255 | $59,542.50 |
| Prasad, Anjula (14 years) | 1,059.00 | $405 | $428,895.00 |
| Ratnayake, Prashantha, D. (8 years) | 278.25 | $385 | $107,126.25 |
| Robinson, Kimberly, V. (5 years) | 853.00 | $325 | $277,225.00 |
| Rossi, Paul, A. (15 years) | 1,672.75 | $415 | $694,191.25 |
| Saltzman, Jay (21 years) | 196.25 | $510 | $100,087.50 |
| Shah, Amee, A. (8 years) | 276.75 | $350 | $96,862.50 |
| Smith, Katherine (8 years) | 946.75 | $350 | $331,362.50 |
| Sosler, Evan (17 years) | 776.50 | $425 | $330,012.50 |
| Spiers, Brigitta (8 years) | 1,690.00 | $385 | $650,650.00 |
| Stone, Justin (14 years) | 1,314.70 | $385 | $506,159.50 |
| Trenery, Jennifer, S. (10 years) | 122.00 | $385 | $46,970.00 |
| Walter, Joan (26 years) | 35.50 | $650 | $23,075.00 |
| Wright, Tremaine (11 years) | 604.50 | $405 | $244,822.50 |
| **Total Discovery Counsel Time** | **25,325.20** | | **$10,080,344.50** |
| | | | |
| **Paralegals** | | | |
| Abetti, Jonathan | 12.25 | $250 | $3,062.50 |
| Armstrong, Laura | 113.75 | $225 | $25,593.75 |
| Brazzell, Ambre, C. | 130.50 | $230 | $30,015.00 |
| Buck, Ginger | 96.75 | $210 | $20,317.50 |
| Bucher, Brian | 2.25 | $210 | $472.50 |
| Clark, Cameron | 71.75 | $245 | $17,578.75 |
| Conway, Charles | 4.00 | $250 | $1,000.00 |
| Dunn, William | 9.25 | $220 | $2,035.00 |

| | | | |
|---|---|---|---|
| Fiore-Walker, Kari | 3.50 | $250 | $875.00 |
| Gaffney, Tyler | 212.00 | $245 | $51,940.00 |
| Hill, Jordan, V. | 373.75 | $250 | $93,437.50 |
| Hoffman, Sara | 14.50 | $225 | $3,262.50 |
| Kane, Chris | 2.50 | $210 | $525.00 |
| Kim, Elliot | 191.25 | $200 | $38,250.00 |
| Lee, JiHoon | 1,376.25 | $260 | $357,825.00 |
| Lu, John | 13.25 | $250 | $3,312.50 |
| McBride, Michael | 838.00 | $260 | $217,880.00 |
| McLaughlin, Victoria | 6.50 | $250 | $1,625.00 |
| Papy, Katherine | 674.00 | $200 | $134,800.00 |
| Petrova, Radka | 114.75 | $220 | $25,245.00 |
| Pollydore, Anwar | 299.75 | $225 | $67,443.75 |
| Ruck, Sonja, L. | 380.50 | $200 | $76,100.00 |
| Sutter, Daniel | 1.00 | $250 | $250.00 |
| Tucker, Rhys | 15.00 | $250 | $3,750.00 |
| Wentworth, Ariel | 2.00 | $245 | $490.00 |
| Williams, Asha | 314.25 | $250 | $78,562.50 |
| **Total Paralegal Time** | **5,273.25** | | **$1,255,648.75** |
| | | | |
| **Staff Attorney** | | | |
| Liu, William | 1,103.75 | $360 | $397,350.00 |
| **Total Staff Attorney Time** | **1,103.75** | | **$397,350.00** |
| | | | |
| **Law Clerks** | | | |
| Elga, Benjamin | 4.00 | $245 | $980.00 |
| Joshua Ripley | 33.50 | $245 | $8,207.50 |
| Kwan, Tung San | 67.75 | $235 | $15,921.25 |
| Lavie, Shay | 7.75 | $240 | $1,860.00 |
| Vance, Shayda | 33.50 | $240 | $8,040.00 |
| **Total Law Clerk Time** | **146.50** | | **$35,008.75** |
| | | | |
| **Investigators and Consultants** | | | |
| Bournazian, Thea | 36.75 | $420 | $15,435.00 |
| Clarke, Suzanne | 0.75 | $420 | $315.00 |
| Elstein, Jason | 39.50 | $400 | $15,800.00 |
| Forostoski, Matt | 40.00 | $400 | $16,000.00 |
| Lirman , Lana | 111.75 | $225 | $25,143.75 |
| O'Connor, Daniel | 189.00 | $300 | $56,700.00 |
| Sifton, John | 9.25 | $435 | $4,023.75 |
| **Total   Investigator   and   Consultant** | **427.00** | | **$133,417.50** |

| Time | | | |
|---|---|---|---|
| **TOTAL TIME AND LODESTAR** | **45,321.45** | | **$20,506,355.50** |

57.     Lead Counsel took this case on a contingency basis, committed their resources and then aggressively litigated it for more than six years without any compensation or guarantee of success. Based on the excellent result achieved for the Class, the quality of work performed, the risks of the Action and the contingent nature of the representation, Lead Counsel submits that the request for a 19% fee award is fair and reasonable and consistent with other similar cases in the Second Circuit.

### ii.   Standing And Expertise Of Lead Counsel

58.     The expertise and experience of counsel are other important factors in setting a fair fee. As demonstrated by Lead Counsel's firm resume, attached hereto as Exhibit 8, the attorneys at Cohen Milstein are experienced and skilled class action securities litigators and have a successful track record in securities cases throughout the country – including within this Circuit – and in MBS litigation, in particular.

### iii.   Standing And Caliber Of Opposing Counsel

59.     The quality of the work performed by counsel in attaining the Settlement should also be evaluated in light of the quality of opposing counsel. Lead Counsel was opposed in this case by very skilled and highly-respected counsel. The Defendants were represented by Simpson Thacher & Bartlett LLP, who spared no effort in the defense of its clients. In the face of this knowledgeable and formidable defense, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle on terms that are favorable to the Class.

### iv.   The Risks Of Litigation And The Need To Ensure The Availability Of Competent Counsel In High-Risk, Contingent Securities Cases

60.     As noted above, the Action was undertaken on a wholly contingent basis. From the outset, Lead Counsel understood that we were embarking on a complex and expensive litigation with no guarantee of compensation for the investment of time, money and effort that the case would require. At the outset of the case, Lead Counsel understood that very limited precedent existed for similar claims arising from the purchase of MBS. In addition, Lead Counsel understood that Defendants would raise myriad challenges based on the structured nature of the securities and that liability, damages and class certification would be heavily contested with no assurance of success.

61.     In undertaking the responsibility for prosecuting the Action, Lead Counsel assured that sufficient attorney resources were dedicated to the investigation of the Class claims against the Defendants and that sufficient funds were available to advance the expenses required to pursue and complete such complex litigation. As set forth below, Lead Counsel received no compensation and, in total, incurred $2,243,198.34 in expenses in prosecuting this Action for the benefit of the Class.

62.     Lead Counsel also bore the risk that no recovery would be achieved. As discussed herein, this case presented a number of risks and uncertainties which could have prevented any recovery whatsoever. Despite the vigorous and competent efforts of Lead Counsel, success in contingent-fee litigation, such as this, is never assured.

63.     Lead Counsel firmly believes that the commencement of a securities class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations.

64.     Courts have repeatedly recognized that it is in the public interest to have experienced and able counsel available to enforce the securities laws. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private plaintiffs − particularly institutional investors − take an active role in protecting the interests of securities purchasers. If this important public policy is to be carried out, plaintiffs' counsel should be adequately compensated, taking into account the risks undertaken in prosecuting securities class actions.

### v.   The Reaction of the Class to Date

65.     As set forth above, Notices have been disseminated to at least 4,775 potential Class Members and their nominees. Hughes Decl., ¶ 8. In addition, the Summary Notice was published in *The Wall Street Journal* and disseminated *PR Newswire*. *See id*. at ¶ 9.  Both the Notice and Summary Notice were published on a dedicated settlement website, www.HarborviewMBSSettlement.com and on Lead Counsel's website.  The Notice explains the Settlement and Lead Counsel's anticipated fee request. The deadline to object to Lead Counsel's fee request is October 14, 2014.  To date, no Class Member has objected.

66.     In addition, the Notice informed Class Members that the deadline to request exclusion from the class is September 30, 2014.  To date, only 11 requests for exclusion have been received by the Settlement Administrator.[6]   Hughes Decl., ¶ 12.   The overwhelming approval of the Class further supports Lead Counsel's request.

67.     In sum, given the complexity and magnitude of the Action; the responsibility undertaken by Lead Counsel; the difficulty of proof on liability and damages; the experience of Lead Counsel and defense counsel; and the contingent nature of Lead Counsel's agreement to

---

[6] Certain of the 11 requests sought exclusion on behalf of multiple entities or subsidiaries.  Exhibit C to the Hughes Declaration sets forth the full list of entities that have requested exclusion.

prosecute this Action, Lead Counsel respectfully submit that the requested attorneys' fees are reasonable and should be approved.

### vi.  Application for Reimbursement of Expenses

68.     Lead Counsel also seeks reimbursement of $2,243,198.34 in litigation expenses reasonably and actually incurred by Lead Counsel in connection with commencing and prosecuting the claims against the Defendants over the course of the last six years. The Notice apprised potential Class Members that Lead Counsel would be seeking reimbursement of expenses in an amount not to exceed $3 million. The amount of the unreimbursed litigation expenses actually requested is far less than what was stated in the Notice and, to date, no objection has been raised to Lead Counsel's request for reimbursement of litigation expenses.

69.     As detailed below, Lead Counsel has incurred a total of $2,243,198.34, in expenses in connection with the prosecution of this litigation. These expenses were all reasonably and necessarily incurred in connection with the prosecution of this Action on behalf of the Class.

**Cohen Milstein Sellers & Toll PLLC**

**EXPENSES**

| Expense Type | Cost |
|---|---|
| In-House Duplicating | $2,918.50 |
| Outside Duplicating | $31,280.08 |
| Duplication Audio/Video Tape | $11,228.40 |
| Long Distance Tele. (Internal) | $520.88 |
| Long Distance (Third Party) | $3,005.21 |
| Postage | $10.88 |
| Complaint Filing Fee | $869.00 |
| Local Courier | $1,536.38 |
| Air Courier | $8,104.09 |

| | |
|---|---|
| Process Server Fee | $30,568.57 |
| Other Court Fees | $1,357.23 |
| Court Reporter Fees | $22,357.90 |
| Transcripts | $465.78 |
| Lexis/Westlaw/Pacer | $89,267.05 |
| Other Computer Services | $2,659.37 |
| Press Release Publication | $1,050.00 |
| Appellate Printing | $19,958.37 |
| Non-Party Discovery Expense Reimbursement | $48,127.93 |
| Travel - Transportation | $12,886.57 |
| Travel - Hotel | $5,267.23 |
| Travel - Taxis, Tips | $1,077.67 |
| Travel - Meals | $1,593.81 |
| Travel - Long Dist. Telephone | $471.13 |
| Travel - Parking Charges | $210.30 |
| Local Transportation | $3,170.00 |
| Document Management | $453,285.26 |
| Expert Witness and Consultant Services | |
|     Due Diligence and Loan File Review | $767,030.27 |
|     Class Certification and Damages | $592,997.95 |
|     Investment Banking Underwriting | $53,522.60 |
|     Industry Experts and Consultants | $8,361.10 |
|     Loss Causation | $834.00 |
| Mediation Services | $50,775.00 |
| Other Publications | $214.30 |
| Secretarial Overtime | $5,119.10 |
| Administrative Overtime | $8.16 |
| Overtime Transportation | $3,249.81 |
| Overtime Meals | $442.12 |
| Supplies | $4,319.14 |
| Business Meals | $3,077.20 |
| **Total** | **$2,243,198.34** |

70.     From the beginning of the case, Lead Counsel was aware that it might not recover any of our expenses, and would not recover anything until the Litigation was partially or fully resolved. Lead Counsel also understood that, even assuming that the case was ultimately

successful, reimbursement for expenses would not compensate us for the lost use of the funds advanced to prosecute this Litigation. Thus, Lead Counsel was motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

71.     As set forth in the Expense Schedule of Cohen Milstein above, Lead Counsel has incurred a total of $2,243,198.34 in unreimbursed litigation expenses through the date of the accompanying motion in connection with the prosecution of this Litigation. The expenses are reflected on the books and records maintained by Lead Counsel. These books and records are prepared from expense vouchers, check records and other source materials, and are an accurate record of the expenses incurred.

72.     The litigation expenses for which Plaintiffs' Counsel seeks reimbursement were largely incurred for professional fees, including the costs of experts, consultants and document management. Plaintiffs' experts on damages and numerosity, economic loss causation, and re-underwriting provided substantial assistance to Lead Counsel in the prosecution and resolution of this Litigation. This included drafting reports and otherwise assisting Lead Counsel in preparing for three class certification motions, merits discovery and mediation.  Those reports provided crucial analysis in establishing potential damages and addressing issues such as loss causation.

73.     The other expenses for which Lead Counsel seek reimbursement are also the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, long distance telephone and facsimile charges, postage and delivery expenses, computerized research, overtime expenses, filing fees and photocopying.

74.     All of the litigation expenses incurred, which total $2,243,198.34, were necessary to the successful prosecution and resolution of the claims against the Defendants.  In view of the complex nature of the Litigation, the expenses incurred were reasonable and necessary to pursue the interests of the Class.  Accordingly, we respectfully submit that the litigation expenses incurred by Lead Counsel should be reimbursed in full.

## V.     CONCLUSION

75.     In view of the outstanding recovery for the Settlement Class, the very substantial risks of this litigation, the enormous efforts of Lead Counsel, the quality of work performed, the contingent nature of the fee, the complexity of the case and the standing and experience of Lead Counsel, Lead Counsel respectfully submits that the Settlement should be approved as fair, reasonable and adequate; that the Plan of Allocation should be approved as fair and reasonable; that a fee in the amount of 19% of the Settlement Fund, plus interest at the same rate as earned by the Settlement Fund, be awarded to Lead Counsel; and that Lead Counsel's litigation expenses be reimbursed in full.

I declare, under penalty of perjury, that the foregoing facts are true and correct.


Dated: September 30, 2014                          */s/ Joel P. Laitman*
                                                   Joel P. Laitman